UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

In re Archdiocese of Milwaukee,

        Debtor.                         Bankruptcy Case No. 11-20059-SVK

---

ARCHBISHOP JEROME E. LISTECKI, as
Trustee of the Archdiocese of Milwaukee Catholic    Adv. Proc. No. 11-2459-SVK
Cemetery Perpetual Care Trust,

        Plaintiff-Appellant,             Case No. 13-CV-179

    v.

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS,

        Defendant.

---

**APPELLANT'S INITIAL BRIEF**
**28 U.S.C. § 158**

---

Brady C. Williamson (WI Bar No. 1013896)
Linda S. Schmidt (WI Bar No. 1054943)
Jennifer L. Vandermeuse (WI Bar No. 1070979)
Godfrey & Kahn, S.C.
780 North Water Street
Milwaukee, WI 53202-3590
Phone: 414-273-3500
Email: lschmidt@gklaw.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION .............................................................................................. 1

STATEMENT OF BASIS FOR APPELLATE JURISDICTION .................................. 2

STATEMENT OF THE ISSUES............................................................................ 2

STANDARD OF REVIEW ................................................................................... 3

STATEMENT OF THE CASE............................................................................... 3

I.  COURSE OF PROCEEDINGS AND DISPOSITION BELOW........................ 5

    A.  The Adversary Proceeding......................................................... 5

    B.  The Amended Complaint........................................................... 6

    C.  The Committee's Motion for Partial Summary Judgment.................. 6

    D.  The Bankruptcy Court's Decision and Order ............................... 8

    E.  The Appeal ........................................................................... 8

II. STATEMENT OF RELEVANT AND UNDISPUTED FACTS. ..................... 9

    A.  Catholic Cemeteries in Catholic Belief and Practice ..................... 10

    B.  The Threatened Loss Of The Trust's Funds ................................ 12

ARGUMENT .................................................................................................. 13

I.  THE FIRST AMENDMENT'S FREE EXERCISE CLAUSE AND RECENT
    APPELLATE APPLICATION OF IT FRAME THIS APPEAL. .................... 13

II. RFRA APPLIES TO THE TURNOVER AND AVOIDANCE CLAIMS
    BROUGHT BY THE COMMITTEE, STANDING IN THE SHOES OF THE
    DEBTOR-IN-POSSESSION AND PURSUANT TO COURT ORDER.......... 17

    A.  The Committee Is "Government" Under RFRA Because, At A Minimum,
    It Is Acting Under Color of Law.................................................. 17

    B.  Regardless, RFRA Applies To Actions Between Private Parties ......... 24

i

III.    APPLICATION OF RFRA TO THE COMMITTEE'S TURNOVER AND
AVOIDANCE CLAIMS IS AN APPROPRIATE EXERCISE OF FEDERAL
LAW. ........................................................................................................ 28

    A.    At A Minimum, RFRA Precludes Any Order Invading The Trust's Funds
Under 11 U.S.C. §§ 542 And 550 .......................................................... 30

    B.    RFRA Also Precludes A Determination That The Trust's Funds Are
Property Of The Estate In The First Instance ....................................... 32

IV.    CONVERSION OF THE TRUST'S ASSETS WOULD SUBSTANTIALLY
BURDEN THE TRUSTEE AND THE TRUST'S FREE EXERCISE OF
RELIGION IN VIOLATION OF RFRA. ........................................................ 35

    A.    RFRA Precludes An Order Requiring Turnover Or Recovery Of The
Trust's Funds As An Impermissible Burden On The Free Exercise Of
Religion ................................................................................................... 35

    B.    The Bankruptcy Code And The Particular Provisions At Issue Do Not
Serve A Compelling Government Interest, Much Less By The Least
Restrictive Means .................................................................................... 39

V.    THE FREE EXERCISE CLAUSE ITSELF ALSO BARS THE COMMITTEE'S
TURNOVER CLAIMS ................................................................................... 42

    A.    The Code Provisions At Issue Are Not Facially Neutral And Generally
Applicable ................................................................................................ 45

    B.    The Laws Impose A Substantial Burden On The Trust And Its Trustee .............. 46

VI.    THIS COURT APPROPRIATELY GRANTED LEAVE TO APPEAL. ........................ 48

CONCLUSION .................................................................................................... 50

ADDENDUM 1:    RELEVANT STATUTES

ADDENDA 2-5:    UNREPORTED CASES

Case 2:13-cv-00179-RTR   Filed 05/15/13   Page 3 of 61   Document 16

# TABLE OF AUTHORITIES

## CASES

*Blixseth v. Brown*, 470 B.R. 562 (D. Mont. 2012)........................................................ 19

*Brownson v. Bogenschultz*, 966 F. Supp. 795 (E.D. Wis. 1997) .................................. 18

*Butner v. United States*, 440 U.S. 48 (1979)............................................... 32, 33, 34, 35

*Callahan v. Woods*, 736 F.2d 1269 (9th Cir. 1984) ...................................................... 42

*Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993)........................... 3, passim

*City of Boerne v. Flores*, 521 U.S. 507 (1997) .............................................. 3, passim

*Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752 (7th Cir. 2003) .................................................................................................... 44

*Cromelin v. United States*, 177 F.2d 275 (5th Cir. 1949) .............................................. 21

*EEOC v. Catholic Univ. of Am.*, 83 F.3d 455 (D.C. Cir. 1996)...................................... 25

*Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872 (1990)........ 25, passim

*Family Life Church v. City of Elgin*, 561 F. Supp. 2d 978 (N.D. Ill. 2008) ............... 44, 46, 47, 48

*Gay Rights Coalition of Georgetown Univ. Law Center v. Georgetown Univ.*, 536 A.2d 1 (D.C. 1987) ....................................................................................... 27

*General Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402 (6th Cir. 2010)................................................................................................... 27

*Gillette v. United States*, 401 U.S. 437 (1971).............................................................. 40

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) .................................................................................................................. 31

*Guinan v. Roman Catholic Archdiocese*, 42 F. Supp. 2d 849 (S.D. Ind. 1998) .......................... 25

*Hall v. American Nat'l Red Cross*, 86 F.3d 919 (9th Cir. 1996) ........................... 23, 24

*Hankins v. Lyght*, 441 F.3d 96 (2nd Cir. 2006) ..................................................... 27, 28

*Hanover Nat'l Bank v. Moyses*, 186 U.S. 181 (1902)......................................... 32, 33

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) .................................................................. 22

Case 2:13-cv-00179-RTR   Filed 05/15/13   Page 4 of 61   Document 16

*Hernandez v. Commissioner*, 490 U.S. 680 (1989) ....................................................... 40

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, ___ U.S. ___,
132 S. Ct. 694 (2012) ................................................................................ 14, passim

*In re Bloch*, 207 B.R. 944 (D. Colo. 1997) ........................................................... 45, 46

*In re Drexel Burnham Lambert Grp.*, 138 B.R. 717 (Bankr. S.D.N.Y.) ..................................... 21

*In re Dye*, 360 F.3d 744 (7th Cir. 2004) ............................................................... 3

*In re Gomes*, 219 B.R. 286 (Bankr. D. Or. 1998) ...................................................... 45, 46

*In re Meyer*, 467 B.R. 451 (Bankr. E.D. Wis. 2012) ................................................... 41

*In re Navarro*, 83 B.R. 348 (Bankr. E.D. Pa. 1988) .................................................. 41

*In re Newman*, 183 B.R. 239 (Bankr. D. Kan. 1995) .................................................. 41

*In re OBT Partners*, 218 B.R. 418 (N.D. Ill. 1998) .................................................. 49

*In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293 (7th Cir. 1995) ...................................... 49

*In re Roman Catholic Archbishop*, 335 B.R. 842 (Bankr. D. Or. 2005) ................................. 40

*In re Schmitz*, 436 B.R. 110 (Bankr. W.D. Wis. 2010) ................................................. 2

*In re SPM Mfg. Corp.*, 984 F.2d 1305 (1st Cir. 1993) ................................................ 19

*In re Turner*, 193 B.R. 548 (Bankr. N.D. Cal. 1996) ................................................. 42

*In re Vencor, Inc.*, 98 Fed. App'x 93 (3d Cir. 2004) ................................................. 2

*In re Walnut Equipment Leasing, Co.*, 2000 WL 1456951 (Bankr. E.D. Pa.
Sept. 22, 2000) (unreported) ........................................................................ 22, 23

*In re Young*, 141 F.3d 854 (8th Cir. 1998) .......................................................... 31, 34

*In re Young*, 82 F.3d 1407 (8th Cir. 1996) .......................................................... 40, 41, 42

*INS v. Chadha*, 462 U.S. 919 (1983) .................................................................. 31

*Jimmy Swaggart Ministries v. Board of Equalization*, 493 U.S. 378 (1990) ............................. 43

*Jones v. Infocure Corp.*, 310 F.3d 529 (7th Cir. 2002) .............................................. 49

*Lawrence v. Goldberg*, 573 F.3d 1265 (11th Cir. 2009) ............................................... 19

*Lonneker Farms, Inc. v. Klobucher*, 804 F.2d 1096 (9th Cir. 1986) .................................. 21

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) ........................................................... 18, 19, 22

*Lukaszewski v. Nazareth Hosp.*, 764 F. Supp. 57 (E.D. Pa. 1991) ...................................... 27

*Mack v. O'Leary*, 80 F.3d 1175 (7th Cir. 1996), *vacated on other grounds*, 522 U.S. 801 (1997) ..................................................................................................... 35, 36, 38

*McCarthy v. Fuller*, Nos. 12-2159, 12-2257, 12-2262, ___ F.3d ___, 2013 WL 1442293 (7th Cir. Apr. 10, 2013) ...................................................................... 3, passim

*McCulloch v. Maryland*, 17 U.S. 316 (1819) ...................................................................... 34

*McDaniel v. Paty*, 435 U.S. 618 (1978) ............................................................................... 26

*Morneau v. Connecticut*, 605 F. Supp. 2d 372  (D. Conn. 2009) ................................... 22

*O'Bryan v. Bureau of Prisons*, 349 F.3d 399 (7th Cir. 2003) ...................................... 31, 32

*Official Comm. of Equity Secured Holders v. Official Comm. of Unsecured Creditors (In re Adelphia Commc'ns Corp.)*, 544 F.3d 420 (2d Cir. 2008) ........................... 20

*Official Comm. of Unsecured Creditors of Renaissant Lafayette LLC v. Interforum Holding LLC*, No. 11-C-0172, 2013 WL 1163783 at *1 (E.D. Wis. Mar. 20, 2013) ..................................................................................................... 3

*Paul v. Watchtower Bible & Tract Soc'y*, 819 F.2d 875 (9th Cir. 1987) ...................................... 27

*Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis. 2d 302, 533 N.W.2d 780 (1995) .................... 14

*Sherbert v. Verner*, 374 U.S. 398 (1963) ...................................................................... 26, 35

*Spacone v. Burke (In re Truck-A-Way)*, 300 B.R. 31 (E.D. Cal. 2003) ........................................ 21

*State v. Miller*, 202 Wis. 2d 56, 549 N.W.2d 235 (1996) ............................................... 35

*Stern v. Marshall*, ___ U.S. ___, 131 S. Ct. 2594 (2011) ...................................................... 7

*Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826 (9th Cir. 1999) .............................. 18, 25

*Szeklinski v. Neary*, No. 07-222, 2007 WL 777539 (E.D. Wis. Mar. 12, 2007) (unreported) ..................................................................................................... 21

*Taunt v. Barman (In re Barman)*, 252 B.R. 403 (Bankr. E.D. Mich. 2000) ............................... 20

*Thomas v. Review Board*, 450 U.S. 707 (1981) ............................................................... 36

*Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036 (7th Cir. 2006) ........................... 24, 25, 28

*United States v. Ali*, 682 F.3d 705 (8th Cir. 2012) ........................................................... 38

v

*United States v. Lee*, 455 U.S. 252 (1982) .................................................................. 40

*Vision Church v. Vill. of Long Grove*, 468 F.3d 975 (7th Cir. 2006) .............................. 43, 44, 46

*Watson v. Jones*, 80 U.S. 679 (1871) ........................................................................... 37

*Wells v. United States*, 98 B.R. 806 (N.D. Ill. 1989) .................................................... 21

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) .................................................................. 26, 35, 40

*Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110
   (9th Cir. 2000) ............................................................................................................ 25

*Wyatt v. Cole*, 504 U.S. 158 (1992) .............................................................................. 22

*Youngman v. Bursztyn (In re Bursztyn)*, 366 B.R. 353 (Bankr. D.N.J. 2007) ............... 21

## STATUTES

11 U.S.C. § 503(b)(2) ...................................................................................................... 19

11 U.S.C. § 503(b)(3)(F) ................................................................................................. 19

11 U.S.C. § 541 ........................................................................................................... 31, 33

11 U.S.C. § 541(a)(1) ...................................................................................................... 33

11 U.S.C. § 541(b) ........................................................................................................... 33

11 U.S.C. § 542 ............................................................................................................... 30

11 U.S.C. § 542(a) ........................................................................................................... 31

11 U.S.C. § 544 ........................................................................................................... 45, 46

11 U.S.C. § 544(a)(3) ................................................................................................... 40, 41

11 U.S.C. § 544(b) ........................................................................................................... 32

11 U.S.C. § 544(b)(1) ...................................................................................................... 32

11 U.S.C. § 544(b)(2) ................................................................................................... 33, 45

11 U.S.C. § 545 ............................................................................................................... 31

11 U.S.C. § 547 ........................................................................................................... 30, 31

11 U.S.C. § 548 ................................................................................................. 30, 31, 45, 46

11 U.S.C. § 548(a)(2) ...................................................................................................... 45

