# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

In re Archdiocese of Milwaukee,

      Debtor.      **Bankruptcy Case No. 11-20059-SVK**

**ARCHBISHOP JEROME E. LISTECKI,**
**as Trustee of the Archdiocese of Milwaukee**
**Catholic Cemetery Perpetual Care Trust,**

      Appellant,     **Adv. Proc. No. 11-2459-SVK**

    **-vs-**       **Case No. 13-C-179**

**OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS,**

      Appellee.

## DECISION AND ORDER

   The Archdiocese of Milwaukee is in bankruptcy. One of the issues in this bankruptcy is whether the Archdiocese's creditors, primarily clerical abuse victims who are represented by the Official Committee of Unsecured Creditors (the "Committee"), appointed by the United States Bankruptcy Trustee, can access funds contained in the Archdiocesan Cemetery Trust. The Cemetery Trust, referred to as the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust, stands apart from the Archdiocese and holds more than $50 million in trust for the perpetual care of more than 500,000 deceased, interred under the tenets of the Catholic faith.

   The Cemetery Trust filed an adversary complaint seeking declaratory relief,

arguing that the Committee cannot access the funds therein without violating the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* ("RFRA") and the Free Exercise Clause of the First Amendment. The bankruptcy court granted the Committee's motion for partial summary judgment, finding that neither RFRA nor the First Amendment barred the Committee's claims or defenses in the adversary proceeding. *In re Archdiocese of Milwaukee*, 485 B.R. 385 (Bankr. E.D. Wis. 2013). Archbishop Jerome E. Listecki, as Trustee for the Cemetery Trust, appealed.

The bankruptcy court's decision is reversed. The Committee, in pursuing the claims of the unsecured creditors under the authority granted to it by the bankruptcy court, acts "under color of law" and is subject to RFRA. § 2000bb-2(1). Therefore, RFRA and the First Amendment prevent the Committee from appropriating the funds in the Trust because doing so would substantially burden the Trustee's free exercise of religion.

## I.    Background

The Archdiocese of Milwaukee was established on November 28, 1843 and created an archbishopric almost 32 years later. The Archdiocese is both a Wisconsin non-stock corporation and a public juridic person under Codex Iuris Canonici or the Code of Canon Law of the Catholic Church. The Archdiocese's mission is to serve Catholic parishes, schools and institutions so that they, too, may effectively serve people in Southeastern Wisconsin and the broader community. The Archbishop is Jerome E. Listecki, successor to the former Archbishop, now Cardinal, Timothy M.

- 2 -

Dolan.

The Archdiocese has operated and maintained Catholic cemeteries and mausoleums in Milwaukee since as early as 1857 (collectively, the "Milwaukee Catholic Cemeteries"). Those cemeteries consist of Catholic burial facilities within the geographical boundaries of the Archdiocese, including individual burial plots, crypts, niches, and property dedicated to future use as burial facilities. The Milwaukee Catholic Cemeteries encompass approximately 1,000 acres of land in which more than 500,000 individuals are interred. An estimated 3,000 burials take place each year.

In 2007, the Cemetery Trust was formed under Wisconsin law by then-Archbishop Dolan. The funds that comprise the Trust's principal took nearly a century to accumulate and include approximately $55 million that had been held, separately for that period, for the perpetual care of the Milwaukee Catholic Cemeteries even prior to being transferred to the Trust in or around March 2008 (collectively, with any later earned or received Trust funds, the "Perpetual Care Funds"). The Archdiocese receives quarterly distributions from the Trust to cover the costs for providing for the perpetual care of the Milwaukee Catholic Cemeteries.

Under Church law, Catholic cemeteries occupy land blessed and consecrated for the specific use of Christian burial. Church law includes canon law, issued or authorized by the Pope, recognized as the Church's supreme legislator. This Church law is universal and applicable to Catholics world-wide. Church law also includes particular law – that is, law that governs a specific territorial area for which it was

- 3 -

promulgated.

When the Archdiocese established its first cemeteries in the mid-1800's, Church law in the United States forbade priests from providing funeral services for Catholics buried in non-Catholic cemeteries. Although this prohibition was eased in later years, allowing Catholic funerals for those buried in non-Catholic cemeteries, the Church continued to emphasize the sanctity of Catholic burial sites and the importance of Church-owned cemeteries. It also required, among other things, that Catholic cemeteries be maintained in a manner befitting their sacred purpose with money set aside to provide the necessary maintenance and care.

These expectations and requirements are reflected in the universal law of the Church, first codified in 1917 as the Code of Canon Law and in the particular law of the Archdiocese. The placement of the canons governing cemeteries in the original 1917 Code and the successor 1983 Code emphasizes the belief that Catholic cemeteries are sacred places, not mere property. As expressed in the Archdiocese's 1979 *Guidelines for Christian Burial*: "Not only is the Catholic cemetery a sacred place, a place of prayer, and a place reflecting our beliefs and traditions, it is also for the community a sign of the link among all the faithful, living and dead."

