IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re: | Chapter 11 |
| Archdiocese of Milwaukee, | Bankruptcy Case No. 11-20059-SVK |
| Debtor. | |
| Archbishop Jerome E. Listecki, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust, | Adv. Proc. No. 11-02459-SVK |
| | District Court Case No. 13-CV-179 |
| Plaintiff-Appellant, | |
| vs. | |
| Official Committee of Unsecured Creditors, | |
| Defendant-Appellee. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION TO VACATE JUDGMENT AND DECISION AND ORDER PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(B) AND 28 U.S.C. § 455**

James I. Stang (CA Bar No. 94435)
Kenneth H. Brown (CA Bar No. 100396)
Gillian Brown (CA Bar No. 205132)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:jstang@pszjlaw.com
         gbrown@pszjlaw.com

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

JURISDICTION AND VENUE ............................................................................................ 6

BACKGROUND ..................................................................................................................... 6

ARGUMENT ........................................................................................................................... 12

    A.    Federal Rule of Civil Procedure 60(b)(6) and Supreme Court and Seventh Circuit precedent authorize the Court to vacate a judgment where the presiding judge should have recused himself pursuant to 28 U.S.C. § 455........ 12

    B.    Judge Randa should have recused himself under 28 U.S.C. § 455..................... 13

    C.    Under the *Liljeberg* test, the Court should vacate the Judgment of Dismissal and the Decision & Order. .................................................................. 19

    D.    The Committee's Motion is timely. .................................................................... 27

CONCLUSION....................................................................................................................... 28

# TABLE OF AUTHORITIES

## CASES

*American Textile Mfrs. Inst., Inc. v. Limited, Inc.*,
  190 F.3d 729 (6th Cir.1999), *cert denied*, 529 U.S. 1054, 120 S.Ct. 1556, 146 L.Ed.2d 461 (2000)................................................................................................................ 16, 27

*Cheney v. United States Dist. Ct.*,
  541 U.S. 913, 124 S.Ct. 1391, 158 L.Ed.2d 225 (2004).......................................................... 15

*Civil Liberties for Urban Believers v. City of Chicago*,
  *342 F.3d 752 (7th Cir. 2003), cert. denied 541 U.S. 1096, 124 S.Ct. 2816, 159 L.Ed.2d 262 (2004)*................................................................................................................ 26

*Conestoga Wood Specialties Corp.*,
  --- F.3d ---, 2013 WL 3845365 (3rd Cir. July 26, 2013) ...................................................... 24

*Hobby Lobby Stores, Inc. v. Sebelius*,
  --- F.3d ---, 2013 WL 3216103 (10th Cir. June 27, 2013)...................................................... 24

*In re Aetna UCR Litigation*,
  2013 WL 1622160 (D.N.J. 2013) ............................................................................................ 19

*In re Marshall*,
  --- F.3d ----, 2013 WL 3242487 (9th Cir. 2013)..................................................................... 14

*In re Sherwin-Williams Co.*,
  607 F.3d 474 (7th Cir. 2010) ................................................................................................... 15

*Liljeberg v. Health Services Acquisition Corp.*,
  486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed. 2d 855 (1988)........................................ 12, 13, 14, 18

*Liteky v. United States*,
  510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).")...................................................... 14

*Matter of Mason*,
  916 F.2d 384 (7th Cir. 1990) ................................................................................................... 15

i

*Porter v. Singletary,*
  49 F.3d 1483 (11th Cir.1995) ........................................................................ 16
*Reed v. Faulkner,*
  842 F.2d 960 (7th Cir. 1988) ...................................................................... 5, 25
*Russell v. Lane,*
  890 F.2d 947 (7th Cir. 1989) ........................................................................ 13
*Tramonte v. Chrysler Corporation,*
  136 F.3d 1025  (5th Cir. 1998) ................................................................. 16, 19
*United States v. Lee,*
  455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) ............................... 26

**STATUTES**

28 U.S.C. § 158 ............................................................................................... 6
28 U.S.C. § 455 ...................................................................................... passim
28 U.S.C. § 1334 ............................................................................................. 6
28 U.S.C. § 1408 ............................................................................................. 6
28 U.S.C. § 1409 ............................................................................................. 6

**OTHER AUTHORITIES**

Code of Conduct for United States Judges ........................................... 6, 13, 16
First Amendment to the United States Constitution .................................. passim
Religious Freedom Restoration Act......................................................... passim

**RULES**

Fed. R. Civ. P. 60 ............................................................................ 1, 6, 12, 27

DOCS_LA:270148.7 05058/003

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") submits this memorandum of points and authorities in support of its motion for an order pursuant to Federal Rule of Civil Procedure 60(b)(6) and 28 U.S.C. § 455 vacating the Judgment in a Civil Case entered by this Court on August 1, 2013 [Dist. Doc. No. 26] (the "<u>Judgment of Dismissal</u>") and the Decision and Order entered on July 29, 2013 [Dist. Doc. No. 24] (the "<u>Decision & Order</u>"). The Judgment of Dismissal and the Decision & Order should be vacated on the grounds that the Honorable Rudolph T. Randa should have recused himself from this presiding over any aspect of this adversary proceeding pursuant to 28 U.S.C. § 455. Under established United States Supreme Court precedent, a presiding judge's failure to recuse himself when required by 28 U.S.C. § 455 is grounds to vacate a judgment under Federal Rule of Civil Procedure 60(b)(6), and the Court should do so in this case.[1]

## INTRODUCTION

At the heart of this stage of this voluntary chapter 11 bankruptcy case is the question of whether the Committee, acting on behalf of the estate, will be able to recover in excess of $55 million it contends the Archdiocese of Milwaukee (the "<u>Debtor</u>") fraudulently transferred to the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust (the "<u>Cemetery Trust</u>").

The Cemetery Trust and the Debtor assert that the monies transferred were and are designated for the care of the Debtor's cemeteries, and that not a single dollar from the Cemetery Trust can be devoted to paying debts owed to creditors. They further contend that the Debtor has contractual, religious and moral obligations to provide perpetual care for each

---

[1] On August 12, 2013, the Committee is filing a separate Motion to Recuse Judge Randa from the Cemetery Trust Litigation or any Cemetery Related Proceedings (the "<u>Motion to Recuse</u>"). Counsel to the Committee has served as counsel to the official committees of unsecured creditors in eight bankruptcy cases concerning archdioceses, dioceses and religious orders, and this is the first time the Committee has ever sought to recuse one of the presiding judges. The Committee has not sought to recuse Judge Randa on the grounds that he is Catholic, but rather due to his undisclosed interest in maintenance of numerous gravesites in the cemeteries at issue. There have been a number of judges who have presided over diocesan bankruptcy cases who have disclosed to the parties that they are Catholic. Specifically, the Committee is informed and believes that the bankruptcy judge in this case, the Honorable Susan V. Kelly, is Catholic, and the Honorable Louse DeCarl Adler, who presided over the chapter 11 bankruptcy case of the Roman Catholic Bishop of San Diego, is Catholic. At no time, even in the face of adverse rulings, did Committee counsel ever seek to recuse those judges.

individual who is or will be buried in its cemeteries, that part of the purchase price of each gravesite was designated for perpetual care, and that the Debtor held those funds in trust prior to their transfer into the Cemetery Trust in 2008. Finally, the Cemetery Trust and the Debtor contend that permitting the Committee to recover the funds transferred to the Cemetery Trust for the estate would make it impossible for the Debtor to fulfill its obligations to care for the cemeteries.