11 U.S.C. § 548(d)(4) .................................................................................. 45

11 U.S.C. § 549 ................................................................................... 30, 31

11 U.S.C. § 550 ................................................................................... 30, 32

11 U.S.C. § 550(a) .................................................................................... 31

11 U.S.C. § 1102 ........................................................................................ 5

11 U.S.C. § 1103(a) ................................................................................... 19

11 U.S.C. § 1102(a)(1) ............................................................................... 19

11 U.S.C. § 1102(a)(4) ............................................................................... 19

11 U.S.C. § 1103(c)(3) ............................................................................... 21

28 U.S.C. § 157(c)(1) .................................................................................. 7

28 U.S.C. § 157(c)(2) .................................................................................. 7

28 U.S.C. § 158 ......................................................................................... 1

28 U.S.C. § 158(a)(3) .................................................................................. 2

28 U.S.C. § 586(a)(3)(E) ............................................................................. 19

28 U.S.C. § 1292(b) ................................................................................... 49

28 U.S.C. § 2571(1) ................................................................................... 21

42 U.S.C. 1983 ......................................................................................... 17

42 U.S.C. § 2000bb *et seq* ........................................................................... 1

42 U.S.C. § 2000bb(b) ................................................................................ 26

42 U.S.C. § 2000bb-1 ............................................................................... 1, 28

42 U.S.C. § 2000bb-1(a) ......................................................................... 17, 24, 34

42 U.S.C. § 2000bb-1(b) ......................................................................... passim

42 U.S.C. § 2000bb-1(c) ......................................................................... 17, 24

42 U.S.C. § 2000bb-2 ................................................................................. 22

42 U.S.C. § 2000bb-2(1) ......................................................................... 17, 23

Case 2:13-cv-00179-RTR   Filed 05/15/13   Page 8 of 61   Document 16

42 U.S.C. § 2000bb-2(4) ............................................................................ 36

42 U.S.C. § 2000bb-3(a) ...................................................................... 26, 34

42 U.S.C. § 2000cc(a)(1) ........................................................................... 43

42 U.S.C. § 2000cc-5(7)(A) ................................................................. 26, 36

Wis. Stat. § 157.11(9g) ............................................................................. 16

Wis. Stat. § 157.115(b)1.-2. (2011-12) .................................................... 13

Wis. Stat. § 440.91(1) ............................................................................... 16

Wis. Stat. § 440.91(6m) ............................................................................ 16

## OTHER AUTHORITIES

5 Collier on Bankruptcy (Alan N. Resnick & Henry J. Sommer eds. 16th ed. 2-13) ................. 33

Archdiocese of Milwaukee, *Guidelines for Christian Burial* (1979) ...................... 4, 11

Canon 1284, section 2 ........................................................................... 4, 16

H.R. Rep. No. 103-88 (1993) .............................................................. 28, 30

J. Morris Clark, *Guidelines for the Free Exercise Clause*, 83 Harv. L. Rev. 327 (1969) ................................................................................................. 42

*Religious Freedom Restoration Act of 1991: Hearings on H.R. 2797 Before the Subcomm. on Civil and Constitutional Rights of the H. Comm. on the Judiciary*, 102nd Cong. 361-69 (1992) ...................................................................... 27

Robert T. Kennedy, *Book V: The Temporal Goods of the Church*, in *New Commentary on the Code of Canon Law* 1495 (John Beal, et al. eds., 2000) ................ 15

## RULES

Fed. R. Bankr. P. 7056 ............................................................................ 8, 50

Fed. R. Bankr. P. 8003(a) ............................................................................ 49

Fed. R. Bankr. P. 8006 ................................................................................. 2

Fed. R. Bankr. P. 8013 ................................................................................. 3

Fed. R. Civ. P. 56 ...................................................................................... 50

Fed. R. Civ. P. 56(a) .................................................................................. 39

Fed. R. Civ. P. 56(b)(1)..................................................................................8

Fed. R. Civ. P. 56(c)(1)..................................................................................39

Fed. R. Civ. P. 56(f)(1)...................................................................................8

Fed. R. Crim. P. 41........................................................................................21

## REGULATIONS

Wis. Admin. Code CB § 5................................................................................16

Wis. Admin. Code CB § 5.02...........................................................................16

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 8, cl. 4.............................................................................30

U.S. Const. art. I, § 8, cl. 18...........................................................................34

Archbishop Jerome E. Listecki ("Archbishop Listecki" or the "Trustee"), as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust (the "Trust"), submits this appellate brief to reverse a decision of the U.S. Bankruptcy Court.

## INTRODUCTION

This is an appeal under 28 U.S.C. § 158. Even now more appropriate and significant than the day it was filed, the appeal challenges the Bankruptcy Court's decision and order granting the Official Committee of Unsecured Creditors (the "Committee") summary judgment on the federal constitutional and statutory claims asserted by the Milwaukee Catholic Cemetery Perpetual Care Trust, through its Trustee. The Court should reverse the Bankruptcy Court's decision and order and direct entry of judgment for the Trustee, based on the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq*. ("RFRA"), and the First Amendment's free exercise clause.

The practical dimensions of this dispute are easily stated. Foremost, the Trust is not in bankruptcy; the Archdiocese of Milwaukee (the "Archdiocese" or "Debtor") is. The Trust holds more than $50 million in trust for the perpetual care of more than 500,000 deceased, interred under the tenets of the Catholic faith beginning more than 150 years ago in 1857. The Committee wants that money for the Debtor's creditors, largely, though not exclusively, clerical abuse victims.

The dispute's legal and canonical dimensions are easily stated as well. The Trust and its Trustee, Archbishop Listecki, are governed not just by state and federal law but by canons of the Church that limit the Trust and the use of its funds. To enhance the free exercise clause, Congress has mandated, "[g]overnment may substantially burden a person's exercise of religion only if..." it furthers a compelling governmental interest using the least restrictive means possible. 42 U.S.C. § 2000bb-1. Accordingly, the Trustee contends that RFRA proscribes the Committee's reach. The Committee disagrees, maintaining that the Committee is not subject to

the statute and, even if it were, application of federal bankruptcy law to reach the Trust would not, by definition, impose a substantial burden on religious practices.

This appeal may well be practically dispositive of the Archdiocese's Chapter 11 proceeding. Indeed, the parties have effectively acknowledged just that by agreeing to stay the entire adversary proceeding pending the resolution of these issues by the Court. Of no less significance, the U.S. Court of Appeals in a decision last month emphasized the jurisdictional threshold that issues like these present. The Bankruptcy Court agreed, erroneously, with the Creditors' Committee in a decision entered on January 17, 2013. The Court should now reverse that decision. Because these issues are fundamental, they are inescapable.

## STATEMENT OF BASIS FOR APPELLATE JURISDICTION

The Court has jurisdiction over this appeal from an interlocutory order, pursuant to 28 U.S.C. § 158(a)(3).

## STATEMENT OF THE ISSUES[1]

1.      Does RFRA apply to the Committee's claims against the Trust because, in bringing those claims for the bankruptcy estate with the Bankruptcy Court's explicit authorization, the Committee either is acting under color of law or otherwise qualifies as "government" under RFRA?

2.      Alternatively, does RFRA apply to the Committee's claims against the Trust because the Act also is applicable to actions between private parties even absent government involvement?

---

[1] The Committee filed a "Counterstatement of Issues on Appeal" on April 29, 2013. Adv. Dkt. No. 98. Neither Bankruptcy Rule 8006, nor any other rule or order, permits the Committee, which did not file a cross-appeal, to submit its own statement of issues. *See* Fed. R. Bankr. P. 8006 (only permitting an appellee that is also a cross-appellant to file a designation of additional items to be included in the record); *see also In re Schmitz*, 436 B.R. 110, 112 (Bankr. W.D. Wis. 2010) (Bankruptcy Rule 8006 does not allow appellees to edit the statement of issues on appeal absent a cross-appeal), citing *In re Vencor, Inc.*, 98 Fed. App'x 93 (3d Cir. 2004). The Committee's effort to reshape the issues stated by the Trustee should be ignored.

3. Does application of RFRA to the Committee's claims, brought pursuant to the U.S. Bankruptcy Code, impermissibly modify, preempt or trump state law under *City of Boerne v. Flores*, 521 U.S. 507 (1997)?

4. Does the First Amendment bar the Committee's claims because, in part, a court order appropriating the Trust's funds for the benefit of creditors would preclude the Trust and its Trustee from exercising their ecclesiastical obligations to provide for the church's cemeteries, all sacred sites under canon law, and for the reasons underlying *McCarthy v. Fuller*, Nos. 12-2159, 12-2257, 12-2262, ___ F.3d ___, 2013 WL 1442293 (7th Cir. Apr. 10, 2013) (Posner, J.).

## STANDARD OF REVIEW

When a district court reviews a bankruptcy court order, the district court may affirm, modify, or reverse a bankruptcy court's judgment, order, or decree, or remand the case for further proceedings. Fed. R. Bankr. P. 8013; *Official Comm. of Unsecured Creditors of Renaissant Lafayette LLC v. Interforum Holding LLC*, No. 11-C-0172, 2013 WL 1163783 at *1 (E.D. Wis. Mar. 20, 2013) (Clevert, J.) (not yet reported). The district court applies a clearly erroneous standard to any findings of fact and reviews *de novo* any conclusions of law. Fed. R. Bankr. P. 8013; *In re Dye*, 360 F.3d 744, 747 (7th Cir. 2004). The Bankruptcy Court here did not make any findings of fact, however, and the facts submitted by the Trust stand undisputed. The questions presented on appeal, therefore, are pure issues of law and only *de novo* review applies.

## STATEMENT OF THE CASE

This statement of the case is unavoidably a statement of legal *and* religious principles. The unique crucible of federal bankruptcy law, designed to resolve all of the claims and disputes involving a debtor's property, remains subject to other federal statutes and the constitution. The Trust and its Trustee, like the Debtor, have religious responsibilities that, at the very least, are

3

co-equal with their civil responsibilities.  In RFRA, however, Congress has limited civil society's ability to burden a party's ecclesiastical responsibilities, including those involved in the establishment and maintenance of religious cemeteries:

> Not only is the Catholic cemetery a sacred place, a place of prayer, and a place reflecting our beliefs and traditions, it is also for the community a sign of the link among all faithful, living and dead.  It is recognition of that Faith which is shared by the dead buried there and the living who commit their deceased to this holy ground.

Archdiocese of Milwaukee, *Guidelines for Christian Burial* (1979).

To maintain that sacred place, the Debtor has long set aside funds—first, in separate accounts and, since 2008, in the Trust.  In canon law, these are restricted funds, "stable patrimony," set aside for a specific purpose.  Those who administer those funds, whether or not in a formal trust, must ensure that they "are in no way lost or damaged," Canon 1284, section 2, and trustees are subject to religious discipline for violating that command.

RFRA and the First Amendment, most would agree, do not permit a municipality to lightly seize a church or a religious cemetery by eminent domain; nor, as the U.S. Court of Appeals has just held, does the law permit a court to determine the religious status of a cleric. Those same legal principles should protect the Trust assets here, at the threshold, in the face of the Committee's claims.  It should do so because those claims, and the prospect of a court order invading the Trust, would impose an impermissible burden on the Trust, the Trustee and the Catholic faith as a whole.[2]

---

[2] The Bankruptcy Court correctly noted that its decision granting the Committee's summary judgment motion "does not necessarily mean that the Cemetery Trust assets will be available to pay the Debtor's creditors; the other Counts of the Complaint and the Committee's Counterclaim remain to be decided."  Adv. Dkt. No 79 (footnote omitted). Those other claims and counterclaims involve a litany of legal and factual issues, including the Archdiocese's practice of maintaining cemetery funds in separate accounts, even before the creation of the Trust.

4

## I.    COURSE OF PROCEEDINGS AND DISPOSITION BELOW.

The Archdiocese filed its petition on January 4, 2011.  The Committee was appointed

20 days later pursuant to 11 U.S.C. § 1102.  Bankr. Dkt. No. 86.[3]  The retention of the

Committee's counsel, co-counsel, special counsel, financial advisor and consultants soon

followed, *see e.g.*, Bankr. Dkt. No. 154; so did discovery and a series of other requests and

objections by the Committee.

### A.    The Adversary Proceeding.

The Trust, on behalf of itself and its beneficiaries, originally filed this adversary

proceeding on June 28, 2011, seeking a declaration that neither it nor the funds it holds are

property of the estate.  Bankr. Dkt. No. 307; Adv. Dkt. No. 1.  The Bankruptcy Court approved a

stipulation giving the Committee standing to respond to the complaint on behalf of the Debtor's

estate, Adv. Dkt. Nos. 11-12, and the Committee filed an answer, affirmative defenses and

multiple avoidance and turnover counterclaims under the Bankruptcy Code.  *Id.*, Nos. 13-14.

The Trust answered the Committee's counterclaims, denying any right to relief on them.  *Id.*,

No. 24.

On March 8, 2012, the Committee filed an application to employ a "special constitutional

and federal statutory law counsel," reflecting the significance of the issues presented here.

Bankr. Dkt. No. 667.  The Debtor objected on the ground that the Committee and its proposed

special counsel had failed to fully disclose counsel's relationships with sexual assault claimants

against the Debtor and with those claimants' counsel.  *Id.*, No. 679.  The Court ultimately

granted the application on April 20, 2012, imposing several limitations.  *Id.*, Nos. 703-706, 732;

*see also id.*, No. 711 (Tr. of Hr'g on Committee's Appl.).

---

[3] Citations to the main bankruptcy case will be designated as "Bankr. Dkt.," while citations to the adversary
proceeding will be designated as "Adv. Dkt."

### B.    The Amended Complaint.

An amended complaint filed on January 13, 2012 substituted the Trustee, Archbishop Listecki, as plaintiff and added claims.  Adv. Dkt. No. 34 ("Am. Compl.").  With his third claim, the Trustee has alleged that both the First Amendment and RFRA preclude any determination that the Trust or its funds are property of the estate.  The Trustee has alleged, among other things, that "[u]sing the Perpetual Care Funds to pay the Debtor's creditors would substantially burden a sincere religious exercise."  *Id*., ¶ 75.  "In short, the care and maintenance of Catholic cemeteries, cemetery property, and the remains of those interred therein is a fundamental exercise of the Catholic faith, which cannot be substantially burdened by even a generally applicable, neutral government law."  *Id*., ¶ 86.

There followed a second stipulation, granting the Committee derivative standing to litigate avoidance and turnover claims against the Trustee; an amended response to the amended complaint, including additional counterclaims (together, "the Avoidance and Turnover Claims"); and the Trustee's response to the Committee's reasserted counterclaims.  Adv. Dkt. Nos. 37-39, 48, 50, 56.  Like the first stipulation, the Committee agreed in the second stipulation that "if not for the Court's order approving this Stipulation, the Committee would not have had standing to bring [*sic*] because those Avoidance and Turnover Claims *belong to the Debtor's estate*."  *Id*., No. 37, ¶ 3 (emphasis added); *see also id*., No. 11, ¶ 3 (same).