For the Church and therefore Catholics, Catholic cemeteries reflect the Catholic belief in the resurrection of Jesus and the community's commitment to the corporal work of mercy of burying the dead. Resurrection of the dead, of course, has always been an essential element of the Christian faith, beginning with Jesus' own

- 4 -

resurrection. For Catholics, moreover, the belief in resurrection is a belief in the ultimate resurrection of one's *own* body. According to this belief, the soul separates from the physical body at death to meet God, while awaiting reunion with its body, transformed and resurrected through the power of Jesus' resurrection, on the last day.

The sacred nature of Catholic cemeteries – and compliance with the Church's historical and religious traditions and mandates requiring their perpetual care – are understood as a fundamental exercise of this core belief. Theologically, the deceased must be treated with respect and charity in the Catholic faith with the hope of resurrection.

Although Archbishop Listecki is the administrator of both the Trust and the Archdiocese, the Trust is separate and distinct from the Archdiocese in civil and in canon law. Under the Code, the ownership of the Trust funds rests in the Trust, not the Archdiocese or the Archbishop. By administering and holding funds for the ongoing care of the Milwaukee Catholic Cemeteries, the Trust and Trustee assume canonical and moral responsibility for that perpetual care.

Similarly, the Code requires that the Trust's funds be used for the Trust's designated purposes. If funds are alienated from the Trust without the required canonical approval, the Archbishop as Trustee may well face discipline and a religious penalty from the Church. Depending on the value of the property at risk, canonical norms require consultation or consent from Church authorities. They may also require approval from the Vatican.

- 5 -

Archbishop Listecki, as Archbishop and Trustee, adheres to the belief in the resurrection of the body and that belief's exercise through, among other things, the perpetual care of the Milwaukee Catholic Cemeteries. If the Trust is legally compelled to cede all or part of the funds to the estate, there will be no funds or substantially less funds for that perpetual care. As a result, neither the Debtor nor the Trust and its Trustee will be able to fulfill their canonical and moral obligations to provide the appropriate care for these sacred sites – consistent with Catholic doctrine and canon law – or assure the requisite permanence, reverence and respect for those buried there.

## II.    Jurisdiction

An appeal to the district court from an interlocutory order issued by a bankruptcy court is appropriate when it involves a controlling question of law over which there is a substantial ground for difference of opinion, and an immediate appeal from the order may materially advance the termination of the litigation. 28 U.S.C. § 1292(b); *In re Archdiocese of Milwaukee*, 482 B.R. 792, 797 (E.D. Wis. 2012). Previously, the Court held that it was "satisfied that this standard is met, such that it will grant leave to appeal. In the course of briefing, the parties are free to pursue further arguments on this point . . ." April 1, 2013 Decision and Order at 2, ECF No. 2. Taking up the Court's invitation, the Committee argues that leave was improvidently granted.

The Committee concedes that most of the issues presented are pure questions of law. However, the Committee argues that whether the Trustee's free exercise rights

- 6 -

would be substantially burdened if some or all of the funds in the Trust were made part of the bankruptcy estate is an issue of fact that is not appropriate for an interlocutory appeal. The Committee is correct that interlocutory appeals on issues of fact are considered "pointless." "Disputed facts are resolved at trial – by the verdict if it's a jury trial and if it's a bench trial by the judge's findings of fact – and thus resolution comes at the end of the trial, which ordinarily is too late for an *interlocutory* appeal." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 625 (7th Cir. 2010) (emphasis in original). That said, the bankruptcy court did not reach the substantial burden issue, although it was raised by the Committee, because it ruled that RFRA did not apply to the Committee in the first instance. Accordingly, the Court is not in the position of reviewing the denial of summary judgment because of the existence of a genuine issue of material fact. *Arenholz v. Bd. Of Trustees of Univ. of Ill.*, 219 F.3d 674, 676 (7th Cir. 2000) ("question of law" refers to "a question of the meaning of a statutory or constitutional regulation, or common law doctrine rather than to whether the party opposing summary judgment has raised a genuine issue of material fact").

The Committee further argues that there are no substantial grounds for difference of opinion on the issues presented by this appeal. Ironically, there may be substantial grounds for difference of opinion regarding the standard which governs whether an issue of law is "contestable." *Compare, Stong v. Bucyrus-Erie Co.*, 476 F. Supp. 224, 225 (E.D. Wis. 1979) (standard is satisfied when "a reasonable appellate judge could vote for reversal of the challenged order"); *In re Bridgestone/Firestone,*

- 7 -

*Inc.*, 212 F. Supp. 2d 903, 909-10 (S.D. Ind. 2002) (rejecting the standard in *Stong*: "Instead, we examine 'the strength of the arguments in opposition to the challenged ruling.'") (internal citation omitted). The arguments in opposition to the bankruptcy court's ruling are strong enough to meet the latter, more rigorous standard.

Moreover, the Court easily concludes that resolution of the issues presented on appeal will materially advance the termination of this litigation. The bankruptcy court stayed the entire adversary proceeding pending the Court's decision on appeal. It cannot be denied that this Court's decision, or a further ruling on appeal from this Court's decision, will shape the course of future proceedings in bankruptcy. The Committee argues that protracted litigation will still occur because the substantial burden issue is not ripe for decision. As noted, the Committee raised this issue before the bankruptcy court. While the bankruptcy court did not reach this issue, it does not follow that the Court must also refrain from doing so.