In its Decision & Order, the District Court essentially held that the Cemetery Trust is not subject to the fraudulent conveyance laws because it is religious. Under the District Court's ruling, a debtor can fraudulently convey funds to a trust and avoid its obligations to its creditors because of its religious status. No other court has ever reached such a conclusion.

During the week of July 29, 2013, the Committee discovered that at least nine of Judge Randa's relatives (including his mother, his father and his wife's parents) are buried in cemeteries owned and operated by the Debtor, the very cemeteries that are to be maintained with the funds moved from the Debtor's accounts to the Cemetery Trust before filing for bankruptcy.[2] This fact alone creates the appearance of partiality in favor of the Cemetery Trust in this action and establishes strong grounds for recusal under 28 U.S.C. § 455(a). This discovery put the Committee on notice that there was reason to be concerned about the District Court's determination that it was appropriate to reach issues that were not addressed below, to decide issues in tension with settled doctrine, and to protect the Cemetery Trust in its entirety by dismissing the litigation.

Judge Randa's purchase of his parents' burial rights is an additional and alternative ground for recusal. The Committee subsequently discovered that Judge Randa himself purchased his parent's burial rights in a cemetery owned by the Debtor, which means that he is a party to a contract wherein the Cemetery Trust is the exclusive provider of care and maintenance for their burial crypts, with an interest in how the funds are used.[3] As a purchaser

---

[2] *See* Affidavit of James Stang submitted in support of this Motion.
[3] *See* Exhibit N to Affidavit of James I. Stang.

of burial rights himself, Judge Randa entered into a contract wherein a portion of the purchase price was, according to the Debtor, set aside in trust for the maintenance of his parents' burial crypts. These monies were moved to the Cemetery Trust as a part of the transfers that are being challenged by the Committee in this case. According to the Cemetery Trust, it is holding funds that have allegedly been set aside to pay for the Debtor's religious, moral, and contractual perpetual care obligations to Judge Randa, obligations which the Debtor contends that it will be unable to fulfill if the fraudulent conveyance laws are applied to its movement of funds to the Cemetery Trust. Therefore, Judge Randa himself is a creditor of the estate. Furthermore, based on the discovery received pursuant to the Rule 2004 Order, the plaintiff in this case, the Cemetery Trust, concedes that it is holding funds (allegedly) in trust for Judge Randa as purchaser of his parents' burial crypts and these are the very funds that the Committee believes were fraudulently transferred and, therefore, seeks to return to the estate. The Debtor asserts it will be unable to fulfill its maintenance obligations to Judge Randa and his relatives, – whether in whole or in part--if the Committee prevails at this stage of the litigation. These facts are is grounds for recusal under 28 U.S.C. § 455(a) and 28 U.S.C. § 455(b)(4) as Judge Randa has an impermissible financial interest in the outcome of the litigation.

For these reasons, Judge Randa should have disqualified himself from presiding over any aspect of this adversary proceeding. Yet, he did not do so. Nor did he disclose the facts to the parties at any time during the case. Instead, he reversed an order of the Bankruptcy Court that granted partial summary judgment in favor of the Committee, dismissed the case and entered summary judgment in favor of the Cemetery Trust, on issues that specifically (by agreement of the parties and order of the Bankruptcy Court) were **not** before the Court.

The appearance of bias and the potential of actual bias created a very real injustice to creditors of the estate, on whose behalf the Committee was acting in the Cemetery Trust Litigation. Judge Randa dismissed an action that had the potential to provide in excess of $55 million to creditors of this estate, which include, not only sex abuse victims, but trade creditors, employees and vendors. Permitting his Judgment of Dismissal and Decision & Order to stand

will also produce injustice in other cases. Judge Randa issued several legally questionable rulings in connection with his decision that will have far-reaching effects in other cases. First, he concluded that a creditors' committee in a bankruptcy case qualifies as the "government" for the purpose of federal statutory and constitutional claims simply because the committee is appointed by the court. By implication, any creditors committee, whether the debtor is religious or not, would be a government actor. If this were a correct interpretation of the law, then all creditor committees would be at risk of being sued by debtors and other parties in interest for alleged statutory or constitutional civil rights violations. Further, if the Religious Freedom Restoration Act ("RFRA") is the basis of the claim, then the debtor will even be able to argue that creditors who, for example, raise fraudulent conveyance claims against the debtor, should pay damages and the debtors' attorneys fees. This is a radical change to federal bankruptcy law and practice, and a detriment to creditors unimagined by Congress when it enacted the Bankruptcy Code or RFRA.

The Court also unilaterally decided that the Cemetery Trust had satisfied its burden of proving a substantial burden, even though the parties and Bankruptcy Court had agreed, appropriately, to set that issue to the side (*see, infra,* at ¶¶ 8-10) because discovery would have been required to decide the issue. The free exercise claimant bears the burden of proving "substantial burden" as a threshold issue in every free exercise case, whether based on RFRA or the First Amendment's Free Exercise Clause, and it has been treated, until now, as a fact question, or at most, a mixed question of fact and law.

The most troubling portion of the Decision & Order was that Judge Randa held that for the purpose of analyzing whether a government action creates a substantial burden on the free exercise of religion, substantial burden is satisfied according to whatever the believer says it is. Not only is that a wildly incorrect statement of free exercise jurisprudence, but it could have a far-reaching effect on other cases that are decided while this one is on appeal, ranging from bankruptcy to land use to child protection cases.

DOCS_LA:270148.7 05058/003

The Decision & Order leap frogs over the standard issues to be addressed before a court or jury can decide whether a substantial burden has been imposed on a religious claimant, all of which require fact-finding. For example, frequently, and legitimately, defendants challenge a free exercise claim based on sincerity. *Reed v. Faulkner*, 842 F.2d 960, 962 (7th Cir. 1988). There is reason to doubt Archbishop Listecki's sincerity in this case, based on the actions of other bishops dealing with claims of survivors. For example, Cardinal Mahoney used cemetery funds to cover the payment of victims' claims in Los Angeles. Harriet Ryan, *Cardinal Mahoney Used Cemetery Money To Pay Sex Abuse Settlement*, Los Angeles Times (Feb. 9, 2013), http://articles.latimes.com/2013/feb/09/local/la-me-church-cemetery-fund-20130210. The Committee could also legitimately challenge, on a factual basis, the assertion that the use of any portion of the funds in the Cemetery Trust constitutes a "substantial" burden.

Finally, it should go without saying that permitting a judge who has family buried in a cemetery owned by the Debtor and whose maintenance needs are funded by the plaintiff (and who has funds allegedly held in trust by the plaintiff for the care of his parents' burial crypts) to preside over an action involving that plaintiff will undermine the public's confidence in the judiciary. This is particularly true where, as here, the judge did not disclose that information. . It is particularly acute, however, when the judge has a financial interest in the future care of the cemeteries. The damage done can, however, be ameliorated by vacating the interested judge's decisions. Vacating the Judgment of Dismissal and the Decision & Order will not waste judicial resources. The Court did not preside over years or months of pretrial maneuvers and discovery. It did not conduct a trial; it did not even entertain oral argument. It conducted an appellate review of the briefs and record submitted by the parties, which included no fact-finding. Briefing was closed on June 12, 2013, and the Court issued its decision less than seven weeks later on July 29. Protecting the public's view of the integrity of the judicial process, and fairness to the creditors, far outweighs any the burden to the judicial system. For these reasons, the Committee asks this Court to vacate the Judgment of Dismissal and the Decision & Order.

DOCS_LA:270148.7 05058/003

## JURISDICTION AND VENUE

This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 455, 158 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The relief requested is predicated upon Federal Rule of Civil Procedure 60(b), 28 U.S.C. § 455 and the Code of Conduct for United States Judges.