### C.    The Committee's Motion for Partial Summary Judgment.

On May 25, 2012, the Committee filed a motion for partial summary judgment, limited to Count III of the Amended Complaint and several of the Committee's related affirmative defenses.  Adv. Dkt. No. 57 (requesting adjudication on the Committee's seventh, twentieth and twenty-second affirmative defenses in addition to the Trustee's First Amendment and RFRA claims).  The Committee filed with its motion a memorandum and a single affidavit, submitting

only a copy of the Trust Agreement Creating the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust (the "Trust Agreement"). *Id.*, Nos. 57-1 ("Comm.'s Summ. J. Br."), 57-2 ("Trust Agr."). The Committee did not submit any other factual evidence or file a statement of proposed material facts.

The Trustee, the Committee and the Debtor subsequently stipulated to the Bankruptcy Court's status for the resolution of the claims raised in the adversary proceeding. *Id.*, No. 61 ("Stip. re Bankr. Ct. Status"). With respect to Count III of the Amended Complaint and the Committee's related affirmative defenses, the parties expressly agreed that they "***do not consent*** to the Bankruptcy Court hearing and determining these [non-core] claims and affirmative defenses. The parties and the Debtor agree [only] that the Bankruptcy Court ... may submit proposed findings of fact and conclusions of law to the district court in accordance with the provisions of 28 U.S.C. § 157(c)(1)." *Id.* ¶ 2. The Bankruptcy Court entered an order approving the stipulation on June 13, 2012. Adv. Dkt. No. 64.[4]

The Trustee's response to the Committee's motion followed on July 9, 2012. *Id.*, No. 69 ("Trustee's Summ. J. Resp."). With its response, the Trustee submitted the Declaration of Archbishop Listecki—attesting to, among other things, the importance of cemeteries and their care within the Catholic faith, his ecclesiastical responsibilities, and the substantial burdens that any transfer of the Trust's funds to the Debtor's estate would impose on the Trustee, the Trust and the Debtor. *Id.* The Trustee also supported the response with a statement of proposed

---

[4] In its decision, the Bankruptcy Court suggested that the Committee need not have filed a statement of proposed undisputed material facts because the Bankruptcy Court's Local Rules governing summary judgment motions do not require such statements. Adv. Dkt. No. 79 ("Bankr. Ct. Dec."), 3 n.2. However, the issues involved are all non-core, and the parties declined to consent to a final determination of those issues by the Bankruptcy Court. Accordingly, the Committee's summary judgment motion fell under the authority of this Court—it still does—and the specific rules governing motions before it. *See* 28 U.S.C. § 157(c)(2) (absent the parties' consent, the Bankruptcy Court may not determine non-core matters); *see also Stern v. Marshall*, ___ U.S. ___, 131 S. Ct. 2594, 2609 (2011) (bankruptcy court lacks authority under Article III to enter final judgment in proceedings that do not arise under Title 11).

material and undisputed facts, pursuant to Local Rule 56(b)(1). Adv. Dkt. No. 69-1. The Trustee requested that the Bankruptcy Court not merely deny the Committee's motion but grant summary judgment in the Trustee's favor pursuant to Fed. R. Bankr. P. 7056 and Fed. R. Civ. P. 56(f)(1). *See, e.g.*, Trustee's Sum. J. Resp., 9.

The Committee filed its reply on November 21, 2012. Adv. Dkt. No. 75 ("Comm.'s Summ. J. Reply"). The reply followed an extensive, but ultimately failed, attempt to reach a mediated resolution of the bankruptcy proceeding itself. *See id.*, No. 73 at 1 (Bankruptcy Court observing that the parties had reached an impasse during mediation).

### D. **The Bankruptcy Court's Decision and Order**.

The Committee's summary judgment motion was heard and decided from the bench on January 11, 2013. Adv. Dkt. No. 78. At the conclusion of the hearing, the Bankruptcy Court suggested that its decision would constitute its proposed findings of fact and conclusions of law. *Id.*, No. 81 ("Summ. J. Hr'g Tr."), 77:11-77:13. Instead, on January 17, the Bankruptcy Court issued a Decision on Motion for Summary Judgment and related Order Granting Motion for Summary Judgment, granting the Committee's motion in full. *Id.*, Nos. 79 ("Bankr. Ct. Dec."), 80 ("Bankr. Ct. Order"). The Bankruptcy Court did not designate any proposed findings of fact or conclusions of law with its Decision and Order, nor did it separately issue findings or conclusions. *See generally*, *id*.

### E. **The Appeal**.

On January 31, 2013, the Trustee timely filed a Motion for Leave to Appeal or to Withdraw the Reference or, Alternatively, Trustee's Objections to Bankruptcy Court's Proposed Findings of Fact and Conclusions of Law. Dkt. No. 1; *see also* Adv. Dkt. Nos. 82 (Motion), 83 (Notice of Appeal). The Committee filed its response on February 14, 2013, and the Trustee filed a reply. Dkt. No. 1-1, 74-95; *see also* Adv. Dkt. Nos. 84-85. This Court granted leave to

8

appeal by a Decision and Order dated April 1, 2013. Dkt. No. 2; *see also* Adv. Dkt. No. 89. It suggested the parties could, in their appellate briefs, revisit the question of whether an appeal is the appropriate procedural remedy rather than, alternatively, a withdrawal of the reference or treating the Bankruptcy Court's decision as proposed findings of fact and conclusions of law, subject to review. *Id.,* 2.

On May 3, 2013, with the consent of the parties, the Bankruptcy Court stayed the entire adversary proceeding until 30 days after this Court issues its decision. *See* Adv. Dkt. No. 104.[5]

## II. STATEMENT OF RELEVANT AND UNDISPUTED FACTS.

The Archdiocese of Milwaukee was established on November 28, 1843 and created an archbishopric almost 32 years later. Adv. Dkt. No. 69-2 (Declaration of Archbishop Listecki ("Archbp. Listecki Decl."), ¶ 10. The Archdiocese is both a Wisconsin non-stock corporation and a public juridic person under Codex Iuris Canonici or the Code of Canon Law (the "Code"). *Id.,* ¶ 22; *see also* Am. Compl. ¶ 1; Adv. Dkt. No. 50 (First Am. Answer to Am. Compl.) ¶ 1. The Archdiocese's mission is to serve Catholic parishes, schools and institutions so that they, too, may effectively serve people in Southeastern Wisconsin and the broader community. Archbp. Listecki Decl. ¶ 10. The Archbishop is Jerome E. Listecki, successor to former Archbishop, now Cardinal, Timothy M. Dolan. *Id.* ¶¶ 1, 22.

The Archdiocese has operated and maintained Catholic cemeteries and mausoleums since as early as 1857 (collectively, the "Milwaukee Catholic Cemeteries"). *Id.* ¶ 11. Those cemeteries consist of Catholic burial facilities within the geographic boundaries of the Archdiocese, including individual burial plots, crypts, niches, and property dedicated to future use as burial facilities. The Milwaukee Catholic Cemeteries encompass approximately 1,000

---

[5] This entry was docketed after the Trustee filed his Designation of Items to Include in the Record. The Trustee requests this Court to take judicial notice of the docket entry.

acres of land in which more than 500,000 individuals are interred. An estimated 3,000 burials take place each year. *Id*. ¶ 12.

In 2007, the Trust was formed under Wisconsin law by then Archbishop Dolan. *Id*. ¶ 22; *see also* Trust Agr. 1. The funds that comprise the Trust's principal took nearly a century to accumulate and include approximately $55 million that had been held, separately, for the perpetual care of the Milwaukee Catholic Cemeteries even prior to being transferred to the Trust in or around March 2008 (collectively, with any later earned or received Trust funds, the "Perpetual Care Funds"). Archbp. Listecki Decl. ¶¶ 29, 42. The Archdiocese receives quarterly distributions from the Trust to cover the costs for providing for the perpetual care of the Milwaukee Catholic Cemeteries. *Id*. ¶ 29.

### A. Catholic Cemeteries in Catholic Belief and Practice.

Under Church law, Catholic cemeteries occupy land blessed and consecrated for the specific use of Christian burial. *Id*. ¶ 9. Church law includes canon law, issued or authorized by the Pope, the Church's supreme legislator. It is the universal law of the Church, applicable to Catholics world-wide. *Id*. ¶¶ 4-6.[6] Church law also includes particular law—that is, law governing the specific territorial area for which it was promulgated. *Id*. ¶ 5.

When the Archdiocese established its first cemeteries in the mid-1800s, Church law in the United States forbade priests from providing funeral services for Catholics buried in non-Catholic cemeteries. *Id*. ¶ 13. Although this prohibition was eased in later years, allowing Catholic funerals for those buried in non-Catholic cemeteries, the Church continued to emphasize the sanctity of Catholic burial sites and the importance of Church-owned cemeteries. *Id*. ¶ 14. It also required, among other things, that Catholic cemeteries be maintained in a

---

[6] The Greek word "canon" (κανών) means "rule, standard or measure." *See* Archbp. Listecki Decl. ¶ 4.

manner befitting their sacred purpose with money set aside to provide the necessary maintenance and care. *Id.* ¶ 15.

These expectations and requirements are reflected in the universal law of the Church, first codified in 1917 as the Code of Canon Law and in the particular law of the Archdiocese. *Id.* ¶¶ 4, 20. The placement of the canons governing cemeteries in the original 1917 Code and the successor 1983 Code emphasizes the belief that Catholic cemeteries are sacred places, not mere property. *Id.* ¶¶ 16, 20. As succinctly expressed in the Archdiocese's 1979 *Guidelines for Christian Burial*": "Not only is the Catholic cemetery a sacred place, a place of prayer, and a place reflecting our beliefs and traditions, it is also for the community a sign of the link among all the faithful, living and dead." *Id.* ¶ 17.

For the Church, Catholic cemeteries reflect the Catholic belief in the resurrection of Jesus and the community's commitment to the corporal work of mercy of burying the dead. *Id.* ¶ 18. Resurrection of the dead, of course, always has been an essential element of the Christian faith, beginning with Jesus' own resurrection. *Id.* ¶ 2(a)-(b). For Catholics, moreover, the belief in resurrection is a belief in the ultimate resurrection of one's *own* body. *Id.* ¶ 2(c). According to this belief, the soul separates from the physical body at death to meet God, while awaiting reunion with its body, transformed and resurrected through the power of Jesus' resurrection, on the last day. *Id.* ¶ 2(d)-(g).

The sacred nature of Catholic cemeteries—and compliance with the Church's historical and religious traditions and mandates requiring their perpetual care—are understood as a fundamental exercise of this core belief. *See, e.g., id.* ¶¶ 3, 9, 15, 21, 31. Theologically, the deceased must be treated with respect and charity in the Catholic faith with the hope of resurrection. *Id.* ¶ 31.

**B.      The Threatened Loss Of The Trust's Funds**.

Although Archbishop Listecki is the administrator of both the Trust and the Archdiocese, the Trust is separate and distinct from the Archdiocese in civil and in canon law.  *Id.* ¶¶ 22-24. Under the Code, ownership of the Trust funds rests in the Trust, not in the Archdiocese or the Archbishop.  *Id.* ¶ 26.  By administering and holding funds for the ongoing care of the Milwaukee Catholic Cemeteries, the Trust and Trustee assume canonical and moral responsibility for that perpetual care.  *Id.* ¶ 34.

Similarly, the Code requires that the Trust's funds be used for the Trust's designated purposes.  *Id.* ¶ 35.  If funds are alienated from the Trust without the required canonical approval, the Archbishop as Trustee may well face discipline and a religious penalty from the Church.  *See id.* ¶¶ 25, 39.  Depending on the value of the property at risk, canonical norms require consultation or consent from Church authorities.  They may also require approval from the Vatican.  *Id.* ¶ 25.

Archbishop Listecki, as Archbishop and Trustee, adheres to the belief in the resurrection of the body and that belief's exercise through, among other things, the perpetual care of the Milwaukee Catholic Cemeteries.  *See, e.g., id.* ¶¶ 21, 40.  If the Trust is legally compelled to cede all or part of the funds to the estate, there will be no funds or, at best, insufficient funds for that perpetual care.  *Id.* ¶ 30.  As a result, neither the Debtor nor the Trust and its Trustee will be able to fulfill their canonical and moral obligations to provide the appropriate care for these sacred sites—consistent with Catholic doctrine and canon law—or assure the requisite permanence, reverence and respect for those buried there.  *Id.* ¶¶ 18, 40-41, 43.[7]

---

[7] In the event that neither the Trust and its Trustee nor the Debtor, are able to provide appropriate care for the Milwaukee Catholic Cemeteries because the Trust ordered to turn over the Trust's assets, the municipalities in which those cemeteries are located will ultimately be responsible for the cemeteries' management and care.  *See,*

*(continued ...)*

**ARGUMENT**

This Court will address the constitutional and statutory issues presented in this appeal *de novo*. While the Bankruptcy Court's decision does not warrant judicial deference, it does warrant respect and discussion. The Bankruptcy Court reviewed the relatively meager case law, some of it conflicting and only *dicta*, and pressed counsel at an extended oral argument. The Bankruptcy Court's conclusions were wrong, but they were so for several reasons—including perhaps, in part, because it did not have the benefit of the U.S. Court of Appeals' latest decision involving the federal courts and religion, *McCarthy v. Fuller*, Nos. 12-2157, 12-2257, 12-2262, ___ F.3d ___, 2013 WL 1442293 (7th Cir. Apr. 10, 2013) (not yet reported), which bears on the weight to be given the undisputed facts submitted by the Trust here.

A religious diocese indisputably may file a Chapter 11 proceeding—more than seven have—but the very nature of a church and religious doctrine distinguish it from an "ordinary" Chapter 11. The specific application of RFRA and the First Amendment also limit any court's (or creditors committee's) legal and equitable reach. The Bankruptcy Court decision should be vacated because it exceeded those limits.