On that point, a ruling from this Court is justified on a variety of procedural and jurisdictional grounds aside from the review of an interlocutory order. After the Committee filed its motion for partial summary judgment, the bankruptcy court approved a stipulation in which the parties agreed that the Trustee's RFRA and First Amendment claims are non-core:

> The Parties and the Debtor **do not consent** to the Bankruptcy Court hearing and determining these claims and affirmative defenses. The Parties and the Debtor agree that the Bankruptcy Court may hear the RFRA and First Amendment Claims and the RFRA and First Amendment Affirmative Defenses and submit proposed findings of fact

- 8 -

and conclusions of law to the district court in accordance with the provisions of 28 U.S.C. section 157(c)(1).

Adversary Docket No. 61, ¶ 2 (emphasis in original). Despite this explicit stipulation, and to the apparent surprise of the parties, the bankruptcy court entered an order granting the Committee's motion for partial summary judgment. As the Trustee argued in its motion for leave to appeal, there is cause to withdraw the reference because the Trustee's claims are concededly non-core. The distinction between core and non-core proceedings is the most important factor in determining whether there is cause for withdrawal since "'efficiency, uniformity and judicial economy concerns are largely consumed within it.' This is mainly because a bankruptcy judge cannot enter a final judgment in a non-core proceeding. Instead, the bankruptcy judge makes recommendations that are subject to *de novo* review in the district court." *In re Archdiocese of Milwaukee*, Case No. 13-C-58, 2013 WL 660018, at *1 (E.D. Wis. Feb. 22, 2013) (internal citations omitted). Also, since the bankruptcy court should have submitted "proposed findings of fact and conclusions of law," § 157(c)(1), the Court could simply treat the bankruptcy court's order as such and review it accordingly.

Whether the Court treats this as an interlocutory appeal, a § 157(c)(1) proceeding, or as a withdrawal of the reference from the bankruptcy court, the legal issues are subject to *de novo* review. Interlocutory appeals are not appropriate vehicles to resolve issues of fact, but the bankruptcy court did not make any findings of fact. To the extent that the interlocutory nature of the bankruptcy court's order calls into

- 9 -

question the Court's plenary authority to resolve the Trustee's RFRA and First Amendment claims, the reference is withdrawn from the bankruptcy court for this limited purpose. *See, e.g., In re Enron Corp.*, No. 03 Civ.1727 LTS, 2003 WL 22481030, at *4 (S.D.N.Y. Nov. 4, 2003) (explaining that if a proceeding is "non-core, [the district court] will ultimately adjudicate the parties' rights, whether in the context of a trial or dispositive motion practice. Legal determinations by the bankruptcy judge will be subject to *de novo* review on appeal in any event, and the Court retains the power to withdraw the reference for cause at any time. The essential attributes of the judicial power remain with this Court to the extent the matter is non-core").

## III. RFRA

RFRA was passed in response to *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872 (1990), which held that "neutral and generally applicable laws are not susceptible to attack under the Free Exercise Clause of the Constitution even if they incidentally burden the exercise of religion." *Lighthouse Inst. of Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 261 (3d Cir. 2007). RFRA was Congress's attempt to overrule *Smith* by "mandating that neutral laws that substantially burden religious exercise must be justified under the compelling government interest test." *In re Emp't Disc. Litig. Against State of Ala.*, 198 F.3d 1305, 1320 (11th Cir. 1999). Prior to *Smith*, the Court had traditionally held that any law that substantially burdened the free exercise of religion was constitutionally permissible only if the government could show a compelling interest. "Thus, the purpose of RFRA was to return to what

- 10 -

Congress believed was the pre-*Smith* status quo of requiring the Government to show a compelling interest for any law that substantially burdened the free exercise of religion." *Harrell v. Donahue*, 638 F.3d 975, 983-84 (8th Cir. 2011) (internal citations omitted).

In *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Court invalidated RFRA as applied to States and their subdivisions because the Act exceeded Congress's remedial powers under the Fourteenth Amendment. *Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005) (citing *Boerne*, 521 U.S. at 532-36). In the wake of *Boerne*, "[e]very appellate court that has squarely addressed the question has held that the RFRA governs the activities of federal officers and agencies." *O'Bryan v. Bureau of Prisons*, 349 F.3d 399, 401 (7th Cir. 2003) (citing *Guam v. Guerrero*, 290 F.3d 1210, 1221 (9th Cir. 2002); *Henderson v. Kennedy*, 265 F.3d 1072, 1073 (D.C. Cir. 2001); *Kikumura v. Hurley*, 242 F.3d 950, 958 (10th Cir. 2001); *In re Young*, 141 F.3d 854, 856 (8th Cir. 1998)). Nonetheless, the bankruptcy court found that *Boerne* precludes the Trustee's RFRA claims because "Wisconsin trust law governs the validity of the Trust, and Wisconsin fraudulent transfer law governs whether transfers of the Debtor's property to the Trust are avoidable and recoverable by the Committee. . . . [T]hese state laws cannot be invalidated by RFRA." 485 B.R. at 392.