## BACKGROUND

1.  On January 4, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §101 et seq. (the "Bankruptcy Code"). The Debtor's bankruptcy case was assigned to the Honorable Susan V. Kelley, United States Bankruptcy Judge (Case No. 11-20059-SVK).

2.  On or about January 24, 2011, the United States Trustee appointed the Committee to represent the Debtor's unsecured creditors pursuant to 11 U.S.C. § 1102(a)(1).

3.  The Debtor owns an unencumbered fee simple interest in and operates the following cemeteries and mausoleums: All Saints Cemetery & Mausoleum, Calvary Cemetery & Mausoleum, Holy Cross Cemetery & Mausoleum, Holy Trinity Cemetery, Mount Olivet Cemetery & Mausoleum, Resurrection Cemetery & Mausoleum, Saint Adalbert Cemetery & Mausoleum, and Saint Joseph Cemetery & Mausoleum (collectively the "Cemeteries"). [Amended Complaint [Adv. Doc. No. 34], ¶ 14; ADOM's Schedule A (Real Property), [Bankr. Doc. No. 111], at 1-2]. The Debtor's ownership of the Cemeteries includes over 1,000 acres of land, all the structures, buildings and other improvements on that land, and all the individual burial plots, crypts, niches, mausoleums and property dedicated for future use as burial facilities within the Cemeteries. [Amended Complaint [Adv. Doc. No. 34], ¶ 12-13; Original Complaint [Adv. Doc. No. 1], ¶ 16].

4.  In 2008, the Debtor transferred approximately $55 million into a trust, the Cemetery Trust, which the Debtor contends it established to fulfill its moral, religious and contractual obligations to provide for the perpetual care of its cemeteries (the "Perpetual Care Funds"). In a lawsuit that Archbishop Listecki (as trustee of the Cemetery Trust (the "Trustee"))

6

filed against the Committee (*Archbishop Jerome E. Listecki, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust, v. Official Committee of Unsecured Creditors*, Bankruptcy Court Case No. Adv. No. 11-2459 SVK and District Court Case No. 13-C-179 (the "Cemetery Trust Litigation")), the Trustee contends that the Perpetual Care Funds are not property of the Debtor's estate and that avoiding the $55 million transfer pursuant to Wisconsin fraudulent transfer law or applying any provision of the Bankruptcy Code by which the funds in the Cemetery Trust could be determined to be property of the Debtor's estate will substantially burden the Cemetery Trust's free exercise of religion in violation of Religious Freedom Restoration Act ("RFRA") and the First Amendment.

      5.      In support of its RFRA and First Amendment defenses, the Cemetery Trust further contends:

> If the Court were to order the Trust to turn over all or part of its funds to the bankruptcy estate for the benefit of secular creditors, there would be no remaining funds (or, at best, insufficient funds) for the Milwaukee Catholic Cemeteries' perpetual care. As a consequence, the Trust and the Archbishop, its trustee, will be not merely "inhibit[ed] or constrain[ed]" from exercising their ecclesiastical obligations for these sacred sites, they will be unable to do so.

[Appellant's Initial Brief, Dist. Doc. No. 16, at 38] (citations omitted).

      6.      By stipulation and order of the Bankruptcy Court, the Committee has standing to defend the allegations in the Cemetery Trust Litigation and assert avoidance claims against the Cemetery Trust for the benefit of the Debtor's estate. [Adv. Doc. No. 11, 12, 37, 39]. Accordingly, the Committee defended the lawsuit on behalf of the estate, and filed counterclaims in which the Committee contends, among other things, that the transfer is both actually and constructively fraudulent under the Bankruptcy Code and Wisconsin law, that the Cemetery Trust is a voidable self-settled trust in which the Debtor is a beneficiary and that the funds transferred into the Cemetery Trust are property of the Debtor's estate. [Adv. Doc. No. 50].

      7.      On November 16, 2011, the Debtor filed an unliquidated class proof of claim (Claim No. 179) "on behalf of purchasers of graves, crypts, mausoleum space, income

care, endowment care, perpetual care and the estates, legal representatives, heirs, successors, assigns and beneficiaries of decedents buried, interred or otherwise preserved in the cemeteries of the Archdiocese of Milwaukee (the "Cemetery Care Claimants")."  The proof of claim notes:

> In making cemeteries and mausoleums available to the catholic faithful, the Archdiocese entered into hundreds of thousands of contracts that contain the Archdiocese's promises to maintain the cemeteries and mausoleums on a continuing basis, and to set aside a portion of the sales price in trust for the perpetual care of the cemeteries.  Over the years, the contracts referred to this obligation variously as income care or perpetual care.  The Archdiocese currently spends millions of dollars per year on perpetual care.

[Proof of Claim 179, at 1-2, ¶ 3].  It continues:

> The Cemetery Care Claimants include deceased persons with no direct voice in these bankruptcy proceedings and other claimants that may not know or understand the potential effect of the Debtor's chapter 11 proceeding.  The Cemetery Care Claimants had or have a simple and straightforward expectation—that the graves, crypts and mausoleums will be maintained forever.  The Debtor believes it is important to administer as many claims as possible in connection with the Debtor's chapter 11 proceeding including the claims of the Cemetery Care Claimants who are likely unaware of the potential impact of these chapter 11 proceedings on the Archdiocese's cemeteries.  Moreover, to be viable, any plan of reorganization must address these perpetual care obligations.

[Proof of Claim 179, at 2, ¶ 5].  Individuals who purchase burial rights do not buy the underlying real property, but instead purchase the right to be buried in the Debtor's Cemeteries for a fee, and the Debtor's promise to maintain the cemeteries.

       8.     In May of 2012, the Committee sought summary judgment against the Cemetery Trust's First Amendment and RFRA claims (the "MSJ") [Adv. Doc. No. 57].  On July 9, 2012, the Trustee filed his Response to the Committee's MSJ (the "Response") [Adv. Doc. No. 69], as well as the Declaration of Archbishop Listecki [Adv. Doc. No. 69] (the "Listecki Declaration").  The Committee's MSJ raised purely legal questions and did not seek summary judgment on the factual issue of whether permitting the Committee to recover the $55 million fraudulently transferred to the Cemetery Trust would impose a substantial burden on the Cemetery Trust's free exercise of religion.  Both parties and the Bankruptcy Court agreed that

the factual issues surrounding the Cemetery Trust's burden of proving substantial burden would be set aside in pursuit of the purely legal issues raised.

9.      In his Response, however, the Trustee briefed this issue, submitted the Listecki Declaration in support and asked the Bankruptcy Court to enter summary judgment in its favor on the entire case on the theory that it had borne its burden of proof on "substantial burden" and, therefore, the court could reach the merits of the RFRA and the First Amendment claims (the "Cross-MSJ").

10.     Because of the intensely factual nature of the inquiry as to the substantial burden issue, prior to the deadline for the Committee to file its reply to the Response, the parties agreed that the Cross-MSJ **would not** go forward and would instead be briefed only after the Bankruptcy Court determined the purely legal issues raised in the Committee's MSJ.  [Adv. Doc. No. 105].  This agreement was then memorialized in the Bankruptcy Court's Minute Order, which states:

> The Court confirmed that the Committee's Reply should be limited to the two issues that Attorney Brown described on the record.  The parties will contact the Court to schedule a hearing on this Motion, to be held after December 3, 2012.  A briefing schedule on the Plaintiff's cross-motion for summary judgment will be issued after a decision is issued on the Committee's summary judgment motion.