**I.    THE FIRST AMENDMENT'S FREE EXERCISE CLAUSE AND RECENT APPELLATE APPLICATION OF IT FRAME THIS APPEAL.**

The Trust and the Trustee have asserted the federal statutory protection of RFRA and the free-standing protection of the free exercise clause of the First Amendment. The Bankruptcy

---

*(... continued)*
*e.g.*, Wis. Stat. § 157.115(b)1.-2. (2011-12) (the municipality may take control of a cemetery and its management and care if the cemetery authority fails to care for the cemetery for a period of one year and must take over if there is a failure of care for a period of five or more years). The First Amendment problems inherent in the use of taxpayer funds, directly or indirectly, to support a religious cemetery are obvious. At least one municipality already has suggested that it may not have sufficient funds to provide such management and care, calling on the Attorney General to ensure that the Trust's funds are preserved for the perpetual care of the Archdiocese's cemeteries. *See* Michael Meidenbauer, *Mequon Council Calls for Attorney General to Intervene in Archdiocese Bankruptcy*, JSOnline, April 10, 2013, http://m.jsonline.com/more/news/ozwash/202331931.htm.

Case 2:13-cv-00179-RTR   Filed 05/15/13   Page 23 of 61   Document 16

Court Decision denied both. RFRA itself reflects an explicit Congressional affirmation of the need to give religion expanded protection—a theme reinforced in the last year by the Supreme Court and, last month, by the U.S. Court of Appeals. Whether those decisions literally control this appeal, they surely frame the discussion and the determination.

In *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, ___ U.S. ___, 132 S. Ct. 694, 702-07 (2012), the Supreme Court reaffirmed the long-standing commitment to keep fundamentally religious doctrinal issues beyond the purview of the judiciary. The First Amendment bars a secular court "from interfering with the decision of a religious group to fire one of its ministers," *Hosanna-Tabor*, 132 S. Ct. at 702, or from determining whether an individual is a nun or a member of a religious order, *McCarthy v. Fuller*, 2013 WL 1442293, at *6, or from determining the requirements for serving as a Catholic priest because doing so "would require interpretation of church canons and internal church policies and practices," *Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis. 2d 302, 533 N.W.2d 780, 790 (1995). So, too, does the First Amendment with RFRA prohibit a court from evaluating the Debtor's decision to designate—or the Trust's maintenance and utilization of—funds for the perpetual care of the Milwaukee Catholic Cemeteries.

The Trust has asserted a stand-alone constitutional defense, separate from its statutory reliance on RFRA. In response, the Bankruptcy Court held that the relevant Bankruptcy Code provisions are neutral and generally applicable and, therefore, their application to the Trust does not violate the free exercise clause of the First Amendment. This holding, based on an incomplete analysis, should also be reversed. At the threshold, however, stands an equally fundamental barrier.

Like other faith communities, the Catholic Church has long considered the cemetery sacred space. Just as secular courts could not insert themselves into the use of a church sanctuary, so, too, courts cannot regulate the care of the faithful departed placed in a sacred burial ground. Archbishop Listecki's declaration succinctly summarizes the doctrine:

> The expectation that Catholic cemeteries will be properly maintained in perpetuity is grounded in the sacred character of the cemetery. The designation and use of funds for the perpetual care of Catholic cemeteries is necessary to and inseparable from the Church's (including the Trustee's, trust's and Archdiocese's) exercise of its belief in the sacredness of Catholic cemeteries and reverence for the dead.

Archbp. Listecki Decl. ¶ 21.

By designating funds for the care of cemetery property, the Archdiocese honored its theological responsibility to provide perpetual care. Regardless of the accounting mechanism or the civil law construct, it is clear that funds entrusted for a designated purpose may only be used for that purpose.

> Stable patrimony is all property, real or personal, movable or immovable, tangible or intangible, that, either of its nature or by explicit designation, is destined to remain in the possession of its owned for a long or indefinite period of time to afford financial security for the future. It is the opposite of free or liquid capital which is intended to be used to meet operating expenses or otherwise disposed of within a reasonably short period of time (within one or, at most, two years).[8]

Moreover, once the Church designates property for a sacred purpose, it also legislates how it is used and administered. Canon law establishes expectations regarding the administration of funds and property by setting forth explicit norms. One is that those who administer property are to

---

[8] Robert T. Kennedy, *Book V: The Temporal Goods of the Church*, in *New Commentary on the Code of Canon Law* 1495 (John Beal, et al. eds., 2000).

"exercise vigilance so that the goods entrusted to their care are in no way lost or damaged."
c. 1284, § 2, 1.

What's more, *Hosanna-Tabor* and *McCarthy* find a pre-existing and practical recognition in Wisconsin law that allows churches to define cemetery property and protect it. Unlike secular cemeteries, which are required to deposit their perpetual care funds in trust, *see* Wis. Stat. § 157.11(9g), churches are exempt from these requirements and allowed to establish their own mechanisms, consistent with their beliefs, to safeguard funds for the perpetual care of their cemeteries. *Id.* at (11) (subsection (9g) does not apply to cemetery authorities not required to be licensed under section 440.91(1)); *see also* Wis. Stat. § 440.91(6m) (a cemetery authority organized by a religious society is not required to be licensed under subsection (1)). Therefore, the Committee's claims would not only defease federal protections. Those claims also perversely stand the Wisconsin religious cemetery exemptions on end by depriving religious cemeteries of perpetual care funds, due to their owners' very reliance on statutory provisions meant to protect churches from inappropriate governmental interference. *See also*, *e.g.*, Wis. Admin. Code CB § 5[9].

As Archbishop Listecki's declaration establishes, "if the funds which comprise the Trust are deemed property of the Debtor's estate, the Archdiocese, the Trust and I, as Archbishop and Trustee, will be unable [to] exercise our respective obligations to provide for the care required for the sacred grave sites under canon law, as well as the Catholic Church's historical and religious traditions and mandates." This Court should not permit the Committee to indirectly unwind Wisconsin's legislative recognition of the policy enunciated in *Hosanna-Tabor* and

---

[9] Wis. Stat. § 157.11(9g) and Wis. Admin. Code Chapter CB Ch. 5 govern the mandatory deposit and maintenance of cemetery care funds. Wis. Admin. Code CB 5 addresses the investment of "care funds." CB § 5.02 recites its intent is to "maintain intact the principal amount in care funds in order to generate sufficient income to maintain cemeteries in perpetuity and to ensure that cemeteries in Wisconsin do not become a financial burden to taxpayers."

*McCarthy*, nor should it otherwise revisit the ecclesiastical decisions made with respect to the designation of perpetual care funds for the preservation of these sacred grounds.

## II.  RFRA APPLIES TO THE TURNOVER AND AVOIDANCE CLAIMS BROUGHT BY THE COMMITTEE, STANDING IN THE SHOES OF THE DEBTOR-IN-POSSESSION AND PURSUANT TO COURT ORDER.

Under RFRA, "[g]overnment" may not "substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless it can demonstrate that the burden furthers a compelling governmental interest using the least restrictive means. 42 U.S.C. § 2000bb-1(a), (b) (2012).  It is undisputed, here, that any attempt to invade the Trust would be a substantial burden on the Catholic religion.  Archbp. Listecki Decl. ¶ 43.  Anyone whose religious exercise has been burdened in violation of RFRA "may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." § 2000bb-1(c) (emphasis added).

The Bankruptcy Court determined that these provisions permit RFRA to be asserted only as a defense in actions directly involving the government.  It further determined that the Committee is a "private" party, not "government" as defined by RFRA, and thus RFRA could not apply to the Committee's claims.  Bankr. Ct. Dec. 3-9.  The Bankruptcy Court was mistaken on both accounts, and its decision should be reversed.

### A.  The Committee Is "Government" Under RFRA Because, At A Minimum, It Is Acting Under Color of Law.

Under RFRA's definitional provisions, a party is "government" if it is "a branch, department, agency, instrumentality, and official (*or other person acting under color of law*) of the United States."  42 U.S.C. § 2000bb-2(1) (emphasis added).  The state action required to trigger RFRA because a person is acting under "color of law" is subject to the same standard used in the Civil Rights Act, 42 U.S.C. § 1983.  *Brownson v. Bogenschultz*, 966 F. Supp. 795,

797 (E.D. Wis. 1997). Accordingly, a party is "government" because it is "acting under color of law" when its conduct may be "fairly attributable" to the state. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (interpreting "color of law" under § 1983).

Conduct is fairly attributable to the state where there is "the exercise of some right or privilege created by the [s]tate" and the party charged with the deprivation "may fairly be said to be a state actor." *Id.* Here, the Committee asserts claims under several provisions of the Bankruptcy Code, purely a product of Congressional action, seeking to claim the Trust's funds for the estate. *See Lugar*, 457 U.S. at 941 (procedures for obtaining prejudgment attachment are the "product of state action"). The first element is, thus, unmistakably met. *Cf.* Bankr. Ct. Dec., 3-9 (not addressing the first element of the "color of law" analysis established by *Lugar*).

The second element is also satisfied here. A party may be a state actor "because he is a ... [government] official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable" to the government. 457 U.S. at 937. Action by a private party pursuant to statute, without "something more," is arguably insufficient to justify characterizing a party a "state actor." *Id.* at 939. But the Committee, and the pursuit of its claims in this case, go well-beyond just "something more"—there is, in fact, a panoply of federally defined and applied power at work.

As the Bankruptcy Court recognized, a number of different tests determine whether a party's conduct has that "something more," making it chargeable to the government, including the "public function," "state compulsion," "nexus," and "joint action" tests. Bankr. Ct. Dec. 5, citing *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835-36 (9th Cir. 1999). The Supreme Court has questioned whether these different "tests" are, in fact, "simply different ways

18

of characterizing the necessarily fact-bound inquiry that confronts" courts in these situations. *Lugar*, 457 U.S. at 939.

Regardless of how anyone characterizes the inquiry, that "something more" is unmistakably present here:  The Committee would not exist but for the affirmative operation of federal law and the exercise of discretion by federal employees and judicial officials—to create the Committee and, once created, to grant it standing to bring this very action.

The Committee is appointed by the U.S. Trustee, for example, pursuant to statutory mandate and subject to court approval.  11 U.S.C. § 1102(a)(1), (4); *see also Blixseth v. Brown*, 470 B.R. 562 (D. Mont. 2012) (appointed with bankruptcy court approval, committee members are functionally equivalent to court appointed officers), citing *Lawrence v. Goldberg*, 573 F.3d 1265, 1269 (11th Cir. 2009).  Once appointed, the Committee is monitored by the U.S. Trustee. 28 U.S.C. § 586(a)(3)(E) (the U.S. Trustee supervises the administration of chapter 11 cases, including monitoring creditors' committees).  Unlike any other "party in interest," the Bankruptcy Court may also order the U.S. Trustee to change the Committee's membership after notice and hearing.  11 U.S.C. § 1102(a)(4); *see also In re SPM Mfg. Corp.*, 984 F.2d 1305, 1317 (1st Cir. 1993) ("the bankruptcy court always retains the power to monitor and control the tenor of reorganization proceedings," including using its section 1102(4) power).

The Committee members' expenses are subject to court approval, which by law may only be reasonable and necessary.  11 U.S.C. § 503(b)(3)(F).  The Committee may employ attorneys or other professionals, but only with court approval, 11 U.S.C. § 1103(a), and those professionals' expenses are similarly subject to court approval.  11 U.S.C. § 503(b)(2). Critically, the Bankruptcy Court also may withdraw the Committee's derivative standing in this adversary proceeding (expressly given by the Bankruptcy Court in the first instance), and it may

do so even in the absence of the Committee's consent if the Bankruptcy Court concludes that the Committee's role is no longer in the best interests of the estate. *Official Comm. of Equity Secured Holders v. Official Comm. of Unsecured Creditors (In re Adelphia Commc'ns Corp.)*, 544 F.3d 420, 423 (2d Cir. 2008).

In short, "every aspect of [the Committee's] position and function is subject to either statutory obligation or to federal executive or judicial branch control." *Taunt v. Barman (In re Barman)*, 252 B.R. 403, 412 (Bankr. E.D. Mich. 2000). In *Barman*, the court asked whether a chapter 7 trustee's inspection of a debtor's residence to look for estate assets was subject to the Fourth Amendment's limits on government power. The court concluded that it was. *Id.* at 412-13. In reaching this conclusion, the *Barman* court identified many of the same indicia of federal executive or judicial control noted by the Trustee with respect to the Committee here.[10] In light of these factors, the court concluded that chapter 7 trustees have a sufficient "nexus" with government authority for their acts to be under color of law such that the Fourth Amendment applied. *Id.*

The Bankruptcy Court nevertheless distinguished *Barman*, stating that the trustee there was acting under color of law, in part "because the U.S. Marshal had accompanied [the] trustee on the search" of the debtor's residence. Bankr. Ct. Dec. 7. Yet the court in *Barman* did not rely to any extent on the U.S. Marshal's presence at the search for its decision. *See generally*, 252 B.R. at 411-13. To the contrary, the court specifically concluded that "the other circumstances surrounding such an order [apart from the assistance of the U.S. Marshal] are sufficient to justify the conclusion that in either event the fourth amendment applies." *Id.* at 413 n.6; *see also*

---

[10] *See Barman*, 252 B.R. at 412 (although not employees of the government, trustees are appointed and supervised by the U.S. Trustee; the U.S. Trustee has authority to remove a trustee from the panel of trustees; the court may remove a trustee from a particular case "for cause"; the trustee's fees are subject to court approval; and trustees may hire an attorney and other professionals only with court approval).

*Youngman v. Bursztyn (In re Bursztyn)*, 366 B.R. 353 (Bankr. D.N.J. 2007) (chapter 7 trustee acting under color of law when inspecting debtor's property).

The Bankruptcy Court similarly cited several cases for the proposition that trustees are not "governmental actor[s]." Bankr. Ct. Dec. 8. Those cases, however, simply do not address whether bankruptcy trustees act ***under color of law***, the standard that is applicable under RFRA.[11]

Of course, bankruptcy trustees (and creditor committees) do act under color of law—whether because of their close nexus with the government or the public functions they serve. Indeed, it has long been recognized that

> a trustee in bankruptcy *or an official acting under the authority of the bankruptcy judge*, is entitled to derived judicial immunity because he is performing an integral part of the judicial process.