It is true, as the bankruptcy court explained, that the property interests of the Archdiocese in relation to the Trust are generally determined by state law. But the ultimate issue of whether or not that property can be brought into the bankruptcy estate

is governed solely by the Bankruptcy Code.  11 U.S.C. § 541(a) (defining the property *of the estate*); § 542(a) (turnover of property *to the estate*); § 550(a) ("to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, *for the benefit of the estate*, the property transferred . . .") (emphasis added).   As the Eighth Circuit held in light of *Boerne*:

> We conclude that RFRA is an appropriate means by Congress to modify the United States bankruptcy laws. . . . The Trustee has not contended, and we can conceive of no argument to support the contention, that Congress is incapable of amending the legislation that it has passed. Neither can we accept any argument that allowing the discharge of a debt in bankruptcy and preventing the recovery of a transfer made by insolvent debtors is beyond the authority of Congress.  We therefore conclude that Congress had the authority to enact RFRA and make it applicable to the law of bankruptcy.

*Young*, 141 F.3d at 861 (internal citations omitted).  Simply put, *Boerne* is no obstacle to the application of RFRA in this case.  Applying RFRA to the Committee's claims would not invalidate state law.

## A.    Government

Under RFRA, "government" may not "substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless it can demonstrate that the burden is "in furtherance of a compelling governmental interest" and is "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000bb-1(a), (b).  As an initial matter, the Trustee argues that RFRA applies not just to claims against "government," as that term is defined by RFRA, but also to actions between private parties.  The Seventh Circuit has indicated, albeit in

- 12 -

dicta, that RFRA "is applicable only to suits to which the government is a party." *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006). This is in accordance with the general weight of authority among other appellate courts. *See Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 411-12 (6th Cir. 2010) (citing then-Judge Sotomayor's dissent in *Hankins v. Lyght*, 441 F.3d 96 (2d Cir. 2006)); *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1120-21 (9th Cir. 2000); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834-35 (9th Cir. 1999).

Therefore, the Court will proceed under the assumption that the Seventh Circuit would find RFRA inapplicable to suits between private parties. Nonetheless, the Court finds that the Committee falls within the definition of "government" because it acts under color of law pursuant to the authority granted to it by the bankruptcy court.

### B.     Color of Law

Under RFRA, "the term 'government' includes a branch, department, agency, instrumentality, and official (*or other person acting under color of law*) of the United States . . ." § 2000bb-2(1) (emphasis added). The "judicial interpretation of the phrase 'acting under color of law,' as used in 42 U.S.C. § 1983, applies equally in [a] RFRA action." *Sutton*, 192 F.3d at 835 (citing *Brownson v. Bogenschutz*, 966 F. Supp. 795, 797 (E.D. Wis. 1997)). Accordingly, the "ultimate issue" is whether "the alleged infringement of federal rights [is] fairly attributable to the [government]." *Rendell-*

*Baker v. Kohn*, 457 U.S. 830, 838 (1982). For the reasons that follow, the Committee's pursuit of claims against the Cemetery Trust is fairly attributable to the government.

The Supreme Court has described a two-part test on the issue of "fair attribution." First, the deprivation "must be caused by the exercise of some right or privilege created by the [government] or by a rule of conduct imposed by the [government] . . ." *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982). The Committee does not dispute that this element is satisfied. *Id.* (describing cases where "a state statute provided the right to garnish or to obtain prejudgment attachment, as well as the procedure by which the rights could be exercised"). As explained above, the Committee is attempting to claim the assets in the Trust for the benefit of the bankruptcy estate pursuant to various provisions of the Bankruptcy Code. *See, e.g.,* 11 U.S.C. § § 541, 542, 544, and 548.

Second, "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Lugar*, 457 U.S. at 937. "Action by a private party pursuant to [a] statute, without something more, [is] not sufficient to justify characterization of that party as a 'state actor.'" *Id.* at 939. The Supreme Court has identified numerous situations when private conduct is fairly attributed to the government. For example, private action can become state action when private actors "conspire or are jointly engaged with state actors to deprive a person of constitutional rights;" when the state "compels the discriminatory action;" when the state "controls a

- 14 -

nominally private entity;" when the state is "entwined" with a private entity's "management or control;" when the state "delegates a public function to a private entity;" or when there is "such a close nexus between the state and the challenged action that seemingly private behavior may be treated as that of the state itself." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 815-16 (7th Cir. 2009) (internal citations omitted).

Confusion reigns in this area of the law, and the Supreme Court has questioned whether these different tests are "actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry that confronts the Court in such a situation . . ." *Lugar* at 939. For example, in *Hallinan*, the Seventh Circuit described the "close nexus" situation as a separate test; just under two months later, the Seventh Circuit wrote that at its "most basic level, the state action doctrine *requires* that a court find such a 'close nexus between the State and the challenged action' that the challenged action 'may be fairly treated as that of the State itself.'" *Rodriguez v. Plymouth Ambulance Service*, 577 F.3d 816, 823 (7th Cir. 2009) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974) (emphasis added)). The *Rodriguez* court then recognized that the various formulations are susceptible to "semantic variations, conflations and significant overlap in practical application; we further recognize that they 'lack rigid simplicity.' Nevertheless, we believe that it is useful to describe these tests as the symbiotic relationship test, the state command and encouragement test, the joint participation doctrine and the public function test." *Id.* at 823-24 (internal

- 15 -

citations and quotations omitted). At the risk of placing this case in a category that may or may not be analytically distinct, the Court finds that it falls under the "delegation of a public function" rubric. In turn, the Committee's performance of this public function, discussed below, demonstrates that the requirement of a "close nexus" has also been satisfied.