[Adv. Doc. No. 73].  Accordingly, the Committee's Reply did not address the substantial burden issues or the factual matters raised in the Listecki Declaration.  The Committee filed its reply on November 21, 2012 (the "Reply").  [Adv. Doc. No. 75].  On January 17, 2013, the Bankruptcy Court granted the Committee's MSJ (the "Order Granting Summary Judgment") [Adv. Doc. No. 79, 80].[4]

11.     The Trustee appealed the Order Granting Summary Judgment to the District Court and on July 29, 2013, District Court Judge Rudolph T. Randa issued his Decision

---

[4] Because the religious claimant bears a *threshold* burden of proving "substantial burden," and that issue was specifically not to be addressed in its Reply to the Bankruptcy Court, the Committee also did not brief in detail the issues that would arise if a holding was reached on "substantial burden," including whether the law serves a compelling interest and does so in the least restrictive means, and whether the application of RFRA in this instance violates the Establishment Clause.

DOCS_LA:270148.7 05058/003

and Order reversing the Bankruptcy Court (the "Decision & Order") [Dist. Doc. No. 24]. On August 1, 2013, Judge Randa entered judgment: (a) denying partial summary judgment to the Committee, (b) granting summary judgment to the Cemetery Trust, and (c) dismissing the Cemetery Trust Litigation. [Dist. Doc. No. 26] (the "Judgment of Dismissal"). Notably, the Court reached the substantial burden issue and entered summary judgment in favor of the Cemetery Trust in spite of the fact that the Cross-MSJ was not before him pursuant to the agreement of the parties and the Minute Order entered by the Bankruptcy Court.

　　　　　12.　　　In his Decision & Order, Judge Randa concluded that the Trustee had borne its burden of proof in establishing substantial burden, that RFRA was a valid affirmative defense in the Cemetery Trust Litigation, and that avoidance of the transfer of any part of the Cemetery Trust's assets would impose a substantial burden on the free exercise of religion by the Trustee and the Cemetery Trust and would impact any Catholic interred or to be interred in an Archdiocese cemetery. Specifically, he found:

> For the church and therefore Catholics, Catholic cemeteries reflect the Catholic belief in the resurrection of Jesus and the community's commitment to the corporeal work of mercy of burying the dead. Resurrection of the dead, of course, has always been an essential element of the Christian faith, beginning with Jesus' own resurrection. For Catholics, moreover, the belief in resurrection is a belief in the ultimate resurrection of one's *own* body. According to this belief, the soul separates from the physical body at death to meet God, while awaiting reunion with its body, transformed and resurrected through the power of Jesus' resurrection, on the last day. The sacred nature of Catholic cemeteries—and compliance with the Church's historical and religious traditions and mandates requiring their perpetual care—are understood as a fundamental exercise of this core belief. Theologically, the deceased must be treated with respect and charity in the Catholic faith with the hope of resurrection.

Decision & Order, at 4-5. The court continued:

> If the Trust is legally compelled to cede all or part of the funds to the estate, there will be no funds or substantially less funds for that perpetual care. As a result, neither the Debtor nor the Trust and its Trustee will be able to fulfill their canonical and moral obligations to provide the appropriate care for these sacred sites-consistent with Catholic doctrine

and canon law—or assure the requisite permanence, reverence and respect for those buried there.

Decision & Order, at 6.

13.     After the issuance of the Decision & Order, counsel for the Committee conducted an inquiry into whether Judge Randa had any relatives interred in any of the cemeteries that are the subject of the Cemetery Trust Litigation.  Committee counsel reviewed the 1940 Federal Census, the Debtor's cemetery website and published obituaries.  These sources show that Judge Randa's parents (Rudolph Randa and Clara Randa), two sisters (Joanne Fertl and Claire Marie McKeown), a brother–in–law (Gordon Fertl), uncle and aunt (John L. Randa and Lucille M. Randa) and parents in law (Albert A. Matera and Catherine M. Matera) are interred in Archdiocesan cemeteries.  Specifically, Judge Randolph's parents, sisters, uncle, aunt and one brother in law are interred in Holy Cross Cemetery.  His wife's parents are interred in All Saints Cemetery.  Both All Saints and Holy Cross are owned and operated by the Debtor and could be impacted by the transfer.  In total, thirty individuals with the last name "Randa" and nine individuals with the last name "Matera" (Judge Randa's wife's maiden name) are interred in Archdiocesan cemeteries (twenty-eight in Holy Cross, three in Mount Olivet, six in All Saints and two at Calvary).

14.     In light of the Committee's discovery of this information, the Committee asked  Debtor's counsel to search the Archdiocesan cemetery business records to determine if Judge Randa or his wife, Melinda (nee Matera) Randa have any agreements for burial spaces at the Archdiocesan cemeteries.  Counsel for the Debtor refused to provide this information on an informal basis and stated that the proper procedure to obtain this information was the submission of an application to the Bankruptcy Court.  On August 2, 2013, the Committee filed its Emergency Motion for Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 Directing Debtor's Production of Documents [Bankr. Doc. No. 2183] to which the Debtor responded and numerous insurers objected.  The Bankruptcy Court granted the requested production, and the Debtor produced the requested documents on August 12, 2013.  The documents include an

"Agreement" between Judge Randa and the Debtor for the purchase of burial rights for his parents and the care and maintenance of their crypt spaces. (*See* Exhibit N to Affidavit of James I. Stang).

15.    At no time during the Cemetery Trust Litigation did Judge Randa, the Debtor, or the Trust (or any other party) disclose any of the foregoing information to the Committee.

## ARGUMENT

**A.    Federal Rule of Civil Procedure 60(b)(6) and Supreme Court and Seventh Circuit precedent authorize the Court to vacate a judgment where the presiding judge should have recused himself pursuant to 28 U.S.C. § 455.**

16.    Federal Rule of Civil Procedure 60(b) provides, "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order or proceeding for the following reasons . . . (6) any other reason that justifies relief."  Both the United States Supreme Court and the Court of Appeals for the Seventh Circuit have held that a presiding judge's failure to recuse himself pursuant to 28 U.S.C. § 455 is grounds to vacate the judgment under Rule 60(b)(6).  In *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed. 2d 855 (1988), ten months after the trial court's judgment was affirmed on appeal, the plaintiff discovered that the trial judge was on the board of trustees of the university from which it had tried to purchase a plot of land that was related to the litigation. The plaintiff then filed a motion to vacate pursuant to Rule 60(b)(6) on the grounds that the trial judge should have recused himself in accordance with 28 U.S.C. § 455.  The Supreme Court agreed, noting:

> Section 455 does not, on its own, authorize the reopening of closed litigation. However, as respondent and the Court of Appeals recognized, Federal Rule of Civil Procedure 60(b) provides a procedure whereby, in appropriate cases, a party may be relieved of a final judgment.  In particular, Rule 60(b)(6), upon which respondent relies, grants federal courts broad authority to relieve a party from a final judgment "upon such terms as are just," provided that the motion is made within a reasonable time and is not premised on one of the grounds for relief enumerated in

12

clauses (b)(1) through (b)(5).  The Rule does not particularize the factors that justify relief, but we have previously noted that it provides courts with authority "adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice," *Klapprott v. United States*, 335 U.S. 601, 614-615, 69 S.Ct. 384, 390, 93 L.Ed. 266 (1949), while also cautioning that it should only be applied in "extraordinary circumstances," 2205 *Ackermann v. United States*, 340 U.S. 193, 71 S.Ct. 209, 95 L.Ed. 207 (1950). Rule 60(b)(6) relief is accordingly neither categorically available nor categorically unavailable for all § 455(a) violations.  We conclude that in determining whether a judgment should be vacated for a violation of § 455(a), it is appropriate to consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process.  We must continuously bear in mind that "to perform its high function in the best way 'justice must satisfy the appearance of justice.' " *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) (citation omitted).