*Lonneker Farms, Inc. v. Klobucher*, 804 F.2d 1096, 1097 (9th Cir. 1986) (emphasis added), cited in *Szeklinski v. Neary*, No. 07-222, 2007 WL 777539, at *1 (E.D. Wis. Mar. 12, 2007) (unreported). For this reason, committees (like trustees) properly enjoy qualified immunity for conduct within the scope of their statutory or court ordered authority. *See In re Drexel Burnham Lambert Grp.*, 138 B.R. 717, 722 (Bankr. S.D.N.Y.) (authority granted creditor committees under 11 U.S.C. § 1103(c)(3) carries with it a fiduciary duty and "an implicit grant of limited immunity"), *aff'd*, 140 B.R. 347 (S.D.N.Y. 1992). This immunity extends to the Committee's actions here in bringing claims specifically authorized by the Bankruptcy Court. *See In re Walnut Equipment Leasing, Co.*, 2000 WL 1456951, at *4 (Bankr. E.D. Pa. Sept. 22, 2000)

---

[11] *See Cromelin v. United States*, 177 F.2d 275 (5th Cir. 1949) (neither federal judge nor bankruptcy trustee is agent, officer or employee of the government under the Federal Tort Claims Act, 28 U.S.C. § 2571(1)); *Wells v. United States*, 98 B.R. 806 (N.D. Ill. 1989) (citing *Cromelin*, bankruptcy trustee is not an agent of the United States such that payment to trustee constituted payment to the IRS); *Spacone v. Burke (In re Truck-A-Way)*, 300 B.R. 31, 37 (E.D. Cal. 2003) (bankruptcy trustee was neither a federal "law enforcement officer," nor an "attorney for the government," within the meaning of Fed. R. Crim. P. 41, governing issuance of search warrants).

(unreported) ("[T]he Committee was authorized [by court order] to commence avoiding actions. It did so, and is entitled to immunity for its actions.").

Indeed, qualified immunity reflects an effort to strike a balance between competing values: compensating those injured by official conduct and "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982). The Supreme Court has recognized qualified immunity to preserve officials' "ability to serve the public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service." *Wyatt v. Cole*, 504 U.S. 158, 167 (1992). "These rationales are not transferable to private parties." *Id*. at 168.

The Bankruptcy Court acknowledged that the Committee enjoys at least qualified judicial immunity. Bankr. Ct. Dec. 7 (the Committee "has shades of judicial immunity"). It nonetheless found that this was not enough to establish color of law. *Id*. To the contrary, "only an individual acting under color of law can assert immunity from suit ...," *Morneau v. Connecticut*, 605 F. Supp. 2d 372, 377 (D. Conn. 2009), and "color of law" is all that is needed to meet the definition of "government" under RFRA. 42 U.S.C. § 2000bb-2.

The Bankruptcy Court's error lies, in part, in its failure to recognize the connection between the Committee's immunity and its "public function"; that function (in addition to the Committee's close nexus to the Bankruptcy Court and U.S. Trustee) establishes the necessary "something more" under *Lugar*. 457 U.S. at 939. "The Committee," the Bankruptcy Court concluded, is not a "governmental actor for purposes of RFRA." Bankr. Ct. Dec. 9. To hold otherwise, the Court said, "would render virtually every participant in a bankruptcy case the

government." *Id*. It is, however, precisely the Committee's unique role—in this as in every Chapter 11 case—that makes it unlike virtually every other participant in a bankruptcy case.

The Committee, unlike other participants, exists solely because of the affirmative operation of federal law creating it. It acts solely because of federal law, including with the immunity and fiduciary obligations that distinguish it, substantively and procedurally, from ordinary claimants and interested parties. *See In re Walnut Equipment Leasing*, 2000 WL 1456951, at *4 (denial of immunity "would chill the ability of a committee to properly exercise its obligations to maximize assets for the estate …."). It, unlike even the claimants whose interests it represents, is subject to supervision by two public officials, the U.S. Trustee and the federal bankruptcy judge. And, here, it has the authority to engage the Trust, through its Trustee, in a contest over $55 million *solely* because a federal judge under federal law has permitted it to do so. Adv. Dkt. No. 39.

In short, the Committee is acting under color of law, whether due to its close nexus with the Bankruptcy Court and U.S. Trustee or its public function. It is, therefore, "government" for purposes of RFRA—and it is subject to the Trustee's defenses under that same Act.[12]

---

[12] RFRA does not define "government" solely in the context of "color of law." It also includes within the statutory definition an "instrumentality ... of the United States." 42 U.S.C. § 2000bb-2(1). Since the statute also uses the terms "branch, department, agency ... and official ... of the United States," *id*., an "instrumentality" is something other than, for example, the Department of Defense or an FBI agent.

In *Hall v. American Nat'l Red Cross*, 86 F.3d 919 (9th Cir. 1996), the Ninth Circuit applied a First Amendment analysis to determine if the Red Cross was an "instrumentality" subject to RFRA and concluded it was not. Traditionally, otherwise private entities are government actors under the First Amendment if they have a sufficient structural or functional nexus to the government. Under a "structural" analysis, or "government entity" test, a party may be an instrumentality of government if it is created to further governmental objectives and government retains for itself permanent authority to appoint the majority of directors of the corporation. *Id*. at 921. A "functional" analysis, or "federal action" test, examines whether the organization's activity constitutes federal action considering the nexus between the government and the challenged action, whether the actor performed functions traditionally reserved to the government, and whether the government encouraged the challenged action. *Id*. at 922.

The *Hall* court first found that the congressional creation of the Red Cross in 1905 "[c]learly ... furthered government objectives." *Id*. at 921. However, the court focused on the fact that the government did *not* have the authority to appoint a majority of the organization's board of directors. Accordingly, it had no structural nexus to

*(continued ...)*

Case 2:13-cv-00179-RTR   Filed 05/15/13   Page 33 of 61   Document 16

**B.     Regardless, RFRA Applies To Actions Between Private Parties**.

Under RFRA, "[g]overnment" may not "substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless it can demonstrate that the burden furthers a compelling governmental interest using the least restrictive means. 42 U.S.C. § 2000bb-1(a), (b).  Anyone whose religious exercise has been burdened in violation of the statute "*may assert that violation as a claim or defense in a judicial proceeding* and obtain appropriate relief against a government."  § 2000bb-1(c) (emphasis added).

Is the statute inapplicable on its face to private parties?  The answer is "no."  The Committee places great weight on *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036 (7th Cir. 2006), for its contrary position that RFRA applies "'only to suits to which the government is a party.'"  Comm.'s Summ. J. Br. 9, quoting 442 F.3d at 1042.  For all of the Committee's reliance on a handful of words in a single case, now abrogated by the U.S. Supreme Court,[13] *Tomic* does not provide the support the Committee seeks.  To the contrary, as the Bankruptcy Court recognized, the language of *Tomic* is *dictum*.  Bankr. Ct. Dec. 4.  The plaintiff-appellant in that case did not even argue RFRA, *see* 442 F.3d at 1043, and thus the question of whether the Act applies solely to private suits was never briefed or fully presented.[14]

---

*(... continued)*

government.  Nor was there a functional nexus because the government did not encourage the acts at issue.  *Id.* at 922.

In a Chapter 11 proceeding, by stark contrast, the U.S. Trustee has the sole authority to appoint members of the Committee—an entity whose sole function is to assist in the reorganization process established under Congress's Article I, section 8 powers.  What's more, the Bankruptcy Court in this case approved and ordered the Committee's pursuit of the turnover and avoidance claims.  Thus, at least a structural, if not also a functional, nexus exists.  Whether the "instrumentality" requirement supplements the "color of law" requirement or is free-standing, the Committee is subject to RFRA.

[13] *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, ___ U.S. ___, 132 S. Ct. 694 (2012); *see infra* at 25 n.13.

[14] In *Tomic*, the Seventh Circuit held that the "ministerial exception" doctrine under the First Amendment served as a jurisdictional bar to employment discrimination claims by ministers against their churches.  442 F.3d at 1039.  The Seventh Circuit was, therefore, concerned with an application of RFRA that would conflict with the ministerial

*(continued ...)*

The Bankruptcy Court nonetheless agreed with the Committee, holding that RFRA only applies to suits in which the government is actually a party and citing *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1120-21 (9th Cir. 2000).  Bankr. Ct. Dec. 4-5.  Yet that case simply does not address whether RFRA applies, as a general matter, to suits between private parties.  *See* 227 F.3d at 1121 (questioning, but expressly declining to decide, whether RFRA applies to intellectual property rights and holding, instead, that the defendant failed to demonstrate that federal copyright laws imposed a substantial burden on religion).

Nor does *Sutton*, 192 F.3d at 826, cited as well, stand for a different proposition.  *See* Bankr. Ct. Dec. 5.  Rather, the court there made clear it was not holding that, in all instances, a party could not bring a RFRA claim against a private entity.  *Sutton*, 192 F.3d at 834 (plaintiff "cannot state a valid claim under RFRA against … a private employer, *in the circumstances presented*") (emphasis added).  And, in fact, other courts have expressly allowed RFRA claims to go forward against private parties.  *See*, *e.g.*, *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 468–69 (D.C. Cir. 1996) (permitting defendant to assert RFRA defense against a private plaintiff as well as the EEOC); *Guinan v. Roman Catholic Archdiocese*, 42 F. Supp. 2d 849, 853 (S.D. Ind. 1998) (permitting RFRA defense against a private party but rejecting it after finding rights not burdened).

The Act itself confirms that the *Catholic University* and *Guinan* courts were correct.  In *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872 (1990), the Supreme

_____

*(… continued)*

exception's jurisdictional hurdle and, impermissibly, require courts to wade into religious disputes.  *See id.* at 1042. The U.S. Supreme Court has since concluded that the ministerial exception is an affirmative defense, not a jurisdictional bar, abrogating *Tomic* and eliminating the concern expressed there.  *Hosanna-Tabor*, ___ U.S. ___, 132 S. Ct. at 709 n.4.

Case 2:13-cv-00179-RTR   Filed 05/15/13   Page 35 of 61   Document 16

Court reversed prior decisions and held that neutral and generally applicable laws can be applied to religious practices, even when not supported by a compelling government interest. In direct response to that decision, Congress enacted RFRA with a stated purpose:

> (1) to restore the compelling government interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963)[,] and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)[,] and *to guarantee its application in all cases where free exercise of religion is substantially burdened*; and
>
> (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

42 U.S.C. § 2000bb(b) (emphasis added); *see also* § 2000cc-5(7)(A) (defining "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief"). Confirming its sweeping reach, the Act explicitly "applies to *all Federal law, and the implementation of that law*, whether statutory or otherwise...." § 2000bb-3(a) (emphasis added).

The Bankruptcy Court's limitation on the scope of relief under RFRA to actions by or against "government" cannot be squared with this broad mandate. As the Supreme Court has observed,

> [s]weeping coverage ensures [the Act's] intrusion at every level of government, displacing laws and prohibiting official actions of almost every description and regardless of subject matter.... *Any law is subject to challenge at any time by any individual* who alleges a substantial burden on his or her free exercise of religion.

*City of Boerne v. Flores*, 521 U.S. at 532 (ultimately holding RFRA unconstitutional as applied to the states) (emphasis added); *see also id*. at 516 ("The Act's universal coverage is confirmed in § 2000bb-3(a).").

Nor can such a limitation be supported by the case law at the heart of RFRA. To the contrary, courts have routinely applied the free exercise clause to suits between private parties. *See*, *e.g.*, *McDaniel v. Paty*, 435 U.S. 618, 629 (1978) (in suit by competing delegation

candidate, state constitution barring ministers from serving as delegates to state constitutional convention violated free exercise rights); *Paul v. Watchtower Bible & Tract Soc'y*, 819 F.2d 875, 879 (9th Cir. 1987) (defendant's practice of "shunning" disassociated members protected by free exercise clause against former church member's tort action).

For these reasons, the Bankruptcy Court's reliance on *General Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402 (6th Cir. 2010), is also misplaced. *See* Bankr. Ct. Dec. 4, citing *McGill*, 617 F.3d at 411 (concluding RFRA's text does not support application to purely private actions). The Sixth Circuit rested its decision primarily on the dissent's reasoning in *Hankins v. Lyght*, 441 F.3d 96 (2nd Cir. 2006). There, then-Judge Sotomayor argued that neither the text nor the history of RFRA supported the Act's application to purely private actions. *Id.* at 114-15. Yet not only does that dissent stand in apparent contradiction to the Supreme Court's observations regarding RFRA's sweeping reach, *Boerne*, 521 U.S. at 532 ("[a]ny law is subject to challenge at any time by any individual"), it is also without support in the legislative history or the majority opinion that led to the dissent.

Congress was plainly aware of the First Amendment's application to private suits when it enacted RFRA in response to *Smith*. *See Religious Freedom Restoration Act of 1991: Hearings on H.R. 2797 Before the Subcomm. on Civil and Constitutional Rights of the H. Comm. on the Judiciary*, 102nd Cong. 361-69 (1992) (testimony of Prof. Douglas Laycock, University of Texas, Austin), citing as reasons for the statute, *inter alia, Gay Rights Coalition of Georgetown Univ. Law Center v. Georgetown Univ.*, 536 A.2d 1, 5 (D.C. 1987) (*en banc*) (in action by student group, holding that District of Columbia's interest in ending discrimination outweighed any burden on defendant's free exercise by forced equal access to facilities and services); *Lukaszewski v. Nazareth Hosp.*, 764 F. Supp. 57, 61 (E.D. Pa. 1991) (holding application of Age

Discrimination in Employment Act ("ADEA") in former employee's suit did not violate defendant hospital's free exercise rights); *see also* H.R. Rep. No. 103-88, at 2 n.2 (1993) (reporting H.R. 1308) (citing Prof. Laycock's written testimony).

"It is hardly to be imagined ... that in seeking to broaden the protection of religious rights, Congress, dropping nary a hint, wiped out a long-established doctrine that gives greater protection to religious autonomy...." *Tomic*, 442 F.3d at 1042. In fact, RFRA's broad protective mandate finds reinforcement in express Congressional statements:

> **To be absolutely clear, the bill does not expand, contract or alter the ability of a claimant to obtain relief in a manner consistent with free exercise jurisprudence**, including Supreme Court jurisprudence, under the compelling government test **prior to *Smith***.