In the underlying Chapter 11 proceedings, the Archdiocese is acting as a debtor-in-possession with respect to the bankruptcy estate. "In recognition of the fact that, in a reorganization, the appointment of a trustee is generally the exception, rather than the rule, the Bankruptcy Code vests a debtor-in-possession with the powers of a trustee in the event no trustee is appointed." *In re iPCS, Inc.*, 297 B.R. 283, 287 (Bankr. N.D. Ga. 2003). As a result, the Archdiocese has "the power to bring causes of action on behalf of the estate, such as avoidance actions." *Id.* More than that, the Archdiocese, as debtor-in-possession, is "duty-bound[] to assert cognizable claims in an effort to recover damages for the benefit of the estate." *Id.*

Archbishop Listecki is the spiritual leader of the Archdiocese, and he is also the Trustee of the Cemetery Trust. Because of this conflict of interest, the Archdiocese cannot bring avoidance actions against the Trust. Accordingly, the Committee, consisting of five unsecured creditors previously appointed by the United States Trustee, 11 U.S.C. §§ 1102(a)(1), (b)(1), was granted derivative standing by the bankruptcy court to "assert and litigate the Avoidance and Turnover Claims against the Archbishop for the benefit of the Debtor's estate, including, but not limited to, any

- 16 -

Avoidance and Turnover Claims that, if not for the Court's order approving this Stipulation, the Committee would not have had standing to bring because those Avoidance and Turnover Claims belong to the Debtor's estate." Adversary Docket No. 39, ¶ 3. The "ability to confer derivative standing upon creditors' committees is a straightforward application of bankruptcy courts' equitable powers." *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003).

In the Court's view, the pursuit of claims on behalf of a bankruptcy estate is a traditional public function. As one court explained, the filing of a Chapter 11 petition causes a "fundamental *legal change* in the entity." *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 524 (Bankr. E.D.N.Y. 1989) (emphasis in original).

> The filing entity is legally different from what it was the moment before filing, as it now assumes the mantle of a new juridical entity, a debtor-in-possession. *As such it becomes an officer of the court subject to the supervision and control of the Bankruptcy Court and the provisions of the Bankruptcy Code. A debtor-in-possession in a Chapter 11 case has the same fiduciary duties as a trustee appointed by a court.* Indeed, the debtor-in-possession occupies the shoes of a trustee in every major way. As a *de jure* trustee, the debtor-in-possession holds its powers in trust for the benefit of creditors.

*Id.* (emphasis added). In other words, the debtor-in-possession is an officer of the court charged with the duty to act for the benefit of the bankruptcy estate. By giving the Committee derivative standing to bring claims on behalf of the estate, the bankruptcy court effectively transferred the responsibility for performing this public function from the Archdiocese, as debtor-in-possession, to the Committee. Stated

- 17 -

another way, because of its inability to pursue legal action against the Trust, the Archdiocese, in conjunction with the bankruptcy court, delegated this function to the Committee, a function that is "traditionally the exclusive prerogative" of the government. *Jackson*, 419 U.S. at 353.

Indeed, by analogy to the immunity of a bankruptcy trustee, courts have held that a creditors committee is entitled to qualified immunity. "Because of its central statutory role in the Chapter 11 process, and to assure the effective representation of its constituency, an official committee such as the Creditors Committee enjoys a qualified immunity that corresponds to, and is intended to further, the Committee's statutory duties and powers." *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 514 (S.D.N.Y. 1994); *see also In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 717, 722 (Bankr. S.D.N.Y. 1992). This immunity "extends to conduct within the scope of the committee's statutory or court-ordered authority." *Id.* The Committee concedes that it is entitled to qualified immunity, but then disclaims what necessarily follows: only parties acting under color of law are entitled to qualified immunity. *Wyatt v. Cole*, 504 U.S. 158, 167-68 (1992) ("Qualified immunity strikes a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions. . . . These rationales are not transferable to private parties"). The Committee cannot claim the benefits of qualified immunity while ignoring its downside in the matter at hand. *See, e.g., In re Walnut Equipment Leasing Co.*, No. 97-19699 DWS, 2000 WL 1456951, at *4 (Bankr. E.D.

- 18 -

Pa. Sept. 22, 2000) ("the Committee was authorized to commence avoiding actions. It did so, and is entitled to immunity for its actions. A contrary holding would chill the ability of the committee to properly exercise its obligation to maximize assets for the estate since it could easily find itself . . . the subject of suit . . .").

The conclusion that the Committee is acting under color of law is supported by the Supreme Court's delegation-of-a-public-function cases. For example, in *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 628 (1991), the Court held that a private litigant in a civil case may not use peremptory challenges to exclude jurors on account of their race because "the injury to excluded jurors would be the direct result of governmental delegation and participation." The Court framed its analysis around three guiding principles. First, the "extent to which the actor relies on governmental assistance and benefits;" second, "whether the actor is performing a traditional governmental function;" and third, "whether the injury caused is aggravated in a unique way by the incidents of governmental authority." *Id.* at 621-22 (internal citations omitted); *see also Georgia v. McCollum*, 505 U.S. 42, 51 (1992) (extending *Edmonson* to a criminal defendant's use of race-based peremptory challenges).