*Id.* at 863-64. *See also Russell v. Lane*, 890 F.2d 947, 949 (7th Cir. 1989) ("[W]e know from *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 108 S.Ct. 2194, 2203-07, 100 L.Ed.2d 855 (1988), that Fed. R. Civ. P. 60(b)(6) can be used in appropriate cases to vacate orders made by a judge who later recused himself, if the ground for recusal existed at the time those orders were made-a condition satisfied in this case.").  As is set forth below, extraordinary circumstances exist in this case that merit vacatur.

**B.    Judge Randa should have recused himself under 28 U.S.C. § 455.**

### *Recusal under 455(a).*

17.    Federal judges have an ethical obligation to perform their duties impartially.  *See* Canon 3, Code of Conduct for United States Judges (the "Judicial Code of Conduct") ("A judge should perform the duties of the office fairly, impartially and diligently.").  The requirement of impartiality helps to insure that litigants receive a fair trial and protects the public's confidence in the judicial system.  *See* Canon 2(A), Judicial Code of Conduct ("A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.").

18.     To preserve the public's confidence in the judiciary, federal judges are required to recuse themselves, not just in proceedings in which they are ***actually*** biased, but "in any proceeding in which [their] impartiality ***might reasonably be questioned***."  28 U.S.C. § 455(a) (emphasis added); Canon 3(c)(1), Judicial Code of Conduct ("A judge ***shall*** disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned. . . .").  For the purpose of section 455(a), both actual partiality and the appearance of a lack of impartiality disqualify the judge.  *See Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. at 865 ("The very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible."); *In re Marshall*, --- F.3d ----, 2013 WL 3242487 (9th Cir. 2013) ("Proof of actual bias is not required under § 455(a).  Instead, bias should 'be evaluated on an objective basis, so that what matters is not the reality of bias or prejudice but its appearance.' *Liteky v. United States*, 510 U.S. 540, 548, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).").

19.     While in this case, Judge Randa certainly knew that his parents, his wife's parents and sisters (if not his other relatives) were buried in the Debtor's Cemeteries and that he was party to a contract with the Debtor for the care and maintenance of his parents' burial crypts, even if he did not, the appearance of impartiality is so critically important that recusal is required under section 455(a) even where the judge ***does not know*** of the facts that created the appearance of impropriety.  As the United States Supreme Court stated in *Liljeberg v. Health Services Acquisition*:

> [A]dvancement of the purpose of the provision – to promote public confidence in the integrity of the judicial process . . . does not depend on whether or not the judge actually knew of facts creating an appearance of impropriety, so long as the public might reasonably believe that he or she knew.

486 U.S at 860.  The Court continued:

> The goal of section 455(a) is to avoid even the appearance of partiality if it would appear to a reasonable person that a judge has knowledge of facts that would give him an interest in the litigation then an appearance of

DOCS_LA:270148.7 05058/003

> partiality is created even though no actual partiality exists because the judge does not recall the facts, because the judge actually has no interest in the case, or because the judge is pure in heart and incorruptible.

*Id. (citing Liljeberg v. Health Services Acquisition Corp.*, 796 F.2d. 796, 802 (5th Cir. 1986)).

20.     A judge contemplating disqualification under section 455(a) should not ask whether he believes he is capable of impartially presiding over the case. Instead, the question is whether a judge's impartiality might be questioned from the perspective of a reasonable person. *Cheney v. United States Dist. Ct.*, 541 U.S. 913, 924, 124 S.Ct. 1391, 158 L.Ed.2d 225 (2004) ("It is well established that the recusal inquiry must be 'made from the perspective of a reasonable observer who is informed of all surrounding facts and circumstances.'") (citations omitted).

21.     The Court of Appeals for the Seventh Circuit has stated that the test under 28 U.S.C. § 455(a) is "whether a reasonable person perceives a significant risk that the judge will resolve the case on a basis other than the merits. This is an objective inquiry." *Matter of Mason*, 916 F.2d 384, 385-86 (7th Cir. 1990). This standard assumes that the hypothetical reasonable person is: (a) informed of all the surrounding facts and circumstances, (b) a thoughtful observer rather than a hypersensitive or unduly suspicious person, and (c) able to appreciate the significance of the facts in light of relevant legal standards and judicial practice and can discern whether any appearance of impropriety is merely an illusion. *In re Sherwin-Williams Co.*, 607 F.3d 474, 477-78 (7th Cir. 2010).

22.     Judge Randa should have recused himself from presiding over the Cemetery Trust Litigation and any other Cemetery Related Proceedings under 28 U.S.C. § 455(a).[5] The fact that Judge Randa's mother, father, sisters and in-laws are buried in Cemeteries owned by the Debtor and that he is the purchaser of his parents' burial rights would cause a reasonable person to perceive a significant risk that he will resolve the case on a basis other than the merits.

---

[5] "Cemetery Related Proceedings" include any other proceeding related to the Debtor's cemeteries, including but not limited to any objection to Proof of Claim 179, any rejection or assumptions of burial rights contracts, and any settlement or other disposition of the Cemetery Trust Litigation pursuant to a plan of reorganization or otherwise.

23. There are three factors that might reasonably cause an objective observer to question Judge Randa's impartiality in connection with the Cemetery Trust Litigation:

a. Judge Randa was certainly aware that his parents, parents-in-law, and sisters (of not his other relatives) were interred in cemeteries owned by the Debtor and that he purchased his parents' burial crypts, and yet failed to disclose those affiliations on the record as required by 28 U.S.C. § 455. Judges have an affirmative duty to investigate and disclose any facts on which the judge's impartiality might reasonably be questioned *or* that relate to a financial interest that he or his family may have in a case before him. *See* 28 U.S.C. § 455(c) ("A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household."); Canon 3(C)(2), Code of Judicial Conduct ("A judge should keep informed about the judge's personal and fiduciary financial interests and make a reasonable effort to keep informed about the personal financial interests of the judge's spouse and minor children residing in the judge's household."); *Porter v. Singletary,* 49 F.3d 1483, 1489 (11th Cir.1995) (judges have an ethical duty to disclose on the record information which the judge believes the parties or their lawyers might consider relevant to the question of disqualification); *Tramonte v. Chrysler Corporation*, 136 F.3d 1025, 1031 (5th Cir. 1998) ("Judge Lemon was under the duty to police her disqualification status. A judge has a duty to be watchful for such disqualifying circumstances and decide any requests to recuse with disclosure necessary to the decision made clear upon the record."). By contrast, litigants have no duty to investigate a judge's potentially disqualifying circumstances. In *American Textile Mfrs. Inst., Inc. v. Limited, Inc.*, 190 F.3d 729 (6th Cir.1999), *cert denied*, 529 U.S. 1054, 120 S.Ct. 1556, 146 L.Ed.2d 461 (2000), the Court of Appeals for the Sixth Circuit specifically rejected the lower court's argument that litigants had a duty to investigate possible grounds for recusal regardless of the procedural posture of the case. It stated:

> [W]e write to clarify that a litigant's duty to investigate the facts of his case does not include a mandate for investigations into a judge's

impartiality. Judge Beckwith erred by suggesting otherwise. After proclaiming that "[t]he strategy employed by Realtor [filing the recusal motion two weeks after receiving an unfavorable dispositive ruling] is questionable at best, and the Court refuses to reward Realtor or encourage this trend," she concluded that subsection of her opinion by stating that "[l]itigants have a duty to investigate and inform the court of any perceived biases before the court and the parties invest time and expense in a case. Realtor has posited no reason for the failure to make a timely inquiry into Judge Holschuh's background." *United States ex rel. American Textile Mfrs. Institute Inc. v. The Limited, Inc.*, 179 F.R.D. 541, 546 (S.D. Ohio 1997). **We believe instead that litigants (and, of course, their attorneys) should assume the impartiality of the presiding judge, rather than pore through the judge's private affairs and financial matters**. Further, judges have an ethical duty to "disclose on the record information which the judge believes the parties or their lawyers might consider relevant to the question of disqualification." *Porter v. Singletary*, 49 F.3d 1483, 1489 (11th Cir.1995). "[B]oth litigants and counsel should be able to rely upon judges to comply with their own Canons of Ethics." *Ibid*. In ATMI's case, Judge Holschuh possibly did not consider the matter sufficiently relevant to merit disclosure, but his nondisclosure did not vest in ATMI a duty to investigate him.