H.R. Rep. No. 103-88, at 8 (bold emphasis added).

Accordingly, the only reasonable interpretation of the phrase "and obtain appropriate relief against a government," 42 U.S.C. § 2000bb-1, is one "broadening, rather than narrowing, the rights of a party asserting the RFRA." *Hankins*, 441 F.3d at 103 (RFRA applied to private actions based on the ADEA). The Committee's claims are subject to RFRA's mandate for this additional reason.

## III. APPLICATION OF RFRA TO THE COMMITTEE'S TURNOVER AND AVOIDANCE CLAIMS IS AN APPROPRIATE EXERCISE OF FEDERAL LAW.

The Eleventh Amendment generally insulates state law from the reach of Congress or the federal courts. Based implicitly on this proposition, the Bankruptcy Court held that RFRA could not possibly bar the Committee's claims against the Trust because to determine otherwise would invalidate the state law governing trusts and transfers in violation of the U.S. Constitution. Bankr. Ct. Dec. 9-10. This conclusion was in error.

Like the Committee, the Bankruptcy Court relied on *City of Boerne v. Flores*, 521 U.S. 507, but that case supports the Trustee's position. In *Boerne*, city authorities in that Texas community denied the Archbishop of San Antonio a building permit to enlarge the local church to accommodate a growing parish. The Archbishop challenged the denial, issued under a local zoning ordinance intended to preserve historic landmarks, as a violation of RFRA. *Id.* at 512. On appeal, the Supreme Court asked whether Congress had exceeded the scope of its enforcement power under section five of the Fourteenth Amendment when it enacted RFRA. The Supreme Court determined it had—with respect to the states. *Id.*

In reaching that conclusion, *id.*, the Supreme Court noted that Congress enacted RFRA in direct response to *Smith*, 494 U.S. 872. Although Congress enacted RFRA pursuant to a range of constitutional powers, it was the Fourteenth Amendment's enforcement power in section five on which Congress relied "in enacting the most far-reaching and substantial of RFRA's provisions, those which impose its requirements on the States." 521 U.S. at 516. Congress's enforcement power under section five is broad. It includes legislation "which deters or remedies constitutional violations ... even if in the process it prohibits [State] conduct which is not itself unconstitutional...." *Id.* at 518.

However, that power is also solely remedial—limited to "'enforc[ing]' the provisions of the Fourteenth Amendment." Congress has no power to "decree the substance of the Fourteenth Amendment's restrictions on the States." *Id.* at 519 (Congress "has been given the power 'to enforce,' not the power to determine what constitutes a constitutional violation."). The Supreme Court found that RFRA was not merely remedial but that it worked a "substantive alteration" to *Smith*'s holding. *Id.* at 534. Thus, RFRA was unconstitutional as applied to the states.

Pointing to *Boerne*, the Bankruptcy Court asserted that RFRA may not be used to "invalidate" state law. Bankr. Ct. Dec. 9; *see also id.*, 10 (stating that RFRA cannot invalidate Wisconsin fraudulent transfer and trust laws). The Committee similarly asserted that, pursuant to *Boerne*, "Congress lacked the power to enact RFRA against the states." Comm.'s Summ. J. Reply 13. True enough. Yet these assertions, while uncontroversial as a general matter, reflect a fundamental misunderstanding of the nature of this case.[15]

Unlike the Archbishop of San Antonio in *Boerne*, the Trustee does not seek to apply RFRA to Wisconsin, any other state government or agency, or their laws. Nor did the Bankruptcy Court or the Committee explain how application of RFRA to the Committee's turnover and avoidance claims here would restrict (or compel) state conduct – or otherwise regulate Wisconsin in the enforcement of its laws. *See generally*, Bankr. Ct. Dec. 9-10; Comm.'s Summ. J. Br. 12-14 (¶¶ 23-25); Comm.'s Summ. J. Reply 13. It would not.

### A.    At A Minimum, RFRA Precludes Any Order Invading The Trust's Funds Under 11 U.S.C. §§ 542 And 550.

In enacting RFRA, Congress relied not merely on its Fourteenth Amendment enforcement powers but also its Article I authority. *See* H.R. Rep. No. 103-88, at 17 ("Congress has the constitutional authority to enact [RFRA] ... [p]ursuant to Section 5 ... and the Necessary and Proper Clause embodied in Article I, Section 8 ...."). That includes, of course, the power to establish "uniform Laws on the subject of bankruptcies ...." U.S. Const. art. I, § 8, cl. 4. Unlike the limited scope of authority under the Fourteenth Amendment's section five, "'Congress has

---

[15] Six of the Committee's 17 counterclaims do not refer to state law in any respect. *See* Adv. Dkt. No. 50 ("First Am. Countercls."), ¶¶ 142-163, 170-176 (Ninth, Tenth, Eleventh and Thirteenth Counterclaims for avoidance brought pursuant to sections 548 and 550), ¶¶ 191-198 (Sixteenth Counterclaim for avoidance pursuant to sections 547 and 550), and ¶¶ 199-201 (Seventeenth Counterclaim for avoidance pursuant to sections 549 and 550). Accordingly, the Committee's arguments under *Boerne* do not apply to those claims, and its motion should be denied for this additional reason.

plenary authority in all cases in which it has substantive legislative jurisdiction, so long as the exercise of that authority does not offend some other constitutional restriction.'" *In re Young*, 141 F.3d 854, 860 (8th Cir. 1998) (*Young III*), quoting *INS v. Chadha*, 462 U.S. 919, 941 (1983).

It is long-settled that RFRA is a proper exercise of Congress's Article I powers and, thus, applies to federal law and the federal government. *O'Bryan v. Bureau of Prisons*, 349 F.3d 399 (7th Cir. 2003); *see also Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) (RFRA bars application of the Controlled Substances Act to a religious sect's use of a sacramental tea containing banned hallucinogen). Moreover, it is federal law—and federal law alone—on which the Committee ultimately relies for the relief it seeks here. Indeed, section 542 of the Bankruptcy Code mandates the return of property to the estate or otherwise provides the Bankruptcy Court the authority to order turnover. 11 U.S.C. § 542(a) ("an entity, other than a custodian, in possession, custody, or control, during the case, of property [of the estate] ... shall deliver to the trustee, and account for, such property"); *see also* 11 U.S.C. § 541 (defining property of the estate). Similarly, section 550 of the Bankruptcy Code gives a bankruptcy trustee the right to recover from a transferee property subject to a voidable transfer. 11 U.S.C. § 550(a) ("to the extent that a transfer is avoided under section 544, 545, 547, 548, [or] 549 ... the trustee may recover, for the benefit of the estate, the property transferred" from the transferee). It is, of course, nothing less than turnover and recovery that the Committee seeks with its counterclaims against the Trust.

The Committee prefers that the Court ignore this statutory fact. Instead, it asserts that the only questions at issue are: (a) whether the Trust's funds may be found property of the estate under Bankruptcy Code section 541 if the Debtor also has a legal or equitable interest in the funds under Wisconsin law, and (b) whether the Debtor's transfer of funds to the Trust—years

ago—may otherwise be avoided under section 544(b) if the transfer also is voidable under Wisconsin law. *See*, *e.g.*, Comm.'s Summ. J. Reply 13. However, even if the Court could answer those questions in the affirmative (it cannot for the reasons discussed below), a mere declaration that the Trust's funds are property of the estate, or that the transfer of those funds is voidable, is insufficient to achieve the Committee's goal—absent exercise of the turnover and avoidance powers under the Bankruptcy Code. *See*, *e.g.*, Comm.'s Summ. J. Br. 13-14 (¶ 25) (acknowledging that the Committee's fraudulent transfer counterclaims are also brought under section 550).

Of course, RFRA binds the federal government, *O'Bryan*, 349 F.3d at 401, and it precludes exercise of the turnover and avoidance powers here—whether by the Court or by the Committee. *See*, *e.g.*, Archbp. Listecki Decl. ¶¶ 18, 25, 39, 40-41, 43. The Bankruptcy Court Decision, thus, should be reversed for its misapplication of *Boerne* to the Committee's claim for federal statutory relief.

## B. RFRA Also Precludes A Determination That The Trust's Funds Are Property Of The Estate In The First Instance.

Congress lawfully exercises its legislative power under the Bankruptcy Clause through reference to local law. *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 190 (1902) ("Nor can we perceive in the recognition of the local law in the matter of exemptions, dower, priority of payments, and the like, any attempty [*sic*] by Congress to unlawfully delegate its legislative power."). It has done so by allowing trustees to avoid transfers voidable under "applicable law," 11 U.S.C. § 544(b)(1), and otherwise generally leaving "the determination of property rights in the assets of a bankrupt's estate to state law." *Butner v. United States*, 440 U.S. 48, 54 (1979).

What Congress gives, however, it may also take away. The Supreme Court has explained the two-edged sword:

> [It] extends to all cases where the law causes to be distributed, the property of the debtor among his creditors; this is its least limit. Its greatest, is the discharge of a debtor from his contracts. *And all intermediate legislation, affecting substance and form, but tending to further the great end of the subject—distribution and discharge—are in the competency and discretion of Congress*.

*Moyses*, 186 U.S. at 186 (emphasis added); *see also Butner*, 440 U.S. at 54 (Congressional power under the Bankruptcy Clause "would clearly encompass a federal statute defining [a] mortgagee's interest in the rents and profits earned by property in a bankrupt estate. But Congress has not [yet] chosen to exercise its power to fashion any such rule," deferring instead to state law). That is black letter law.

Indeed, although section 541 generally leaves the definition of property interests (legal and equitable) to state law, *Butner*, 440 U.S. at 54, it specifically exempts certain interests from the estate's corpus. 11 U.S.C. § 541(a)(1) ("Except as provided ... all legal or equitable interests of the debtor in property as of the commencement of the case" comprise the estate); *see also id*. at § 541(b) (defining legal and equitable interests not included in the estate). Congress has similarly limited a trustee's avoidance powers under section 544, notably with respect to religious tithing and other charitable contributions, among other examples. 11 U.S.C. § 544(b)(2); *see also* 5 Collier on Bankruptcy ¶ 544.06[3] (Alan N. Resnick & Henry J. Sommer eds. 16th ed. 2-13) ("[e]ven if there is time under state law to assert the claim, the trustee is subject to the limitations period in section 546 applicable to the commencement of avoidance actions generally").

The Bankruptcy Court, like the Committee, did not explain how the application of RFRA to sections 541 and 544 could impermissibly "invalidate" state law, Bankr. Ct. Dec. 9-10, in light of all of these other limitations on the Bankruptcy Code's selective deference to state law. The

Bankruptcy Court cited *Butner* but, as the quotation from that case highlights, *Butner* supports the Trustee, not the Committee:

> [P]roperty interests are created and defined by state law. *Unless some federal interest requires a different result,* there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.

Bankr. Ct. Dec. 10, quoting *Butner*, 440 U.S. at 55 (emphasis added). With RFRA, Congress determined that the need to protect parties from substantial burdens on the free exercise of their religion requires just such a different result. *See* 42 U.S.C. § 2000bb-1(a)-(b); *see also id*. at § 2000bb-3(a) ("This chapter applies to *all Federal law*, and the implementation of that law....") (emphasis added).

In short, "RFRA is an appropriate means by Congress to modify ... bankruptcy laws." *Young III*, 141 F.3d at 861. The U.S. Court of Appeals held in *Young III* that RFRA is constitutional as applied to federal law and, therefore, a bankruptcy trustee's avoidance of a debtor's religious tithes to a church was precluded by RFRA. *Id*. at 856, 861.

Under the Necessary and Proper Clause, Congress has the authority "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its bankruptcy power. *Id*. at 860 (citing U.S. Const. art. I, § 8, cl. 18). Quoting the Supreme Court's affirmation almost two centuries ago that "the constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it," the Court of Appeals concluded that RFRA was an appropriate choice by Congress to modify federal bankruptcy laws. *Young III*, 141 F.3d at 861 (quoting *McCulloch v. Maryland*, 17 U.S. 316, 421 (1819)). Thus, to the extent state laws conflict with RFRA, enacted by Congress under its Article I authority, "on the subject

of bankruptcies [those state laws] are suspended." *Butner*, 440 U.S. at 54 (n.9) (internal citations

omitted).[16]

## IV.   CONVERSION OF THE TRUST'S ASSETS WOULD SUBSTANTIALLY BURDEN THE TRUSTEE AND THE TRUST'S FREE EXERCISE OF RELIGION IN VIOLATION OF RFRA.

Having determined that RFRA does not apply to the Committee's claims in the first

instance, the Bankruptcy Court did not address whether those claims would pose a substantial

burden on the Trustee and Trust in violation of the Act.  The undisputed evidence compels the

answer:  They would.

### A.     RFRA Precludes An Order Requiring Turnover Or Recovery Of The Trust's Funds As An Impermissible Burden On The Free Exercise Of Religion.

The Seventh Circuit has held that a substantial burden on the free exercise of religion,

within the meaning of RFRA, is one that

> forces adherents of a religion to refrain from religiously motivated
> conduct, inhibits or constrains conduct or expression that manifests
> a central tenet of a person's religious beliefs, or compels conduct
> or expression that is contrary to those beliefs.

*Mack v. O'Leary*, 80 F.3d 1175, 1179 (7th Cir. 1996), *vacated on other grounds*, 522 U.S. 801

(1997).  Courts evaluating that substantial burden must be "sensitive to religious feeling."  *Id*.

Religious practices that are not mandatory may nonetheless be "important to their practitioners,

---

[16] Wisconsin state law does not in fact conflict with RFRA.  To the contrary, the state constitution's free exercise clause requires the same strict scrutiny analysis that applied pre-*Smith* under the U.S. Constitution and continues to apply to federal law, including bankruptcy law, under RFRA.  Wisconsin Supreme Court precedent is unequivocal on this point:

> In assessing previous free conscience and free exercise challenges, this court,
> and the court of appeals, have utilized the principles and analytical framework
> developed by the United States Supreme Court in *Sherbert*, *Yoder*, and *Thomas*.
> We conclude that the guarantees of our state constitution will best be furthered
> through continued use of the compelling interest/least restrictive alternative
> analysis of free conscience claims and see no need to depart from this time-
> tested standard.