First, the Court explained that although "private use of state-sanctioned private remedies or procedures does not rise, by itself, to the level of state action, our cases have found state action when private parties make extensive use of state procedures with 'the overt, significant assistance of state officials.'" *Edmonson*, 500 U.S. at 622 (internal citations omitted). The Court continued: "It cannot be disputed that, without

- 19 -

the overt, significant participation of the government, the peremptory challenge system, as well as the jury trial system of which it is a part, simply could not exist." *Id.* at 622. Similarly, the Committee exists only because it was appointed by the bankruptcy trustee, and it is subject to oversight and control by the trustee and the bankruptcy court. 28 U.S.C. § 586(a)(3)(E) (trustee is responsible for "monitoring creditors' committees appointed under title 11"); 11 U.S.C. § 1103(a) (court must approve the hiring of any "attorneys, accountants, or other agents"); §§ 503(b)(2), (b)(3)(F), (b)(4) (allowance of administrative expenses);[1] § 1102(a)(4) (bankruptcy court may order the trustee to change the membership of a committee if it "determines that the change is necessary to ensure adequate representation of creditors").

Most important, the Committee is allowed to pursue claims on behalf of the bankruptcy estate only because the bankruptcy court gave the Committee standing to do so. This standing can be unilaterally withdrawn. *In re Adelphia Commc'n Corp.*, 544 F.3d 420, 423 (2d Cir. 2008) ("a court may withdraw a committee's derivative standing and transfer the management of its claims, even in the absence of that committee's consent, if the court concludes that such a transfer is in the best interests of the bankruptcy estate"). Accordingly, without the "direct and indispensable participation of the judge, who beyond all question is a state actor," *Edmonson* at 624, the Committee would not be able to serve its intended purpose. The bankruptcy court

---

[1] The bankruptcy court already suspended payment of the Committee's legal fees and expenses because of concern over the Archdiocese's ability to cover its operating expenses. Bankruptcy Docket Nos. 1464, 1784.

"'has not only made itself a party to the [violation], but has elected to place its power, property and prestige behind the [violation].'" *Id.* (internal citations omitted). "In so doing, the government has 'create[d] the legal framework governing the [challenged] conduct,' and in a significant way has involved itself with" violating the Trustee's right to free exercise of religion. *Id.* (internal citations omitted).

Second, as the Court already explained, the pursuit of claims on behalf of a bankruptcy estate is a traditional public function. *Jackson* at 352 ("We have . . . found state action present in the exercise by a private entity of powers traditionally exclusively reserved to the [government]"). As in *Edmonson*, this public function is not altered because the Committee is motivated by private interests. "Though the motive of a peremptory challenge may be to protect a private interest, the objective of jury selection proceedings is to determine representation on a governmental body. . . . The fact that the government delegates some portion of this power to private litigants does not change the governmental character of the power exercised." *Edmonson* at 626; *see also McCollum*, 505 U.S. at 54 ("that a defendant exercises a peremptory challenge to further his interest in acquittal does not conflict with a finding of state action. Whenever a private actor's conduct is deemed 'fairly attributable' to the government, it is likely that private motives will have animated the actor's decision").

Third, the injury in *Edmonson* was "made more severe" because the government "permit[ted] it to occur within the courthouse itself. Few places are a more real expression of the constitutional authority of the government than a

- 21 -

courtroom, where the law itself unfolds." *Edmonson* at 628. So it is here. Free exercise of religion, just like equal protection, is inherent in our constitutional system.

For the foregoing reasons, the Committee's actions are fairly attributable to the government. Therefore, the Committee is acting under color of law for purposes of RFRA.

### C.    Substantial Burden

Under RFRA, a "substantial burden on the free exercise of religion . . . is one that forces adherents of a religion to refrain from religiously motivated conduct, inhibits or constrains conduct or expression that manifests a central tenet of a person's religious beliefs, or compels conduct or expression that is contrary to those beliefs." *Mack v. O'Leary*, 80 F.3d 1175, 1179 (7th Cir. 1996). This "generous definition" is "sensitive to religious feeling. Many religious practices that clearly are not mandatory . . . are important to their practitioners, who would consider the denial of them a grave curtailment of their religious liberty." *Id.* It also reflects the "undesirability of making judges arbiters of religious law." *Id.*

In 2000, Congress enacted the Religious Land Use and Institutionalized Persons Act ("RLUIPA"),[2] which defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42

---

[2] RLUIPA was enacted in response to *Boerne*, discussed above. "So Congress went back to the drawing board, narrowed its focus, and began compiling a legislative record of free-exercise violations in two discrete areas: laws affecting land use by religious organizations and laws affecting the religious exercise of institutionalized person. RLUIPA was the result of this effort and was adopted in 2000, three years after" *Boerne*. *River of Live Kingdom Ministries v. Vill. Of Hazel Crest, Ill.*, 611 F.3d 367, 380 (7th Cir. 2010) (Sykes, J., dissenting).