*Id*. at 742 (emphasis added).

   b.  Second, the issues at this stage of this voluntary chapter 11 bankruptcy involve the Debtor's capacity to cover its cemetery obligations (including for those gravesites in which Judge Randa has a emotional and/or financial stake), and whether those gravesites could or would be affected if the Debtor's fraudulent conveyance is voided. If the Debtor were not to have sufficient funds to fulfill its obligations because of its obligations to its creditors and/or a failure to raise funds in the future, Judge Randa's relative's gravesites could potentially fall into disrepair. Alternatively, the financial burden of providing perpetual care could fall to Judge Randa and/or his wife.

   c.  Third, as the purchaser of his parents' burial rights, the Cemetery Trust and the Debtor contend that the Cemetery Trust is holding monies paid by him to fulfill the Debtor's perpetual care obligations to Judge Randa, obligations which the Debtor claims it cannot satisfy if the Committee prevails in the litigation. He is, in effect, a creditor himself.

17

24.     For these reasons, Judge Randa should have recused himself pursuant to section 455(a).

### *Recusal under 28 U.S.C. § 455(b(4).*

25.     Section 455(b)(4) provides a separate ground for recusal in this case.  It states that a federal judge **shall** disqualify himself when "[h]e knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, **or any other interest** that could be substantially affected by the outcome of the proceeding."  28 U.S.C. § 455(b)(4);  Canon 3(C), Judicial Code of Conduct ("(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which . . .  (c) the judge knows that the judge, individually or as a fiduciary, or the judge's spouse or minor child residing in the judge's household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be affected substantially by the outcome of the proceeding.").  Because section 455 deals with the appearance of impropriety (as opposed to actual impropriety), the existence of the facts listed in section 455(b) requires recusal, even if the judge believes they do not create an appearance of impropriety.  *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. at 860 n.8.

26.     By virtue of Judge Randa's purchase of his parents' burial crypts in the Debtor's Cemeteries, Judge Randa has a "financial interest in the subject matter in controversy" in violation of section 455(b)(4).  The Agreement between Judge Randa and the Debtor includes the Debtor's obligation to provide perpetual care for Judge Randa's parents' burial crypts, and the Debtor allegedly transferred a portion of his purchase price to the Cemetery Trust to do so. As the Debtor contends (and the Court actually found in its Decision & Order) that the Debtor will be unable to satisfy its perpetual care obligations to purchasers of burial rights if the Cemetery Trust is available in whole or in part to the bankruptcy estate, Judge Randa would have

a financial interest in seeing that the Cemetery Trust prevails so that there are adequate funds to cover the Debtor's perpetual care obligations to him.[6]

27.     Judge Randa is already part of the uncertified class on whose behalf the Debtor filed Proof of Claim 179.  As such, his disqualification is mandatory under 455(b)(4).  In *Tramonte v. Chrysler Corporation*, 136 F.3d 1025 (5th Cir. 1025), the Court of Appeals for the Fifth Circuit held that if a judge or an immediate family member is a member of a putative class seeking monetary relief, section 455(b)(4) requires recusal because of the judge's financial interest in the case.  *Id.* at 1029.  This is true even if the class has not been certified.  *Id.* at 1030; *accord In re Aetna UCR Litigation*, 2013 WL 1622160 (D.N.J. 2013).

28.     Finally, section 455b)(4) also requires disqualification if the judge knows that he, individually or as a fiduciary, has or any other interest that could be substantially affected by the outcome of the proceeding.[7]  Judge Randa has such an interest.  If the Perpetual Care Funds are made available to the estate, in whole or in part, and the Debtor does not have sufficient funds to fulfill its perpetual care obligations, his relative's gravesites could presumably fall into disrepair.  Alternatively, the financial burden of providing perpetual care could fall to Judge Randa.[8]

29.     For these reasons, Judge Randa should have recused himself pursuant to section 455(b)(4).

## C.     Under the *Liljeberg* test, the Court should vacate the Judgment of Dismissal and the Decision & Order.

30.     As was established above, Judge Randa should have recused himself under both sections 455(a) and 455(b)(4).  In such a case, *Liljeberg* authorizes the Court to

---

[6] Section 455(d)(4) defines "financial interest as "ownership of a legal or equitable interest, however small…." 28 U.S.C. § 455(d)(4).

[7] Section 455(d)(3) defines 'fiduciary" as "such relationships as executor, administrator, trustee and guardian. . ." 28 U.S.C. § 455(d)(3).

[8] For the record, the Committee denies that the funds were held in trust prior to their transfer to the Cemetery Trust, denies that the Cemetery Trust is a valid trust under state law and notes that even if the entirety of the assets held in the Cemetery Trust were ultimately recovered for the estate, some of those funds could be made available to pay for the Debtor's perpetual care obligations.

vacate the judgment after considering the following factors: (a) the risk of injustice to the parties, (b) the risk that the denial of relief will produce injustice in other cases, and (c) the risk of undermining the public's confidence in the judicial process. Each of these factors weighs in favor of vacatur.

### *Risk of injustice to the parties.*

31.    Judge Randa's apparent bias and his potential actual bias created a very real injustice to the creditors of the estate. Had Judge Randa disclosed his connections and interest in the Perpetual Care Funds and the Cemeteries when the appeal was assigned to him, the Committee could have requested that he recuse himself at that time. Instead, he failed to make the disclosures, reached issues that were not before him, reversed the Bankruptcy Court's Order Granting Summary Judgment against the Cemetery Trust on its First Amendment and RFRA defenses, and then went beyond that to grant summary judgment to the Cemetery Trust and dismiss the entire action. The Court did so in spite of the parties' agreement and a Bankruptcy Court order that determined that it would not consider the Cross-MSJ or the substantial burden, factual issues raised by the Cemetery Trust. In good faith reliance on that court order, the Committee did not file any opposition to the Cross-MSJ or the Listecki Declaration. Judge Randa then relied <u>exclusively</u> on the Listecki Declaration for all of the facts supporting his Decision & Order and for his findings that the application of neutral, generally applicable provisions of the Bankruptcy Code and state fraudulent conveyance law would impose a substantial burden on the Cemetery's Trust's free exercise of religion. *See* Decision & Order, at 25-26.