*State v. Miller*, 202 Wis. 2d 56, 549 N.W.2d 235, 240-41 (1996).

who would consider the denial of them a grave curtailment of their religious liberty." *Id.*; *see also Thomas v. Review Board*, 450 U.S. 707, 718 (1981) (holding pre-*Smith* that a substantial burden exists under the First Amendment where the state "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs").

Subsequent to *Mack*, Congress bolstered the Seventh Circuit's view of "substantial burden" by amending RFRA's definition of "religious exercise" to include "*any exercise of religion*, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A) (emphasis added); *see also* § 2000bb-2(4). RFRA's expansive conception of religious exercise leaves no question that a judicial order granting the relief the Committee seeks would constitute an immeasurable burden on the Trust's and its Trustee's (as well as the Debtor's) free exercise of religious beliefs.

The Catholic Church, like other faith communities, considers the cemetery sacred space—directly related to the Church's belief in the resurrection of the body and the final consummation of the world. *See* Archbp. Listecki Decl. ¶ 2(a)-(b). Catholic cemeteries, accordingly, are not mere property; they are sacred places under canon law, blessed and consecrated by the Church. *Id.* ¶¶ 16, 20. Similarly, the maintenance of Catholic cemeteries is an expression of Catholic belief in the resurrection and commitment to the corporal work of mercy of burying the dead. *Id.* ¶ 18. The Church's laws, as well as its historical and religious traditions, require the perpetual care of Catholic cemeteries in a manner befitting their sacred purposes and that money be set aside for this purpose. *Id.* ¶¶ 15, 21.

The Committee nonetheless disdainfully seeks to counterstate the issue before this Court by asking "[c]an a religious organization hide assets in violation of the state trust law that under the United States Bankruptcy Code determines what assets are required to be made available to

its creditors?" Adv. Dkt. No. 98, 3; *see also* Dkt No. 13-8, 103. The Committee's

counterstatement of issues, *see* Fed. R. Bankr. P. 8006, itself illustrates why the constitution

precludes secular courts from evaluating matters of religious doctrine and belief.

> [T]he mere adjudication of such questions would pose grave
> problems for religious autonomy: It would require calling
> witnesses to testify about the importance and priority of the
> religious doctrine in question, with a civil factfinder sitting in
> ultimate judgment of what the accused church really believes, and
> how important that belief is to the church's overall mission.

*Hosanna-Tabor*, 132 S. Ct. at 715 (Alito, J., concurring).

Just as secular courts could not insert themselves into a controversy over the proper use

of a church sanctuary (or by whom), *see Watson v. Jones*, 80 U.S. 679, 730-31 (1871) (dispute

between pro- and anti-slavery factions of congregation over ownership of church property not

subject to civil adjudication), so, too, courts cannot adjudicate the centrality or requisite level of

care for the faithful departed placed in a sacred burial ground. Rather, a federal court must take

extraordinary care when "religious questions"—such as interpretation of the Catholic Church's

religious doctrine—are implicated. *McCarthy v. Fuller*, 2013 WL 1442293, at *4. Although a

secular court may still decide whether there is an authoritative church position on an issue, an

authoritative ruling removes the issue from the jurisdiction of the court.

In *Fuller*, a U.S. District Court had ruled that a federal jury could decide whether a

litigant was a member of a Catholic religious order, notwithstanding the fact that a decision in

the affirmative would contradict a ruling of the Holy See, a religious body authorized by the

Church to decide such matters. *Id.* On appeal, at the invitation of the U.S. Court of Appeals, the

Holy See filed an amicus brief concluding that the defendant, since leaving the Congregation of

the Sisters of the Precious Blood, had not been a member of any recognized Catholic

organization. *Id.*

Judge Posner elaborated on the effect of the Church's position:

> The brief is the unquestionably authentic statement of the Holy
> See. In it the Holy See has spoken, laying to rest any previous
> doubts: Fuller has not been a member of any Catholic religious
> order for more than 30 years. Period. The district judge has no
> authority to question that ruling. A jury has no authority to
> question it. We have no authority to question it.

*Id*. at *7. The Court emphasized that a secular court cannot take sides on issues of religious

doctrine, and "[r]eligious questions are to be answered by religious bodies." *Id*. at *4

Accordingly, the Court of Appeals reversed the district court's refusal to take judicial notice of

the Holy See's ruling. *Id*. at *8. The defendant's religious status was no longer a litigable issue.

*Id*.

If the Court here were to order the Trust to turn over all or part of its funds to the

bankruptcy estate for the benefit of secular creditors, there would be no remaining funds (or, at

best, insufficient funds) for the Milwaukee Catholic Cemeteries' perpetual care. Archbp.

Listecki Decl. ¶ 30. As a consequence, the Trust and the Archbishop, its Trustee, will be not

merely "inhibit[ed] or constrain[ed]" from exercising their ecclesiastical obligations to provide

for these sacred sites, *Mack*, 80 F.3d at 1179, they will be unable to do so. *See*. Archbp. Listecki

Decl. ¶¶ 18, 40-41, 43. Moreover, such an order would compel the Archbishop to use the funds

for a purpose other than that for which they were entrusted and designated—contrary to his and

the Trust's beliefs—and at the risk of religious penalty.[17] *Id*. ¶¶ 21, 25, 34, 35, 40, 44; *see*

*United States v. Ali*, 682 F.3d 705 (8th Cir. 2012) (pretrial order requiring criminal defendant to

---

[17] Conduct permissible under civil law may still be subject to ecclesiastical authority and discipline. *See*, *e.g*.,
Sharon Otterman, *Caught in Methodism's Split Over Same-Sex Marriage*, N.Y. Times, May 6, 2013, at A16
(minister who performed same sex wedding ceremony may face canonical trial for "ecclesiastical disobedience" and
violating church rules).

stand when court convened and recessed—in contravention of her religious beliefs—constituted substantial burden under RFRA).

The Committee failed to raise any genuine dispute of material fact concerning the substantial burden its claims would impose on the Trustee and the Trust's free exercise of religion. In the Bankruptcy Court, Archbishop Listecki's declaration of substantial burden stands uncontroverted. It is the only evidence, and it compels judgment on this issue in his favor. Fed. R. Civ. P. 56(a), (c)(1).[18]

The declaration cannot be refuted—not only procedurally but substantively. It reflects the Trustee's authoritative statements of his obligations to his faith and the faith's cemeteries under canon law. The interpretation of canon law undoubtedly requires interpretation of "religious questions." In short, whether alienating the Trust funds would force the Trustee to violate his ecclesiastical obligations is a question that may not be answered by this Court because it is answered in canon law.

B.      **The Bankruptcy Code And The Particular Provisions At Issue Do Not Serve A Compelling Government Interest, Much Less By The Least Restrictive Means**.

In light of this substantial burden, the applicable Bankruptcy Code sections may only be applied to the Trust if they "(1) [are] in furtherance of a compelling government interest; and

---

[18] The Committee asserted that the Trust could not show a substantial burden because "[h]ow much of the recovered assets will be used to pay the allowed claims of general unsecured creditors (including any claims the Trust may have) cannot be determined at this time." Comm.'s Summ. J. Reply 13. Thus, so the argument goes, whatever funds are left, if any, may in fact be sufficient for the perpetual care of the Milwaukee Catholic Cemeteries. *See id.* Bereft of facts in its summary judgment submissions, however, the Committee's argument ignores the very burden imposed by the obligation to transfer itself. *See, e.g.*, Archbp. Listecki Decl. ¶ 25 (the transfer of Trust funds in violation of canonical norms and approval can result in a canonical penalty). Regardless, the Committee, which brought this motion in the first instance, has provided no evidence that the Trust can afford the loss of a single dollar (much less the millions that the Committee no doubt hopes to secure) without impairing the Trust's ability to provide perpetual care. *Cf. id.* ¶ 30 ("If the Committee is successful in converting the Trust corpus into property of the Debtor's estate, there will be no funds or, at best, insufficient funds, for the perpetual care of the Milwaukee Catholic Cemeteries.").

(2) [are] the least restrictive means of furthering that compelling government interest."

42 U.S.C. § 2000bb-1(b).  They are neither.

The Supreme Court has never held that enforcing the Bankruptcy Code qualifies as a compelling government interest, nor would it likely do so if presented with the question. Compelling government interests are only those "interests of the highest order."  *In re Young*, 82 F.3d 1407, 1419 (8th Cir. 1996) (*Young II*) (citing *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 546 (1993)).  For example, the government has a compelling interest in enforcing systems that perform crucial public functions, such as the tax system, *Hernandez v. Commissioner*, 490 U.S. 680, 699 (1989); the social security system, *United States v. Lee*, 455 U.S. 252, 258-59 (1982); national security and public safety, *Gillette v. United States*, 401 U.S. 437 (1971); and public education, *Yoder*, 406 U.S. at 213.  Comparing these interests to those furthered by bankruptcy law, the *Young II* court concluded that the interests advanced by the bankruptcy system are by definition not compelling under RFRA.  82 F.3d at 1420.

Likewise, the specific Bankruptcy Code provisions at issue do not further a compelling government interest.  The purpose of the avoidance and turnover provisions "is to maximize the bankruptcy estate and thereby maximize the recovery for creditors."  *In re Roman Catholic Archbishop*, 335 B.R. 842, 864 (Bankr. D. Or. 2005) (examining 11 U.S.C. § 544(a)(3)).  But, as the court observed, the provisions are limited—in principle and in practice:

> [T]he Bankruptcy Code itself contains various provisions that limit the breadth of the estate, including, for example, § 541(d), which excludes from the bankruptcy estate property in which a debtor holds only legal but not equitable title.  There are also exceptions in the Bankruptcy Code to the policy of providing a debtor with a fresh start, such as the exceptions to discharge set out in § 523(a). Thus, the Bankruptcy Code itself provides for exceptions that do not further the policies of the Code. In light of those exceptions, I conclude that there is no compelling governmental interest in

> applying § 544(a)(3), if doing so would impose a substantial
> burden on the exercise of religion.

*Id*.  The same principle applies to all of the avoidance and turnover provisions at issue.

Numerous provisions in the Bankruptcy Code limit the breadth and composition of the debtor's

estate or otherwise create exceptions that do not further its maximization.  In light of these

exceptions, the purpose of the avoidance and turnover provisions cannot rise to the level of a

compelling government interest.

Once it determined that RFRA (and the First Amendment) did not apply in the first

instance, the Bankruptcy Court did not pursue this issue.  *See generally*, Bankr. Ct. Dec.  With its

initial summary judgment brief, the Committee cited a string of cases, without explanation, for

the proposition that the Bankruptcy Code provisions on which it relies serve a compelling

government interest.  Comm.'s Summ. J. Br. 19-20.  As the Trustee observed in response,

however, all but one of those cases did not involve the Bankruptcy Code provisions at issue.[19]

What's more, the case that remained, *In re Newman*, 183 B.R. 239, 251 (Bankr. D. Kan. 1995),

relied on *In re Young*, 152 B.R. 939 (D. Minn. 1993) (*Young I*), which was reversed on this very

issue by the Eighth Circuit Court of Appeals in *Young II*, 82 F.3d at 1419-20.  Accordingly,

neither the Bankruptcy Code in general, nor the avoidance and turnover provisions in particular,

constitute a compelling government interest.

Moreover, even assuming the interests at issue are "compelling," it cannot be said that the

relevant Bankruptcy Code provisions utilize the "least restrictive means" of furthering the

interest the Committee articulates.  42 U.S.C. § 2000bb-1(b).  Courts have looked to pre-*Smith*

case law when analyzing the "least restrictive means" exception of RFRA.  *See*, *e.g.*, *In re*

---

[19] *See* Trustee's Summ. J. Resp. 26, discussing *In re Meyer*, 467 B.R. 451 (Bankr. E.D. Wis. 2012) (free exercise challenge to § 707(b)); *In re Navarro*, 83 B.R. 348 (Bankr. E.D. Pa. 1988) (establishment clause challenge to § 1325(b)); *In re Turner*, 193 B.R. 548 (Bankr. N.D. Cal. 1996) (RFRA challenge to § 110(c)).

*Turner*, 193 B.R. 548, 556 (Bankr. N.D. Cal. 1996) (citing *Callahan v. Woods*, 736 F.2d 1269, 1272-73 (9th Cir. 1984)). According to the court in *Callahan*, this test "forces us to measure the importance of a regulation by ascertaining the marginal benefit of applying it to all individuals, rather than to all individuals except those holding a conflicting religious conviction." *Callahan*, 736 F.2d at 1272 (citing J. Morris Clark, *Guidelines for the Free Exercise Clause*, 83 Harv. L. Rev. 327, 331 (1969)). If the compelling goal can be accomplished despite the exemption of a particular individual, then a regulation that denies an exemption is not the least restrictive means of furthering the state interest. *Id*. at 1272-73.

The general objective of enlarging debtors' bankruptcy estates will not be undermined by exempting those individuals whose free exercise of religion is substantially burdened by avoiding a transfer or otherwise compelling turnover. The court in *Young II* articulated the point well: "[W]e cannot see how the recognition of what is in effect a free exercise exception to the avoidance of fraudulent transfers can undermine the integrity of the bankruptcy system as a whole; its effect will necessarily be limited to th[is] debtor's creditors, who will as a result have fewer assets available to apply to the outstanding liabilities." *Young II*, 82 F.3d at 1420. In other words, even if there are fewer assets to distribute, the importance of respecting religious convictions outweighs the importance of applying it to all individuals. Accordingly, the "least restrictive means" exception in RFRA is not satisfied here.

## V.     THE FREE EXERCISE CLAUSE ITSELF ALSO BARS THE COMMITTEE'S TURNOVER CLAIMS.

The Trust has asserted a stand-alone constitutional defense, separate from its statutory reliance on RFRA. In response, the Bankruptcy Court held that the relevant code provisions are neutral and generally applicable and, therefore, their application to the Trust does not violate the

free exercise clause of the First Amendment. This holding, based on an incomplete and flawed analysis, should also be rejected.

The First Amendment guarantees that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Since *Smith*, 494 U.S. at 878, as a general proposition, a law that is neutral and of general applicability need not be justified by a compelling governmental interest, even if it has the *incidental* effect of burdening a particular religious practice.[20] *See Lukumi Babalu*, 508 U.S. at 531. Neutrality and general applicability are interrelated, and "failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Id*.