- 22 -

U.S.C. § 2000cc-5(7)(A). The RLUIPA definition, now incorporated by RFRA, §
2000bb-2(4), "prompted a renewed consideration of what constitutes a substantial
burden." *Koger v. Bryan*, 523 F.3d 789, 799 (7th Cir. 2008). In the "context of
RLUIPA's broad definition of religious exercise, a land-use regulation that imposes a
substantial burden on religious exercise is one that necessarily bears direct, primary,
and fundamental responsibility for rendering religious exercise – including the use of
real property for the purpose thereof within the regulated jurisdiction – effectively
impracticable." *Civil Liberties for Urban Believers v. City of Chi.*, 342 F.3d 752, 761
(7th Cir. 2003). The Court is unsure as to whether this formulation is useful outside of
a land use regulation. However, RLUIPA also applies to prisons that receive federal
funding, *Ortiz v. Downey*, 561 F.3d 664, 670 (7th Cir. 2009), and *Koger* applied the
*Civil Liberties* test to such a claim. In any event, the *Mack* standard apparently still
applies to RFRA claims, and even if the *Civil Liberties* standard should apply, the
difference is not outcome-determinative. *Koger*, 523 F.3d at 799 ("In determining
when an exercise has become 'effectively impracticable,' it is helpful to remember that
in the context of the Free Exercise Clause, the Supreme Court held that a government
imposes a substantial burden on a person's beliefs when it 'put[s] substantial pressure
on an adherent to modify his behavior and violate his beliefs'") (quoting *Thomas v.
Review Bd.*, 450 U.S. 707, 718 (1981)); *Mack* at 1178 ("the more generous definition
is more faithful both to the statutory language and to the approach that the courts took
before *Smith*, in cases like . . . [*Thomas*] – which is the approach that Congress wanted

them to take under [RFRA]"); *Guerrero*, 290 F.3d at 1222 (applying *Thomas*'s "substantial pressure" test to an RFRA claim).

As explained by Archbishop Listecki, "the care and maintenance of Catholic cemeteries, cemetery property, and the remains of those interred is a fundamental exercise of the Catholic faith." Adv. Docket No. 69-2, Declaration of Archbishop Listecki, ¶ 3. Thus, if the Trust's funds are converted into the bankruptcy estate, there will be no funds or, at best, insufficient funds for the perpetual care of the Milwaukee Catholic Cemeteries. *Id.* at ¶ 30. Moreover, Archbishop Listecki would be forced to choose between obedience to church doctrine and obedience to a civil judicial authority:

> In my lay and ecclesiastical capacities, responsible for the religious, moral, and fiscal health of the Archdiocese – as well as the Trust – I have never been placed in a position of having to choose between a doctrinal directive or mandate from church authorities and a lawful order from a civil judicial authority. No religious leader in American society should be compelled to make that choice, which is no choice at all in light of the overriding deference owed one's highest religious authority.

*Id.* at ¶ 44.

Archbishop Listecki's declaration unquestionably represents the authoritative church position regarding the central and sacred nature of cemeteries to the Catholic faith. A secular court "may not take sides on issues of religious doctrine." *McCarthy v. Fuller*, 714 F.3d 971, 975 (7th Cir. 2013). The Court's only province is to decide "whether a party is correct in arguing that there is an authoritative church ruling on an

- 24 -

issue, a ruling that removes the issue from the jurisdiction of that court. But once the court has satisfied itself that the authorized religious body has resolved the religious issue, the court may not question the resolution." *Id.* at 976 (internal citations omitted). In *Fuller*, a civil lawsuit "charging RICO, trademark, and copyright violations along with Indiana torts," *Id.* at 972, the defendant claimed that she was a member of a Roman Catholic religious order. The district court held that this was a proper jury question, but on appeal, the Seventh Circuit elicited an *amicus* brief from the Holy See which concluded that Fuller "is not a nun . . ., not a member of the Catholic Sisterhood or of any Catholic religious order, and not entitled under Catholic law to call herself Sister Therese." *Id.* at 976. Judge Posner considered the brief to be the "unquestionably authentic statement of the Holy See. In it the Holy See has spoken, laying to rest any previous doubts: Fuller has not been a member of any Catholic religious order for more than 30 years. Period. The district judge has no authority to question that ruling. A jury has no authority to question it. We have no authority to question it." *Id.* at 978. In other words, "federal courts are not empowered to decide (or to allow juries to decide) religious questions." *Id.* at 980.

The Committee argues, as discussed above, that further proceedings are required because substantial burden is an issue of fact that needs further development through discovery. Procedurally, the Committee moved for partial summary judgment, and in response, the Trustee asked the bankruptcy court to not only deny the Committee's motion, but also to enter summary judgment in his favor. Fed. R. Bankr.