32.    Because the District Court deemed the Listecki Declaration as "uncontroverted," the Committee never had the opportunity to dispute its inaccuracies.

a.    For example, in the Decision & Order, the District Court found (based solely on the Listecki Declaration) that "the funds that comprise the Trust's principal took nearly a century to accumulate and include approximately $55 million that had been held, separately for that period, for the perpetual care of the Milwaukee Catholic Cemeteries even

prior to being transferred to the Trust in or around March of 2008 . . .”). Decision & Order, at 3. This is blatantly false and is contradicted by the Debtor's own financial statements, which show that the funds were comingled with other funds and that for many decades the cemetery care funds were only accounted for as a liability, not as funds held in trust for others. Indeed, before the transfer of its funds to the Cemetery Trust, the Debtor had always commingled the payments it received from its cemetery customers with its operating funds and other non-trust funds instead of segregating these payments.

   b. The Debtor acknowledged that the funds designated for perpetual care were the Debtor's money (in other words, not held in trust) in a letter requesting permission to transfer those funds into the Cemetery Trust. On June 4, 2007, Archbishop Dolan wrote a letter to His Eminence, Claudio Cardinal Hummes, O.F.M., Prefect Congregation for the Clergy in Rome Italy requesting permission to transfer $56,943,983.35 of ADOM's money to the Cemetery Trust. The letter states in pertinent part:

> As Archbishop of the Archdiocese of Milwaukee, Wisconsin, U.S.A, I respectfully request permission to proceed with the **alienation of property owned by this same Archdiocese**. The alienation will involve the transfer of assets from the patrimony of the Archdiocese of Milwaukee to a separate juridic person, an autonomous pious foundation known as The Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust.
> …
> **By transferring these assets to the Trust, I foresee an improved protection for these funds from any legal claim and liability**. A careful analysis by experts has concluded that the funds currently held for perpetual care needs are sufficient for the long-term use by the Catholic cemeteries. The value of the fund to be transferred was $56,943,983.35 as of December 31, 2006.

[ADOM 112303-112304] (emphasis added).

   c. The Decision & Order states, “Similarly [Canon Law] requires that the Trust's funds be used for the Trust's designated purposes. If funds are alienated from the Trust without the required canonical approval, the Archbishop as Trustee may well face

discipline and a religious penalty from the Church." Decision & Order, at 5. Yet, if the Committee had been permitted to controvert this "fact", it would have shown that on at least two separate occasions, the Debtor used monies that it now contends it held in trust for uses that were not related to perpetual care. In 1973, for example, ADOM transferred approximately $3 million of assets it had designated for perpetual care to an account to be used for the Debtor's general operations. In 1984, the Debtor used $450,000 funds designated for perpetual care to make up budgetary shortfalls.

33. The Court's precipitous actions—taken without disclosing Judge Randa's own personal interest in the disposition of the Perpetual Care Funds--have created a grave injustice to the creditors in this case, both procedurally and substantively. The Court has dismissed an action that had the potential to provide in excess of $55 million to creditors of this estate, which include, not only sex abuse victims, but trade creditors, employees and vendors.

34. There is little prejudice to the Cemetery Trust from granting the requested relief. If the Court vacates the Judgment of Dismissal and the Decision & Order, presumably the Cemetery Trust's appeal of the Bankruptcy Court's order could be assigned to and heard by another District Court judge. There is no restraining order in place that prevented the Cemetery Trust from dispensing money to the Debtor to provide for the care of its Cemeteries prior to the Judgment of Dismissal. Therefore, even if the judgment is vacated, the Cemetery Trust will continue to be able to fulfill its purpose (funding the Debtor's perpetual care needs).

*The risk that denial of relief will produce injustice in other cases.*

35. The Judgment of Dismissal and the Decision & Order will have a tremendous effect on other cases. Judge Randa made an unprecedented ruling that a committee of unsecured creditors in a bankruptcy case qualifies as the "government" for the purpose of federal statutory and constitutional claims because the "pursuit of claims on behalf of a bankruptcy estate is a traditional public function." Decision & Order at 17. In doing so, he reasoned:

> [T]he debtor in possession is an officer of the court charged with the duty to act for the benefit of the bankruptcy estate. By giving the Committee derivative standing to bring claims on behalf of the estate, the bankruptcy court effectively transferred the responsibility for this public function from the Archdiocese, as debtor-in-possession, to the Committee. Stated another way, because of its inability to pursue legal action against the Trust, the Archdiocese, in conjunction with the bankruptcy court, delegated this function to the Committee, a function that is "traditionally the exclusive prerogative" of the government.

*Id.* at 17-18. While failing to disclose his own interest in this case, the Court interpreted the law in an unprecedented fashion to find that a committee of unsecured creditors is a government actor. By implication, any creditors committee, whether the debtor is religious or not, could be a government actor. If this were a correct interpretation of the law, then all creditor committees would be at risk of being sued by debtors and other parties in interest for alleged statutory or constitutional civil rights violations. In other words, the victims of the debtors' financial mistakes and/or misfortunes will become the targets of the debtor if the debtor chooses the federal bankruptcy route. If RFRA is the basis of the claim, then the debtor will even be able to argue that creditors who, for example, raise fraudulent conveyance claims against the debtor should pay damages and the debtors' attorneys' fees. This is a radical change to federal bankruptcy law and practice.

36. The decision on whether the Committee is a government actor is so far removed from existing doctrine that it is likely to destabilize other bankruptcy cases. If that were correct, creditors would have to factor into any decision to be included in the bankruptcy whether they can afford to risk being sued by the debtor for alleged "constitutional" violations. The decision cannot be limited, by its reasoning, to the fraudulent conveyance context. For example, a religious organization could allege that all of its income is "dedicated to God's work" and "any payment to a non-believer violates its religious benefits." Therefore, RFRA and the First Amendment, on the court's reasoning, could be used as a sword to protect the estate from any trade or secular creditor. A chapter 11 bankruptcy could become the vehicle for absolute protection of an estate, rather than the equitable distribution of the debtor's estate to its creditors.

23

Even if the organization did not prevail under RFRA, the creditors would have to weigh in the likely delay created by litigating constitutional issues in federal court into any decision to join a committee of creditors. Creditors would be forced to choose between the efficiencies of a committee and navigating the bankruptcy independently. Bankruptcy courts would be faced with individual creditors with like interests, rather than the pooling of arguments created by the vehicle of committees, or with many fewer creditors than would normally be involved. That would subvert the goals of federal bankruptcy law and dramatically alter debtor and creditor incentives in this context.

37. In light of a recent decision by the Tenth Circuit, the effect on bankruptcy law could be even more extreme, especially when added to the court's reasoning on substantial burden. In *Hobby Lobby Stores, Inc. v. Sebelius*, --- F.3d ---, 2013 WL 3216103 (10th Cir. June 27, 2013), the Tenth Circuit, *en banc*, held that a for-profit corporation could employ RFRA to challenge the contraception mandate in the federal health care act. *But see Conestoga Wood Specialties Corp.,* --- F.3d ---, 2013 WL 3845365 (3rd Cir. July 26, 2013). On the court's reasoning in this case, combined with the *Hobby Lobby* reasoning, Wal-Mart could declare bankruptcy and fight off creditors by simply asserting its board has religious beliefs in philanthropy and, therefore, the estate must be preserved for philanthropy and not used for creditors.

38. The Court also violated the Committee's rights under the Due Process Clause, by unilaterally deciding that the cemetery had satisfied its burden of proving a substantial burden, even though the parties and Bankruptcy Court had agreed, appropriately, to set that issue to the side because discovery would have been required to decide the issue. The free exercise claimant bears the burden of proving "substantial burden" as a threshold issue in every free exercise case, whether based on RFRA or the First Amendment's Free Exercise Clause, and it has been treated, until now, as a fact question, or at most, a mixed question of fact and law. The decision in this case relieved the Cemetery Trust of that burden of proof, and denied any opportunity for discovery to the Committee.