Courts have formulated the free exercise analysis in different ways but, in the Seventh Circuit, "[t]he relevant inquiry is two-fold." *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 996 (7th Cir. 2006). A court first examines whether challenged law is "neutral and of general applicability." *Id*. If not, it "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Id*. "This does not end the inquiry, however: '[A] regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it *unduly burdens* the free exercise of religion, in which case there must be a compelling governmental interest justif[ying] the burden.'" *Id*. (emphasis added) (citing *Jimmy Swaggart Ministries v. Board of Equalization*, 493 U.S. 378, 384-85 (1990)).

---

[20] *Smith*'s rejection of strict scrutiny was controversial. 494 U.S. at 894 (O'Connor, J., concurring). Congress quickly moved to pass RFRA to mitigate its effects and restore the compelling interest test to a broader range of situations than *Smith* contemplated. In 2000, Congress also passed the Religious Land Use and Institutionalized Persons Act (RLUIPA), which sought to re-impose strict scrutiny protection for, among other things, land use regulations that impose a substantial burden on religious exercise. 42 U.S.C. § 2000cc(a)(1).

The Committee argued that the constitutional inquiry ends after concluding that a law is neutral and generally applicable, no matter how substantial the burden might be. Summ. J. Hrg. Tr. 74:1-6; 74:15-16; 75:12-15. The Committee's interpretation of Free Exercise Clause jurisprudence is incorrect. Indeed, "[N]o Free Exercise Clause violation results where a burden on religious exercise is the *incidental effect* of a neutral, generally applicable, and otherwise valid regulation, in which case such regulation need not be justified by a compelling governmental interest." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 763 (7th Cir. 2003) (emphasis added), (citing *Smith*, 494 U.S. 872; *Lukumi Babalu,* 508 U.S. 520). In other words, while neutral and generally applicable laws with "incidental effects" only require rationality review, a facially neutral and generally applicable law nevertheless violates neutrality if it "unduly burdens" the free exercise of religion. Strict scrutiny is still required under these circumstances.

The Supreme Court would not have included "incidental effect" in the legal lexicon if the Court was only concerned with whether the law was neutral and generally applicable. Accordingly, whether "a burden on religious exercise is the incidental effect" of the law cannot be ignored—it must be analyzed factually or the test in incomplete. *See, e.g., Family Life Church v. City of Elgin*, 561 F. Supp. 2d 978, 986 (N.D. Ill. 2008) (citing *Vision Church*, 468 F.3d at 996, for the proposition that even if a law is facially neutral, if it unduly burdens the free exercise of religion, it must still be justified by a compelling governmental interest).[21]

---

[21] In its initial summary judgment brief, the Committee cited *Vision Church* to support the proposition that rationality review must *always* be applied. This citation was misleading. The Committee, in a parenthetical designed to support its position, paraphrased the section of the decision where the Court of Appeals analyzed the ordinances *under the Equal Protection Clause*: *See Vision Church*, 468 F.3d at 1001 (finding that the municipal ordinances challenged by the church did not classify on the bases (*sic*) of race, national origin, or religion, and therefore applying only rational basis scrutiny to the Church's claims...), cited in Comm.'s Summ. J. Br. 16.

A. **The Code Provisions At Issue Are Not Facially Neutral And Generally Applicable**.

In this case, strict scrutiny applies in the first instance because the relevant Bankruptcy Code provisions are not facially neutral and generally applicable. As the Supreme Court has made clear, a law lacks facial neutrality if it "refers to a religious practice without a secular meaning discernible from the language or context" or if its object is to suppress religious practice. *Lukumi Babalu*, 508 U.S. at 533-34. A law lacks general applicability if it imposes burdens only on conduct motivated by religious belief in a selective manner. *Id*. at 543.

The Bankruptcy Court concluded that the Bankruptcy Code is neutral and generally applicable because "the provision at issue here—the provision that creates and defines the bankruptcy estate—advances one of the 'overarching purposes' of the Bankruptcy Code" and because no Bankruptcy Code provision "targets" religion. Bankr. Ct. Dec. 11. The Bankruptcy Court did not address whether the Bankruptcy Code is uniformly neutral.

In fact, the Bankruptcy Code provisions undeniably lack facial neutrality: sections 548 and 544 explicitly carve out religious and charitable contributions from the reach of bankruptcy law. 11 U.S.C. § 548(a)(2), (d)(4); 11 U.S.C. § 544(b)(2). Provisions that protect contributions to qualified religious entities (known in some faiths as "tithing") most certainly "refer[] to a religious practice without a secular meaning discernible from the language or context" and, therefore, cannot be deemed neutral.

The Committee cited *In re Gomes*, 219 B.R. 286 (Bankr. D. Or. 1998), and *In re Bloch*, 207 B.R. 944 (D. Colo. 1997), to support its contention that sections 544 and 548 are neutral and generally applicable. Comm.'s Summ. J. Br. 17. Notably and significantly, both cases were decided before the 1998 enactment of the Religious Liberty and Charitable Donation Protection Act ("RLCDPA"), immunizing religious and charitable contributions from the reach of

45

sections 544 and 548.  *See In re Gomes*, 219 B.R. at 290-91 (provisions of pre-RLCDPA

sections); *In re Bloch*, 207 B.R. at 947 (pre-RLCDPA section 548).  They, thus, do not provide

the support the Committee seeks.  The Bankruptcy Code, containing exemptions aimed

specifically at religious practices, is not neutral and generally applicable.  Strict scrutiny applies.

### B.      The Laws Impose A Substantial Burden On The Trust And Its Trustee.

Even if this Court finds that the Bankruptcy Code is facially neutral (it is not), the inquiry

does not end there: "[A] regulation neutral on its face may, in its application, nonetheless offend

the constitutional requirement for governmental neutrality if it unduly burdens the free exercise

of religion," in which case there must be "a compelling governmental interest justif[ying] the

burden."  *Vision Church*, 468 F.3d at 996.  For free exercise purposes, an undue, even

substantial burden exists "when the government [has] put substantial pressure on an adherent to

modify his behavior and to violate his beliefs."  *Family Life Church*, 561 F. Supp. 2d at 987

(citing *Vision Church*, 468 F.3d at 997).  Laws that impose a substantial burden remain subject to

strict scrutiny but, "[e]ven if detrimental to religious exercise, a merely incidental effect of a

neutral and generally applicable regulation need not be justified in strict scrutiny terms."  *Id.*

In *Family Life Church*, a church alleged, among other things, that the city's requirement

that it apply for a permit to operate its homeless shelter, and the delays associated with its

application, violated its rights under the free exercise clause and RLUIPA.  561 F. Supp. 2d

at 986.  After concluding that the subject ordinance was facially neutral, the district court

considered whether the effects of the law were incidental, or whether they rose to the level of a

substantial burden.  *Id*. at 987-88.  Any burden, the court observed, was incidental and

self-inflicted.  Yet the court did, indeed, analyze the burden—legally and factually:

> Much of the burden on Family Life was self-imposed by its
> premature opening of the shelter before seeking a Permit and its
> then having to close down the shelter during the pendency of the

> Permit application. Homeless shelters cannot be created overnight, and the cogs of local land use approval require time to turn. Any burden on religious exercise felt by Family Life in the eight months that its application was pending was only incidental to Elgin's legitimate interests in maintaining orderly municipal development.

*Id.* at 988 (internal citations omitted). Elgin's zoning ordinances were facially neutral and generally applicable—they did not saddle the church with a substantial burden—and the Court concluded that the free exercise clause was not implicated. *Id*. at 988.

Whether the burden is "incidental" or "substantial" always requires a fact-intensive inquiry; the Bankruptcy Court, however, neither acknowledged nor undertook such an inquiry here. Granting summary judgment without considering the level of the burden was impermissible. In this regard, particularly, the Committee's failure to submit any admissible evidence pursuant to Rule 56 has unavoidable significance.

Putting aside the need to honor local rules, perhaps one reason the Bankruptcy Court made no findings of fact is that the Committee failed to establish any facts, disputed or not, save the existence of the Trust. It is not enough to say, as did the Bankruptcy Court, that there is no need for factual findings because this dispute involves only questions of law. Yet questions of law are invariably asked and resolved within a factual context, and the only factual context here is the evidence provided by the Trustee: the transfer of funds from the Trust to the estate would invariably impose a substantial burden on religious doctrine and practice.

Based on the record facts and the reasons discussed above, this Court should grant summary judgment in favor of the Trustee because the statutes the Committee wishes to apply will unduly burden the free exercise of religion. If the Committee were permitted to enforce the Bankruptcy Code's avoidance provisions against the Trustee, the Committee and Court would force the Trust and its Trustee to violate their religious beliefs and obligations under canon law.

47

*See Family Life Church*, 561 F. Supp. 2d at 987. The Court should not conclude otherwise. The Trustee's burden would be nothing less than substantial, and strict scrutiny applies—even in the absence of RFRA's statutory mandate.

While the Bankruptcy Court never reached the question of whether the challenged provisions are narrowly tailored to serve a compelling government interest under the First Amendment, they are not—for reasons that need not be repeated here. *See* Section IV.B. *supra*.[22] The First Amendment, if not RFRA, precludes the Committee from raiding the Trust.

## VI. THIS COURT APPROPRIATELY GRANTED LEAVE TO APPEAL.

The Court granted leave to appeal in an April 1, 2013 order. In granting leave, the Court indicated that it was satisfied that the standard for leave to appeal had been met but only preliminarily.

> In the course of briefing, the parties are free to pursue further arguments on this point, in addition to alternative grounds raised by the Trustee's motion. The Court will make more explicit findings on the proper basis for this appeal in connection with a substantive ruling on the merits.

Dkt. No. 2, 2. The Trustee timely raised its arguments in support of leave to appeal with its motion and restates and incorporates those arguments here by reference. Dkt. No. 1, 6-11; *see also* Adv. Dkt. No. 82, 6-11.

With its response, the Committee objected to granting leave to appeal solely on the basis that the parties' stipulation, and the related Bankruptcy Court order, required the Bankruptcy Court to only issue proposed findings of fact and conclusions of law for review by this Court. That was an order the Bankruptcy Court did not implement. Dkt. No. 1-1, 76, ¶ 4; *see also* Adv.

---

[22] *See generally*, *Lukumi Babalu*, 508 U.S. at 546 (if the interest that a law seeks to achieve could be accomplished through drawing the law more narrowly, while burdening religion to a lesser degree, or if the law is "overbroad" or "underinclusive," the law is not narrowly tailored.).

Case 2:13-cv-00179-RTR   Filed 05/15/13   Page 58 of 61   Document 16

Dkt. No. 84, 3 ¶ 4. The Committee did not otherwise contest any of the arguments raised by the Trustee. *See*, *generally*, Dkt. No. 1-1, 74-77; *see also* Adv. Dkt. No. 84, 1-4.

In particular, the Committee did not dispute that each of the issues presented "involves a controlling question of law as to which there is substantial ground for difference of opinion and ... an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b) (setting forth the standard governing interlocutory appeals); *see also In re OBT Partners*, 218 B.R. 418, 419 (N.D. Ill. 1998) (district courts apply the standard in 28 U.S.C. § 1292(b) when reviewing motions for leave to appeal interlocutory bankruptcy court orders and decrees). Moreover, the Committee did not timely dispute the Trustee's arguments supporting its motion for leave to appeal, *see* Fed. R. Bankr. P. 8003(a) ("*Within 14 days after service of the motion* [for leave to appeal], an adverse party may file with the clerk an answer in opposition.") (emphasis added); accordingly, it has conceded those arguments and may not contest them now. *See Jones v. Infocure Corp.*, 310 F.3d 529, 534 (7th Cir. 2002) (claims not properly articulated in a brief are generally deemed waived); *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1306 (7th Cir. 1995) (generally, arguments raised only at oral argument are waived).[23]

The Court's decision to accept this matter as an interlocutory appeal has been reinforced by two developments since its order—one substantive, the U.S. Court of Appeals decision in *McCarthy v. Fuller*, and one procedural, the parties' stipulation to suspend the entire adversary proceeding pending the resolution of these issues. This Court, now or later, will need to decide whether the very nature of the Trust (and the Debtor) necessarily affect the conduct of these

---

[23] The Committee's response was incorrectly directed to the Bankruptcy Court and asked that court to "redesignate" its decision as proposed findings of fact and conclusions of law and vacate its related order. *See* Dkt. No. 1-1, 75-76, ¶ 3; *see also* Dkt. No. 1-1, 91-92, ¶¶ 2-4 (Trustee observing in reply that the rules did not permit the relief requested by the Committee). The Bankruptcy Court did not accept that invitation.

proceedings in light of RFRA and the free exercise clause. It would be tragically ineffective—for the estate, for the claimants, and for the judicial process—to permit these proceedings to continue with the massive discovery and controversy already on the horizon, without a resolution of the constitutional and statutory issues now fully presented in this Court.

The Court, accordingly, should affirm its original grant of leave to appeal.

## CONCLUSION

For the reasons stated above, even if the Committee could successfully prove its avoidance and turnover claims (it cannot), the Trustee and the Trust would be put to a choice between fidelity to religious belief and ecclesiastical directive or compliance with the Court's order. RFRA and the First Amendment command that they not be compelled to make that choice.

WHEREFORE, the Trustee respectfully requests that the Court reverse the Bankruptcy Court's Decision and Order, thereby denying the Committee's motion for partial summary judgment. Because it need not stop there, the Trustee further requests that the Court grant the Trustee summary judgment under Fed. R. Civ. P. 56 and Bankruptcy Rule 7056, applying RFRA to end the Committee's crusade to appropriate the Trust's funds for the bankruptcy estate.

Dated:  May 15, 2013.

GODFREY & KAHN, S.C.

By:  /s/Linda S. Schmidt

Brady C. Williamson
Linda S. Schmidt
Jennifer L. Vandermeuse

780 North Water Street
Milwaukee, WI 53202-3590
Phone: 414-273-3500
Fax: 414-273-5198
Email: lschmidt@gklaw.com

*Attorneys for Archbishop Jerome E. Listecki, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust*

9461597.1

51