P. 7056; Fed. R. Civ. P. 56(f)(1) (Judgment Independent of the Motion). At a hearing which occurred before the Committee filed its reply brief, the parties agreed that the bankruptcy court would defer ruling on the substantial burden issue, at least with respect to how it was raised by the Trustee's request for summary judgment. October 18, 2012 Hearing Transcript, ECF No. 13-14. Accordingly, the bankruptcy court did not reach this issue because it concluded that RFRA did not apply to the Committee's actions in the first instance. That being said, Archbishop Listecki's declaration stands unopposed, and on the issue of religious doctrine, it is unassailable. Moreover, the issue of substantial burden is essentially coterminous with religious doctrine. Canon law dictates that the funds in the Trust must be used for the perpetual care of those interred under the tenets of the Catholic faith. Removing some or all of these funds from the Trust and placing them in the bankruptcy estate would undoubtedly put "substantial pressure" on Archbishop Listecki and the Trust to "modify [their] behavior" and "violate [their] beliefs." *Koger* at 799. No amount of discovery can change canon law. In this context, any transfer of funds from the Trust to the estate would meet the substantial burden test.

### D. Compelling Governmental Interest; Least Restrictive Means

Because the Committee is "government," and because invading the Trust would substantially burden the Trustee's free exercise of religion, the Committee must establish that this burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. § 2000bb-1(b)(1), (2).

- 26 -

Compelling governmental interests are "interests of the highest order." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Examples include maintaining the tax system, *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989), enforcing participation in the social security system, *United States v. Lee*, 455 U.S. 252, 258-59 (1982), maintaining national security and public safety, *Gillette v. United States*, 401 U.S. 437, 462 (1971), and providing public education, *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972).

With respect to the Bankruptcy Code, the Court agrees with the Eighth Circuit that the "interests advanced by the bankruptcy system are not compelling under the RFRA." *In re Young*, 82 F.3d 1407, 1420 (8th Cir. 1996), *vacated on other grounds*, 521 U.S. 1114 (1997), *reaff'd*, 141 F.3d 854 (8th Cir. 1998). "[B]ankruptcy is not comparable to interests of national security or public safety. . . . [A]llowing debtors to get a fresh start or protecting the interests of creditors is [also] not comparable to the collection of revenue through the tax system or the fiscal integrity of the social security system, which have been recognized as compelling governmental interests in the face of a religious exercise claim." *Id.*; *see also In re Roman Catholic Archbishop of Portland, Ore.*, 335 B.R. 842, 864 (Bankr. D. Or. 2005) ("the Bankruptcy Code itself contains various provisions that limit the breadth of the estate, . . . Thus, the Bankruptcy Code itself provides for exceptions that do not further the policies of the Code. In light of those exceptions, I conclude that there is no compelling governmental interest in applying § 544(a)(3) if doing so would impose a substantial

- 27 -

burden on the exercise of religion").

Furthermore, even if enforcement of the Bankruptcy Code could be considered a compelling governmental interest, enforcing the code in this particular case is not the least restrictive means of furthering that interest. "If the compelling state goal can be accomplished despite the exemption of the particular individual, then a regulation which denies an exemption is not the least restrictive means of furthering the state interest." *Callahan v. Woods*, 736 F.2d 1269, 1272-73 (9th Cir. 1984). Once again, as the Eighth Circuit explained: "we cannot see how the recognition of what is in effect a free exercise exception to the avoidance of fraudulent transfers can undermine the integrity of the bankruptcy system as a whole; its effect will necessarily be limited to the debtor's creditors, who will as a result have fewer assets available to apply to the outstanding liabilities, and not all creditors or even all debtors." *Young*, 82 F.3d at 1420

## IV.  First Amendment

The First Amendment provides that Congress shall make no law prohibiting the free exercise of religion. The Free Exercise Clause "withdraws from legislative power, state and federal, the exertion of any restraint on the free exercise of religion. Its purpose is to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority." *Jimmy Swaggart Ministries v. Bd. Of Equalization of Cal.*, 493 U.S. 378, 384 (1990). When faced with a free exercise challenge, the first inquiry is whether the law being challenged is neutral and of general applicability. Such a law

"need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi*, 508 U.S. at 531 (citing *Smith*). In this respect, the bankruptcy court held that the "purpose and effect of the Bankruptcy Code provisions at issue in this case are generally applicable and religion-neutral." 485 B.R. at 393.

This conclusion, even if correct, does not end the inquiry. *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 996 (7th Cir. 2006). "A regulation neutral on its face may, in its *application*, nonetheless offend the constitutional requirement for neutrality if it unduly burdens the free exercise of religion," in which case there must be a "compelling governmental interest justif[ying] the burden." *Id.* (quoting *Jimmy Swaggart Ministries*, 493 U.S. at 384-85) (emphasis added). As the Court already explained, the burden on the Trustee's free exercise of religion is substantial, and there is no compelling governmental interest which can justify the burden. *St. John's United Church of Christ v. City of Chi.*, 502 F.3d 616, 644 (7th Cir. 2007) ("a facially-neutral law that 'imposes a substantial burden on religion' offends the Free Exercise Clause and likewise is subject to strict scrutiny") (quoting *Vision Church* at 996).

## V.      Conclusion

RFRA and the First Amendment prevent the Committee from appropriating the funds in the Trust because doing so would substantially burden the Trustee's free exercise of religion.

Therefore, **IT IS HEREBY ORDERED THAT** the decision of the

bankruptcy court is **REVERSED**, and this matter is **REMANDED** for further proceedings consistent with this opinion.

   Dated at Milwaukee, Wisconsin, this 29th day of July, 2013.


            **BY THE COURT:**


            **HON. RUDOLPH T. RANDA**
            **U.S. District Judge**