39.     Perhaps the most troubling was the portion of the decision was that the District Court held that for the purpose of analyzing whether a government action creates a substantial burden on the free exercise of religion, substantial burden is satisfied according to whatever the Church says it is.  Specifically, the Court stated:

> The Committee argues, as discussed above, that further proceedings are required because substantial burden is an issue of fact that needs further development through discovery. Procedurally, the Committee moved for partial summary judgment, and in response, the Trustee asked the bankruptcy court not only to deny the Committee's motion, but also to enter summary judgment in his favor. Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56(f)(1) (Judgment Independent of Motion). At a hearing which occurred before the Committee filed its reply brief, the parties agreed that the bankruptcy court would defer ruling on the substantial burden issues, at least with respect to how it was raised by the Trustee's request for summary judgment. October 18, 2012 Hearing Transcript, ECF No 13-14. Accordingly, the bankruptcy court did not reach this issue because it concluded that RFRA did not apply to the Committee's actions in the first place.  That being said, Archbishop's declaration stands unopposed, and on the issue of religious doctrine, it is unassailable. Moreover the issue of substantial burden is essentially coterminous with religious doctrine. Canon law dictates that the funds in the Trust must be used for the perpetual care of those interred under the tenets of the Catholic faith. Removing some or all of these funds from the Trust and placing them in the bankruptcy estate would undoubtedly put "substantial pressure" on Archbishop Listecki and the Trust to "modify [their] behavior" and "violate [their] beliefs." *Koger* at 799.  No amount of discovery can change canon law. In this context, the transfer of funds from the Trust to the estate would meet the substantial burden test.

Decision & Order, at 25-26 (emphasis added). Not only is that is wildly incorrect statement of free exercise jurisprudence, but it could have a far-reaching effect on other cases that are decided while this one is on appeal.

40.     The decision leap frogs over the standard issues, all of which require fact-finding.  Frequently, and legitimately, defendants challenge a free exercise claim based on sincerity.  *Reed v. Faulkner*, 842 F.2d at 962. There is reason to doubt the Trustee's sincerity in this case, based on the actions of other bishops dealing with claims of survivors.  For example, Cardinal Mahoney used cemetery funds to cover the payment of victims' claims in Los Angeles.

DOCS_LA:270148.7 05058/003

Case 2:13-cv-00179-RTR   Filed 08/12/13   Page 28 of 32   Document 28

Harriet Ryan, *Cardinal Mahoney used cemetery money to pay sex abuse settlement*, LOS ANGELES TIMES (Feb. 9, 2013), http://articles.latimes.com/2013/feb/09/local/la-me-church-cemetery-fund-20130210.[9]

41.     Under the District Court's interpretation of "substantial burden," the believer satisfies its burden of proof by simple assertion "substantial" has no content, and the defendant has no opportunity to pursue discovery about the believer's assertions.  If this were the proper interpretation of the doctrine, churches could obtain any zoning they choose simply by stating that they believe their chosen location is the best location and tax objectors could avoid payment of federal taxes by asserting they do not believe in paying the taxes.  In other words, the reasoning of the decision would require the reversal of *Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752 (7th Cir. 2003), cert. denied 541 U.S. 1096, 124 S.Ct. 2816, 159 L.Ed.2d 262 (2004)*  and *United States v. Lee*,  455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982). In this case, therefore, the risk of injustice to other parties is not just from the risk that other judges might be emboldened to flout their disclosure requirements, but also that parties far from this case will be prejudiced by these constitutionally questionable rulings.

### *The risk of undermining the public's confidence in the judicial system.*

42.     It should go without saying that permitting a judge whose mother, father and other close family members are buried in a cemetery owned by the Debtor and whose maintenance obligations are funded by the plaintiff in a case to preside over an action involving that cemetery will undermine the public's confidence in the judiciary.  The potential harm is multiplied when the judge himself has purchased care and maintenance rights in that cemetery and those care funds are allegedly being held by the plaintiff. This is particularly true where, as here, the judge did not disclose that information. The damage done can, however, be ameliorated by vacating the interested judge's decision.

---

[9] See Exhibit O to Stang Affidavit. The Committee could also legitimately challenge, on a factual basis, the assertion that the use of any portion of the Cemetery funds constitutes a "substantial" burden.

43.     Furthermore, vacating the Judgment of Dismissal and the Decision & Order will not waste judicial resources.  The Court did not preside over years or months of pretrial maneuvers and discovery.  It did not conduct a trial, or even permit oral argument. It simply conducted an appellate review of the briefs and record submitted by the parties. Briefing was closed on June 12, 2013, and the Court issued its decision less than 7 weeks later on July 29. The Committee has investigated and filed this motion within two weeks of that decision. Protecting the integrity of the judicial process far outweighs the de minimis burden to the judicial system.

44.     For the foregoing reasons, the Committee asks the Court to vacate the Decision & Order and the Judgment Dismissal.

**D.     <u>The Committee's Motion is timely.</u>**

45.     A motion to vacate a judgment pursuant to Federal Rule of Civil Procedure 60(b) must be made "within a reasonable time . . . ." Fed. R. Civ. P. 60(c).  When the grounds for the motion is that the presiding judge should have recused himself pursuant to section 455, the motion is timely if it is brought at the earliest possible moment after obtaining knowledge of the acts demonstrating the bases fort such claim. *See Liljeberg v. Health Services Corp*., 486 U.S. at 870 (vacating a judgment ten months after entry based on trial courts violation of 28 U.S.C. § 455(a)).

46.     The Committee became aware of these potentially disqualifying facts for the first time during the week of July 29, 2013 and brought this Motion forthwith. While it is true that some of the information about Judge Randa's relatives was publically available before that time, it is also true, as noted above, that litigants do not have an obligation to poke around in a judge's personal and financial affairs in the hope of discovering disqualifying conflicts. They are, instead, entitled to assume judicial impartiality, and the Committee did make such an assumption in this case. *See American Textile Mfrs. Inst., Inc. v. Limited, Inc.*, 190 F.3d at 742.

Furthermore Judge Randa's agreement with the Debtor was not publicly available, and the Committee was forced to obtain to by a court order.

## <u>CONCLUSION</u>

For the reasons stated above, the Committee respectfully requests that the Court vacate the Judgment of Dismissal and the Decision & Order.

Respectfully submitted,

Dated: August 12, 2013            By     */s/ Marci A. Hamilton, Esq.*
                                         Marci A. Hamilton, Esq.
                                         36 Timber Knoll Drive
                                         Washington Crossing, PA  18977
                                         Telephone: (215) 353-8984
                                         Email: Hamilton.marci@gmail.com

                                         Special Counsel to the Official Committee
                                         of Unsecured Creditors

28

PACHULSKI STANG ZIEHL & JONES LLP

By      */s/ James Stang*
         James I. Stang (CA Bar No. 94435)
         Kenneth H. Brown (CA Bar No. 100396)
         Gillian N. Brown (CA Bar No. 205132)
         Erin Gray (CA Bar No. 157658)
         Pachulski Stang Ziehl & Jones LLP
         10100 Santa Monica Blvd., 13th Floor
         Los Angeles, CA  90067
         Telephone:  (310) 277-6910
         Facsimile:   (310) 201-0760
         E-mail:   jstang@pszjlaw.com
                  kbrown@pszjlaw.com
                  gbrown@pszjlaw.com

         -and-

         Albert Solochek (State Bar No. 1011075)
         Jason R. Pilmaier (State Bar No. 1070638)
         Howard, Solochek & Weber, S.C.
         324 E. Wisconsin Ave., Suite 1100
         Milwaukee, WI  53202
         Telephone:  (414) 272-0760
         Facsimile:  (414) 272-7265
         E-mail:   asolochek@hswmke.com
                 jpilmaier@hswmke.com

         Attorneys for the Official Committee of
         Unsecured Creditors