UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

In re Archdiocese of Milwaukee,

              Debtor.                        Bankruptcy Case No. 11-20059-SVK

---

ARCHBISHOP JEROME E. LISTECKI, as
Trustee of the Archdiocese of Milwaukee Catholic    Adv. Proc. No. 11-2459-SVK
Cemetery Perpetual Care Trust,

              Plaintiff-Appellant,          Case No. 13-CV-179

      v.

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS,

              Defendant.

---

**BRIEF OF ARCHBISHOP JEROME E. LISTECKI, AS TRUSTEE OF THE
ARCHDIOCESE OF MILWAUKEE CATHOLIC CEMETERY PERPETUAL CARE
TRUST, IN OPPOSITION TO OFFICIAL COMMITTEE OF UNSECURED
CREDITORS' MOTION TO VACATE AND MOTION FOR RECUSAL**

---

## INTRODUCTION

    The United States Court of Appeals is 100 miles from this courthouse and, last week,

counsel for the Creditors' Committee filed the four-page electronic form that enabled this case to

reach it in a matter of minutes.  For the time being, however, the Committee presses on with

motions to vacate the District Court's July 29, 2013 decision and August 1, 2013 judgment, and

to disqualify the presiding judge.  The Committee's counsel has expressed its dissatisfaction in

terms beyond the boundaries of reasoned advocacy.[1]  Moreover, counsel's tactics—in a

---

[1] The temptation to disparage federal judges personally after an adverse decision is not uncommon.  *See, e.g.*, Pete
Brush, *Bloomberg Attack on Stop-and-Frisk Judges Riles Some Attys*, Law360 (Aug. 14, 2013 6:35 p.m.),

*(continued …)*

proceeding that already has taken more than 24 months and cost approximately $2.5 million in professional fees for the estate—ensure yet more delay and cost for their own constituency and disrespect for the process.

The Committee's motions and briefs, discussed here in a consolidated response, rest on a flawed—indeed, false—premise. The Committee contends that family burial plots give Honorable Rudolph T. Randa a financial interest because he may be responsible for the maintenance of the graves if the Trust is unable to meet its obligations. Any potential impact on the presiding judge is so remote and diffuse, if it exists at all, that no reasonable person informed of the facts would conclude he resolved the suit on anything but the merits. Moreover, the burial plots long have been a matter of public record, known or ignored by the Committee's counsel until the Committee received an adverse decision on its claims.

One can only conclude that the Committee's counsel is seeking another judge for a second district court opinion—but to what avail? The Committee has requested, and will receive, *de novo* review of the substantive issues. Especially with appellate review all but guaranteed, these motions border on frivolous.[2]

_____

*(... continued)*

http://www.law360.com/articles/464880/bloomberg-attack-on-stop-and-frisk-judge-riles-some-attys. The Bankruptcy Court, when the constitutional and statutory issues first arose, authorized the retention of a special counsel, at the request of the Committee's counsel and at the estate's expense, to supplement the Committee's two other law firms. This was the special counsel's quoted reaction to the District Court's decision: it is "so indefensible in so many ways that we suspected there was reason to investigate any involvement he might have with the cemeteries." Annysa Johnson, *Judge Conflict Suggested*, Milwaukee J. Sentinel, Aug. 4, 2013, at 2B.

[2] There may be more to the pending motions than they suggest. As long ago as 2004, the Committee's special counsel characterized RFRA as "misguided"—in part, because it "wrongly transforms courts into legislatures." The statute, in her assessment, even "infringes" on the federal judiciary's authority "by displacing the Court's own interpretation of [the] Free Exercise Clause [in *Employment Div. v. Smith*], and replacing it with Congress's preferred interpretation." Since the "need for RFRA simply cannot be proven," it should be repealed. Marci Hamilton, *A Federal Appeals Court Says a Religious Group Can Import Illegal Drugs: The Religious Freedom Restoration Act Shows Its True Colors*, Findlaw (Nov. 18, 2004), http://writ.news.findlaw.com/hamilton/20041118.html.

2

The Committee's motions should be denied—under the United States Code, the rules of procedure and judicial ethics, common law, and common sense.

## RELEVANT PROCEDURAL AND FACTUAL BACKGROUND

This Court is familiar with the disposition of the case. A summary is nonetheless warranted, given the Committee's mischaracterization of the record.

### *The Bankruptcy Court Proceedings*

The Trust filed this adversary proceeding on June 28, 2011, seeking a declaration that neither it nor its funds are property of the bankruptcy estate. Bankr. Dkt. No. 307; Adv. Dkt. No. 1.[3] An amended complaint added a claim seeking declaration that both the First Amendment and RFRA preclude a determination that the Trust or its funds are property of the estate ("Count III"). Adv. Dkt. No. 34. On May 25, 2012, the Committee filed a partial summary judgment motion, limited to Count III and several of the Committee's related affirmative defenses. Adv. Dkt. No. 57. The Committee's counsel chose to file a brief and a single affidavit, submitting only a copy of the agreement that created the Trust in support of its motion. *Id*., Nos. 57-1, 57-2.

The Trustee's response to the Committee's motion followed on July 9, 2012.[4] Adv. Dkt. No. 69 ("Trustee's Summ. J. Resp."). With its response, the Trustee submitted the Declaration of Archbishop Jerome Listecki—attesting to, among other things, the importance of cemeteries and their care within the Catholic faith, his ecclesiastical responsibilities, and the substantial

---

[3] Citations to the main bankruptcy case will be referred to as "Bankr. Dkt." Citations to the adversary proceeding will be referred to as "Adv. Dkt." Citations to the District Court docket will be referred to as "Dkt." Citations to the Court of Appeals docket will be referred to as "App. Dkt."

[4] The Committee repeatedly asserts that the Trustee filed a cross-motion for summary judgment. *See*, *e.g.*, Committee Resp. Br., Dkt. No. 19 at 8. The Trustee did no such thing. Rather, it requested in its response brief that the Bankruptcy Court grant summary judgment to the Trustee pursuant to Fed. R. Bankr. P. 7056 and Fed. R. Civ. P. 56(f)(1). *See* Trustee's Summ. J. Resp., Adv. Dkt. No. 69 at 9.

3

burdens any transfer of the Trust's funds to the Debtor's estate would impose on the Trustee, the Trust and the Debtor. *Id*., No. 69-2. The Trustee also supported the response with a statement of proposed material and undisputed facts, pursuant to Local Rule 56(b)(1).[5] *Id*., No. 69-1.

At an October 18, 2012 status conference, the Committee's counsel told the Bankruptcy Court that the substantial burden issue was "factually intensive" and would require discovery. Yet, the Committee continued to press for a finding of no substantial burden in its summary judgment reply. Adv. Dkt. No. 75 at 12 (arguing "[t]he Trust cannot show a substantial burden here."). The Bankruptcy Court heard argument on January 11, 2013 and, again, counsel for the Committee argued the substantial burden question:

> Well, [RFRA, the Religious Freedom Restoration Act, is] only going to apply in a circumstance where there's a substantial burden imposed on the religious entity. That's the threshold question of every RFRA case. And so before we get to any other aspect, the question has to be, is there a substantial burden. And the answer is, of course there's no substantial burden because, in this case, they haven't—they—none of their arguments could even remotely argue that their religious practices become impracticable, which is the standard. Adv. Dkt. No. 81, Summ. J. Hr'g Tr. 17:6-17:14.

From the bench that day and in a written decision dated January 17, 2013, the Bankruptcy Court entered a decision and order granting the Committee's partial motion for summary judgment. *Id*., Nos. 79, 80. The Bankruptcy Court determined that RFRA and the First Amendment did not apply in the first instance and, accordingly, did not engage in any further

---

[5] In its decision, the Bankruptcy Court suggested that the Committee need not have filed a statement of proposed undisputed material facts because the Bankruptcy Court's Local Rules do not require such statements. Adv. Dkt. No. 79 at 3 n.2. However, the issues involved are all non-core, and the parties expressly declined to consent to a final determination of those issues by the Bankruptcy Court. Accordingly, the Committee's summary judgment motion fell under the authority of this Court and the specific rules governing motions before it. *See* 28 U.S.C. § 157(c)(2) (absent the parties' consent, the Bankruptcy Court may not determine non-core matters); *see also Stern v. Marshall*, ___ U.S. ___, 131 S. Ct. 2594, 2609 (2011) (in general, bankruptcy court lacks authority under Article III to enter final judgment in proceedings that do not arise under Title 11); *Wellness Int'l Network, Ltd. v. Sharif*, No. 12-1349, 2013 WL 4441926 at *21 (7th Cir. Aug. 21, 2013) (in a non-core proceeding, the district court may treat the bankruptcy court's order as proposed findings of fact and conclusions of law to be reviewed *de novo*).

4

analysis. *In re Archdiocese of Milwaukee*, 485 B.R. 385, 388; *see also* Committee Resp. Br., Dkt. No. 19 at 11 (conceding the Bankruptcy Court did not address "substantial burden" because it determined RFRA and the First Amendment did not apply), 48 (same).

***The District Court Appeal***

The Trustee timely filed a Motion for Leave to Appeal or to Withdraw the Reference or, Alternatively, Trustee's Objections to Bankruptcy Court's Proposed Findings of Fact and Conclusions of Law. Dkt. No. 1; *see also* Adv. Dkt. Nos. 82 ("Motion for Leave"), 83 ("Notice of Appeal"). This Court granted leave to appeal. Dkt. No. 2; *see also* Adv. Dkt. No. 89.

On July 29, 2013, this Court entered the Decision and Order (the "Decision") challenged by the Committee's motions. The Court withdrew the reference to the extent that the interlocutory nature of the Bankruptcy Court order rendered its jurisdiction uncertain. Dkt. No. 24 at 9-10. The Court held that RFRA and the First Amendment do in fact apply and prevent the Committee from appropriating the funds in the Trust because doing so would substantially burden the Trustee's free exercise of religion. *Id*. at 29. No compelling governmental interest justified this burden. *Id*. at 27, 29.

Accordingly, the District Court reversed the Bankruptcy Court's decision. *Id*. at 29-30. On August 1, 2013, following a recommendation from the Bankruptcy Court, the District Court entered a final judgment granting summary judgment in the Trustee's favor and dismissing the remaining claims in the adversary proceeding (the "Judgment"). Dkt. No. 26. That ended the case, if only momentarily.

***Post-Judgment Discovery and the Motions to Vacate and Recuse***

One day after the Judgment, the Committee filed an emergency motion for discovery (the "Discovery Request"), asserting that "[a]fter the issuance of Judge Randa's 'Decision and Order,' counsel for the Committee conducted an inquiry into whether Judge Randa had any

5

relatives interred in any of the Archdiocese cemeteries." Bankr. Dkt. No. 2179 at 3, ¶ 4. The Committee's counsel explained that it had just conducted an internet search of the Archdiocesan cemetery website and published obituaries, which reflected the fact that a number of Judge Randa's relatives were buried in Archdiocesan cemeteries. *Id*.

In light of this "discovery," the Committee asked the Debtor to search the Archdiocesan business records to determine if Judge Randa or his wife had any burial spaces at the cemeteries. *Id*. ¶ 6. The Debtor's counsel declined to do so absent guidance from the Bankruptcy Court, and the Committee issued a Bankruptcy Rule 2004 Request. *Id*. There followed various amended motions, objections, affidavits, and responses. *See generally* Bankr. Dkt. Nos. 2183-96. After a hearing on August 8, 2013, the Bankruptcy Court entered an order granting the Discovery Request, defining the specific documents to be produced. Bankr. Dkt. No. 2200. Three days later, the Committee filed the pending motion to vacate (the "Motion to Vacate") and a separate motion to recuse the presiding judge, the Honorable Rudolph T. Randa (the "Recusal Motion"). Dkt. Nos. 27 and 30.

The motions are premised on three factual bases: Judge Randa's relatives are buried in Archdiocese-owned cemeteries, he purchased burial crypts for his parents, and the Archdiocese filed a contingent proof of claim on behalf of all of the Trust's beneficiaries. With these motions pending, on August 26, 2013, the Committee filed a notice of appeal to the Seventh Circuit Court of Appeals.[6] Dkt. No. 36; *see generally* App. Dkt. No. 1.

---

[6] The Committee filed its Notice of Appeal regarding the Court's July 29, 2013 Decision while the motion for recusal and motion to vacate remain pending. Under Fed. R. App. P. 4(a)(4)(B)(i), the Notice of Appeal becomes effective only once the pending motions are resolved by this Court. Federal Rule 4 applies because Judge Randa, in part, exercised original jurisdiction by withdrawing of the reference. *See* Fed. R. App. P. 6.

6

## ARGUMENT

The Committee's motions are baseless and untimely. They do not meet the standards under either 28 U.S.C. § 455 or Rule 60(b)(6) and, accordingly, the Court should deny them.

## I.    THE MOTIONS IGNORE THE *DE NOVO* STANDARD OF REVIEW THAT THE COURT OF APPEALS WILL APPLY.

The Court of Appeals reviews a district court's decision on appeal from the bankruptcy court *de novo*, allowing the Court of Appeals to "assess the bankruptcy court's judgment anew, employing the same standard of review the district court itself used." *In re Boone Cnty. Utilities, L.L.C.*, 506 F.3d 541, 542 (7th Cir. 2007) (citing *In re Kmart Corp.*, 381 F.3d 709, 712 (7th Cir. 2004)); *see Corporate Assets, Inc. v. Paloian*, 368 F.3d 761, 767 (7th Cir. 2004). The Committee has already filed a Notice of Appeal. Accordingly, the Committee's attempt to impugn the presiding judge's motive will have no legal or practical impact on the merits of its claims.

To the contrary, whether now or even after an additional review of the parties' briefs in the district court, the Court of Appeals will ultimately decide for itself whether the Committee has any threshold right to pursue the Trust's funds on behalf of the estate. In doing so, the Seventh Circuit will not give deference to the District Court's decision, whether issued by Judge Randa or any other judge that might "replace" him. Disqualification "was never intended to enable a discontented litigant to oust a judge because of adverse rulings made, for such rulings are reviewable otherwise…." *Ex parte American Steel Barrel Co.*, 230 U.S. 35, 44 (1913).[7]

---

[7] *See also Ballen v. Martin Chevrolet-Buick,* 16 F. Supp. 2d 449, 453 (D. Del. 1998) (judge's ruling and remarks on the evidence generally do not constitute personal bias or prejudice, rather they are "grist for the appeal mill, not as bases for recusal"); *In re Allied-Signal, Inc.,* 891 F.2d 967, 970 (1st Cir. 1989) (parties should not use recusal motion to "manipulate[e] the system for strategic reasons, perhaps to obtain a judge more to their liking"); *Franco v. Yale University,* No. 00-1927, 2002 WL 63803 at *3 (D. Conn. Jan. 9, 2002) ("plaintiff seems to be challenging [ ] the legal basis for this Court's decision ... These are grounds for appeal, not recusal."); *United States v. El-Gabrowny,*

*(continued …)*

7

The pending motions targeting Judge Randa are a thinly disguised attempt to shop for a new district court judge who will agree with the Committee on the merits. They serve no purpose other than to delay appellate review and increase litigation costs, decreasing creditor recovery. The Committee has already filed a Notice of Appeal. Indeed, appellate review could have been far more imminent but for the actions of the Committee's counsel challenging, in hindsight, the District Court's decision. Both motions should be denied on this ground alone.

## II. THE MOTIONS ARE UNTIMELY AND IMPROPER.

The motions fail for an additional threshold reason. A party seeking Rule 60(b)(6) relief must file the motion within a "reasonable time." *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 863 (1988). When a movant relies upon 28 U.S.C. § 455 for Rule 60(b) relief, as it does here, courts apply section 455's requirements for determining whether the motion was made within a reasonable time. *See*, *e.g.*, *Travelers Ins. Co. v. Liljeberg Enterprises, Inc.*, 38 F.3d 1404, 1410 (5th Cir. 1994); *Summers v. Singletary*, 119 F.3d 917, 920-21 (11th Cir. 1997). Under section 455, "[t]he law is well settled that one must raise the disqualification of the judge at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification." *United States v. Patrick*, 542 F.2d 381, 390 (7th Cir. 1976).

---

*(... continued)*

844 F. Supp. 955, 959 (S.D.N.Y. 1994) ("because it is in the nature of a judge's job to rule, and any ruling must favor one side and disfavor the other, rulings during the course of a case generally are not regarded as evidence of bias, even if it is alleged that a disproportionate number favor one side"); *In re National Union Fire Ins. Co.,* 839 F.2d 1226, 1229 (7th Cir. 1988) ("a change of umpire in mid-contest may require a great deal of work to be redone ... and facilitate judge-shopping"); *McCann v. Communications Design Corp.,* 775 F. Supp. 1506, 1522 (D. Conn. 1991) ("[a] judge must be free to make rulings on the merits without the apprehension that if he makes a decision, even a disproportionate number of decisions, in favor of one litigant, he may have created the impression of bias."); *McBeth v. Nissan Motor Corp. U.S.A.,* 921 F. Supp. 1473, 1489 (D.S.C. 1996) ("[a]long with the appearance of impartiality that must be preserved, so too must 'judge shopping' be avoided"); *McCann,* 775 F. Supp. at 1522 ("Recusal motions should not be used as 'strategic devices to judge shop' ").

Notably, if the movant knew—or could have known—the basis for the recusal motion before an adverse decision or ruling, any post-decision motion is untimely. *Schurz Commc'ns, Inc. v. FCC*, 982 F.2d 1057, 1060 (7th Cir. 1992) (Judge Posner characterized *SCA Services, Inc. v. Morgan*, 557 F.2d 110 (7th Cir. 1977), the single Seventh Circuit case holding there is no timeliness requirement for recusal motions, as "weak precedent" that fails to follow *United States v. Patrick*, which "had established the law of this circuit on the question"); *see also Union Carbide Corp. v. U.S. Cutting Serv., Inc.*, 782 F.2d 710, 716 (7th Cir. 1986) (recognizing the timeliness requirement). The need for timeliness serves an obvious purpose: "[l]itigants cannot take the heads-I-win-tails-you-lose position of waiting to see whether they win and if they lose moving to disqualify a judge who voted against them." *Schurz Commc'ns*, 982 F.2d at 1060. The requirement "prohibits knowing concealment of an ethical issue for strategic purposes." *Id*. (quoting *United States v. York*, 888 F.2d 1050, 1055 (5th Cir. 1989)); *see also United States v. Yonkers Bd. of Educ.*, 946 F.2d 180, 183 (2d Cir. 1991) (timeliness prevents waste of judicial resources and ensures that a movant does not "hedge its bets").

If the basis for recusal is a matter of public record, as in this case, then the failure to seek recusal in a timely manner is not excusable. *See Liljeberg*, 486 U.S. at 863 n.11 (noting that the ground for recusal "was not a matter of public record at the time the case was tried and decided"); *United States v. Ruzzano*, 247 F.3d 688 (7th Cir. 2001) (even if the party did not know of the basis for recusal prior to a sentence, recusal is not timely when the basis is a matter of public record); *see also Union Carbide Corp.*, 782 F.2d at 716 (the movant "may have waited too long" to recuse the judge under sections 455(a) and (b) because his stock ownership was a matter of public record).

9

Here, neither motion is timely. The fact that some of Judge Randa's family members are buried in the Archdiocese's cemeteries is a matter of public record. It always has been. Indeed, the Committee's counsel concedes it obtained the information regarding his deceased relatives through a simple internet search, which included a review of the cemetery web site. *See* James Stang Aff. in Support of Recusal Motion, Dkt. No. 32, 3-5 ¶¶ 6-12. In fact, the Committee's lead bankruptcy counsel reported spending 5.5 hours thoroughly exploring the "entire" cemetery website prior to the appeal to the district court. He asked to be paid for that work. *See* Bankr. Dkt. No. 578-2. That substantial effort, by a senior partner, should have revealed virtually all of the same evidence the Committee now relies upon—particularly, the burial records. The Committee either knew, or should have known, of the basis for its Recusal Motion long before Judge Randa ended, or entered, the case.[8]

The Committee makes much of the fact that it is not seeking Judge Randa's recusal because he is Catholic.[9] *See* Committee Br. in Support of Motion to Vacate, Dkt. No. 28 at 1 n.1. But, surely, the fact that he is Catholic (like the Bankruptcy Court judge) must have put counsel on notice that it was at least possible—indeed, probable—that relatives were buried in a Catholic cemetery in Milwaukee, especially given his family's roots here. Indeed, even a cursory internet search of public records disclosed that Milwaukee Catholic and Jewish cemeteries list the family names of 18 of the 28 judges and magistrates serving in the Eastern

---

[8] Judge Randa has issued other decisions in the Archdiocese case—as early as October, 2012. *See, e.g.,* Bankr. Dkt. No. 1031 (in part, denying the Debtor's motion to withdraw the reference for the purpose of claims allowance and disallowance). The Committee's counsel has long been aware of Judge Randa's role as the first appellate court, in effect, in this Chapter 11 proceeding.

[9] The Committee's counsel also asserted that, in the eight religious bankruptcy cases in which it has served as counsel, this is the first time it has sought to recuse a judge. A review of those dockets, however, reveals that Committee's counsel also had no significant adverse legal rulings in any of those cases except, arguably, one adversary proceeding lost but mooted by appeal.

10

District and Seventh Circuit. Accordingly, counsel's decision to wait until after Judge Randa's ruling to conduct its inquiry is inexcusable and inexplicable. For lack of timeliness alone, the motions should be denied.

## III. THE RECUSAL MOTION IS BASELESS.

Judges are presumed to be impartial. *United States v. Sidener*, 876 F.2d 1334, 1336 (7th Cir. 1989). Indeed, federal judges are obligated *not* to recuse themselves where there is no reason to question their impartiality. *New York City Housing Dev. Corp. v. Hart*, 796 F.2d 976, 980 (7th Cir. 1986). Parties thus face a substantial burden to present factual allegations that overcome that presumption of impartiality. *United States v. Baskes,* 687 F.2d 165, 170 (7th Cir. 1981). The Committee has not met—and cannot meet—its heavy burden to justify recusal under any provision of federal law.

### A. Judge Randa Does Not Have A Prohibited Interest In The Cemetery Trust Litigation.

A disqualifying interest means one of two things: (1) a "financial interest" in the subject matter of the case or in a party to the case; or (2) "any other interest" that could be substantially affected by the outcome of the proceeding. 28 U.S.C. § 455(b)(4); *see generally Hook v. McDade*, 89 F.3d 350, 356 (7th Cir. 1996); *see also In re New Mexico Natural Gas Antitrust Litig.*, 620 F.2d 794, 796 (10th Cir. 1980) (section 455(b)(4) differentiates between two kinds of interests). Judge Randa does not have an interest that falls within the purview of this statute.

### 1. Judge Randa does not have a "financial interest" in the subject matter of the case or in a party to the case.

A prohibited "financial interest" means "ownership of a legal or equitable interest, however small … in the affairs of a party." 28 U.S.C. § 455(d)(4). In turn, an "interest" under section 455(b)(4) means "an investment or other asset whose value depends on the outcome, or some other concrete financial effect." *Hu v. Am. Bar Ass'n*, 334 F. App'x 17, 19 (7th Cir. 2009)

11

(citing *Guardian Pipeline, L.L.C. v. 950.80 Acres of Land*, 525 F.3d 554, 557 (7th Cir. 2008)). A remote, contingent benefit is not a "financial interest" within the meaning of the statute. *See In re New Mexico Natural Gas Antitrust Litig.*, 620 F.2d at 796; *see also Hook*, 89 F.3d at 356 ("where an interest is not direct, but is remote, contingent, or speculative, it is not the kind of interest which reasonably brings into question a judge's impartiality.") (quotation omitted).

In this case, Judge Randa does not have a "financial interest" under section 455(b)(4). The Committee attempts to rely on a document more than 38 years old regarding the entombment of Judge Randa's parents in a crypt owned by the Archdiocese, as evidence of a financial interest.[10]  The Committee has made no showing, however, that the outcome of the cemetery trust litigation will affect the value of that alleged interest, whatever it is.  Judge Randa's parents are entombed.  That will not change because of this suit.  Moreover, there is no discernible personal financial value associated with the maintenance of two individual crypts among the 500,000 burial sites sustained by funds from the Trust.

Further still, the Committee's argument that "the financial burden of providing perpetual care could fall to Judge Randa" is far too speculative and remote to qualify as a financial interest under section 455(b).  In the event that neither the Trust and its Trustee nor the Debtor are able to provide appropriate care for the Milwaukee Catholic Cemeteries—because the Trust is ordered to turn over *all* of the Trust's assets—the municipalities in which those cemeteries are located will likely be responsible for the cemeteries' management and care.  Under Wisconsin Statute § 157.115(b)1.-2. (2011-12), the municipality may take control of any cemetery and its management and care if the cemetery authority fails for a period of one year, and the local

---

[10] Any "agreement" Judge Randa has is with the Archdiocese, not with the Trust.  *See* James Stang Aff. in Support of Recusal Motion, Dkt. No. 32, Ex. N (Archdiocese, as Seller, conveying the "right of entombment only" in the space).

12

government *must* step in if there is a failure of care for a period of five or more years. The Committee's claim that Judge Randa or his family will ultimately need to bear the financial responsibility for the two crypts is wild speculation without any basis.

The Committee is also wrong that Judge Randa has a financial interest by virtue of the Archdiocese filing a contingent proof of claim on behalf of the "Cemetery Care Claimants" in the bankruptcy case and, therefore, is "a member of a putative class seeking monetary relief." Committee Br. in Support of Motion to Recuse, Dkt. No. 31 at 17 (*citing Tramonte v. Chrysler Corp.*, 136 F.3d 1025 (5th Cir. 1998)). The Committee mischaracterizes the proof of claim and misapplies the law.

Even if the phrase a "member of a putative class" has any meaning here, the case cited by the Committee, *Tramonte*, is easily distinguishable. The dispositive factor for recusal there was whether a judge, as a class member, was entitled to "recover financially" from the lawsuit should the class prevail. *Id.* at 1029. Judge Randa has no such right here—the proof of claim expressly denies individuals the right to recover financially. It states:

> Filing of this Cemetery Care POC [proof of claim] by the Archdiocese *does not constitute a request for payment* on behalf of any individual entity, and is without prejudice to the rights, if any, of any individual filing a proof of claim for perpetual care, or to amend this Cemetery Care POC.
>
> Filing of this Cemetery Care POC by the Archdiocese *does not constitute an assertion by the Debtor as to whether or not individual Cemetery Care Claimants are "creditors"* as defined in 11 U.S.C. 101(10) with respect to the obligations of the Debtor to provide perpetual care.

Rider to Proof of Claim 179-1, ¶ ¶ 8-9 (emphasis added).

There is no possibility that resolution of the cemetery trust litigation would entitle Judge Randa to recover financially by virtue of the proof of claim, or that any benefit from the proof of claim could possibly be divisible among the hundreds of thousands of families with relatives

13

buried in cemeteries, or that the Trust would attempt such a disbursement. Further still, Judge

Randa has not filed a proof of claim and, even if he (rather than his parents' estate) desired an

individual claim for perpetual care, the deadline to file a proof of claim passed long ago. Bankr.

Dkt. No. 331. Therefore, even if he could be construed as a creditor under the Bankruptcy Code

(which the Trustee does not agree is proper),[11] Judge Randa is not "seeking monetary relief,"

*Tramonte*, 136 F.3d at 1029, nor could he as a beneficiary of the Trust. He has no financial

interest in this case whatsoever.

> **2.      Judge Randa does not have any "other interest" that could be
> substantially affected by the cemetery trust litigation.**

The Committee alternatively asserts that Judge Randa should recuse himself because he

has some "other interest that could be substantially affected by the outcome of the proceeding."

28 U.S.C. § 455(b)(4). Whether such an interest warrants judicial disqualification depends on

two variables—the remoteness of the interest and its extent or degree. *See, e.g.*, *In re Beard*, 811

F.2d 818, 831 (4th Cir. 1987) (*citing In re Virginia Elec. & Power Co.*, 539 F.2d at 368) (holding

that while $100 in cash in hand is not in and of itself *de minimis*, where the possibility of

recovering that amount is spread over 40 years, dependent on numerous variables, the judge's

speculative recovery is not disqualifying); *see generally Hook v. McDade*, 89 F.3d at 356; *New

York City Dev. Corp.*, 796 F.2d at 979-80. "As the interest becomes less direct, it will require

disqualification only if the litigation substantially affects that interest." 811 F.2d at 831.

A status the judge shares with the general public does not constitute an interest for the

purpose of section 455(b); it is too remote. *See New York City Dev. Corp.*, 796 F.2d at 979;

---

[11] Moreover, status as a creditor does not equate to being a party to the proceeding for the purposes of
section 455(b)(4). *See* Committee on Codes of Conduct Advisory Opinion No. 100 (June 2009) (simply being a
creditor or interest holder of the bankruptcy estate is not a sufficient interest to make that creditor "a party to the
proceeding" under section 455(b)(4)).

14

*Union Carbide Corp.*, 782 F.2d at 714-15. In *In re New Mexico Natural Gas Antitrust Litig.*, for example, the court concluded that a judge's status as natural gas consumer was too insubstantial to require his recusal from cases involving antitrust claims against oil companies—even when the plaintiffs' victory would result in lowering the cost of a portion of the gas resold to customers. 620 F.2d at 796-97. One group estimated that the judge could experience a gas bill savings of $31.00 per year as a result of ruling in favor of the plaintiffs, though another group conceded that the amount was "too speculative to be capable of estimation." *Id*. at 796.

Concluding that the judge's interest as a natural gas consumer would not be substantially affected by the litigation, the court explained,

> [W]e believe Congress did not intend to require disqualification in all cases in which the judge might benefit as a member of the general public. We realize that recusal would be required by the statute if the judge owned even one share of stock in a party to the litigation. But an interest shared by the judge in common with the public is distinguishable … the policy to promote public confidence in the impartiality of the judicial system is not served to as great an extent by disqualifying a judge who would receive only such a benefit. It is not simply a question of de minimis effect; a personal benefit or detriment shared in common with the community at large is perceived to have a different psychological effect on a judge than would a benefit or detriment not so shared.

*Id*.

Similarly, in this case, obtaining burial rights for his parents 38 years ago did not give the judge an interest cognizable under section 455(b)(4). As already explained, it is highly unlikely, if not impossible, for Judge Randa to be financially impacted by the cemetery trust litigation. *See* Sec. III.A.1, *supra*. But even assuming his interest would be affected, he shares this "detriment" with the community at large: more than 500,000 individual remains are interred in 1,000 acres of Archdiocese-owned land in Wisconsin. Rider to Proof of Claim 179-1 ¶ 2.

15

Indeed, obtaining burial rights is a transaction common to many, if not most, families, whether the cemetery is public or has sectarian affiliation. Even Hon. Susan V. Kelley, who first decided the summary judgment motion for the Committee, has relatives buried in Catholic cemeteries, albeit in Kimberly, Wisconsin, rather than in Milwaukee. *See* Burial records of Francis Van Lieshout and Marie (Mayme) VanHeeshwyk (grandparents to Judge Kelley), http://wc.rootsweb.ancestry.com/cgi-bin/igm.cgi?op=GET&db=littlechute&id=I32329; http://wc.rootsweb.ancestry.com/cgi-bin/igm.cgi?op=GET&db=littlechute&id=I32330 (Internet Materials, Trustee's Addendum No. 5). All cemeteries could go bankrupt, rendering cemetery trust funds in dispute. S*ee generally Emergency Motion Filed in Cemetery Case*, WLS-TV (Sept. 17, 2009), http://abclocal.go.com/wls/story?section=news/local&id=7018859. The risk that anyone's remains may lack care for the failure of trust funds is universal. Like the judge's status as a natural gas consumer in *New Mexico Natural Gas*, the benefits and theoretical burdens that Judge Randa may share with the public do not rise to the "interest" contemplated in section 455(b). And, even if his interest was cognizable under section 455(b), it certainly will not be "substantially affected" by the outcome of this litigation.

As a final matter, section 455(b)(4) does not apply unless the judge knew of the disqualifying financial interest. *Liljeberg*, 486 U.S. at 859; Richard E. Flamm, *Judicial Disqualification* § 24.4, at 711 (2d ed. 2007 & Supp. 2012). The Committee's briefs are noticeably devoid of any indication that Judge Randa knew of the alleged personal financial interest—however remote, however nominal, however theoretical. Thus, even if the Committee could demonstrate a prohibited interest (it cannot), the Committee has not established prior knowledge and, for that reason as well, the Court should deny both motions.

16

**B.      A "Reasonable Person" Would Not Have Questioned Judge Randa's Ability To Impartially Resolve The Issues In This Litigation.**

In addition to section 455(b), section 455(a) provides that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  Under section 455(a), disqualification is warranted when "a reasonable person perceives a significant risk that the judge will resolve the case on a basis other than the merits."  *In re Mason*, 916 F.2d 384, 385 (7th Cir. 1990) (citing *Liljeberg*, 486 U.S. at 865 (further citations omitted)).  This is an objective inquiry, essential when the question is how things may appear to the well-informed and thoughtful observer, not just to a hypersensitive or unduly suspicious person.  *Mason*, 916 F.2d. at 386.

A reasonable person under this standard is fully informed of the publically-available facts bearing on the issue of recusal.  *Union Carbide Corp.,* 782 F.2d at 715.  A reasonable person is able to appreciate the significance of the facts in light of relevant legal standards and judicial practice and can discern whether any appearance of impropriety is merely an illusion.  *In re Sherwin-Williams Co*., 607 F.3d 474, 478 (7th Cir. 2010).  Finally, a reasonable person is unconcerned with trivial risks as "there is always some risk, a probability exceeding 0.0001%, that a judge will disregard the merits."  *Mason*, 916 F.2d at 386.

Judge Easterbrook put it this way:

> Trivial risks are endemic, and if they were enough to require disqualification we would have a system of preemptory strikes and judge-shopping, which itself would imperil the perceived ability of the judicial system to decide cases without regard to persons. A thoughtful observer understands that putting disqualification in the hands of a party, whose real fear may be that the judge will *apply* rather than disregard the law, could introduce a bias into adjudication. Thus the search is for a risk substantially out of the ordinary.

*Id*.

Case 2:13-cv-00179-RTR   Filed 09/02/13   Page 17 of 28   Document 41

Section 455(a) does not allow for disqualification on the basis of unsubstantiated, dubious, or loosely-based charges of partiality. Flamm, *Judicial Disqualification* § 24.3, at 701; *see also United States v. Sypolt*, 346 F.3d 838, 839 (8th Cir. 2003) ("Despite the sweeping language of … § 455(a), …, the statute does not extend literally to any kind of doubtful behavior"); *In re Aguinda*, 241 F.3d 194, 201 (2d Cir. 2001) ("Where a case … involves remote, contingent, indirect or speculative interests, disqualification of a judge is not required [under section 455(a)].").

Moreover, circumstances that only produce indirect effects on a judge's interest do not cause informed and reasonable observers to doubt a disinterest in the case's outcome. Again, Judge Easterbrook:

> Judges regularly sit in cases that could affect their well-being tangentially. A judge who owns a house could be affected by a decision influencing the rate of interest, a judge who owns stock in the coal industry could be affected by a decision in a case concerning nuclear power, and so on. These indirect effects do not cause informed, reasonable observers to doubt a judge's disinterest. We therefore concluded in *New York City Housing Development Corp.* that a judge's ownership of municipal bond funds did not disqualify him in a case involving bonds issued by a different municipality, even though the funds had been underwritten by a party to the case. We held in *Union Carbide* that the prospect that a judge would resent her husband's need to sell stock (and pay a brokerage fee) so that she could sit in a case was insufficient to call her impartiality into reasonable question.

*In re Nat'l Union Fire Ins. Co.*, 839 F.2d at 1229-30.

If a financial impact is small in light of the relevant facts, or if there is no evidence that would enable the financial impact to be quantitatively evaluated, a reasonable person would not perceive a "significant" risk that the judge would resolve the case on anything other than the merits. For example, in *Union Carbide*, a judge presiding over an antitrust class action married a man who owned stock in two companies that were part of the plaintiff class. 782 F.2d at 711-13.

18

Union Carbide requested that the judge recuse herself and, after consideration, the judge held she could preside over the case if her husband sold the stock. *Id*. at 713. The husband sold the stock, incurring a brokerage fee of $900, and invested the proceeds in a money market fund. *Id*. Union Carbide maintained that the judge should *still* recuse herself, by virtue of section 455(a), under the theory that "by having to pay $900 in brokerage fees and giving up potential future appreciation in the value of the stocks [the judge] might be sore at Union Carbide; or, at least, … a reasonable person might think she would be sore." *Id*. at 715.

Judge Posner disagreed. Union Carbide failed to present evidence that would enable the financial impact on the judge and her husband to even be evaluated in terms of whether the sale of the stock resulted in any lost benefit. *Id*. Moreover, the brokerage fee was too small, in light of the judge's and her husband's salaries and in light of the proportion of the fee to the proceeds from the sale of the stock, to cause a reasonable person to conclude that the judge would act partially against Union Carbide. *Id*. at 916. The standard under section 455(a) was not met.

In this case, the fact that some of Judge Randa's relatives are buried in Archdiocese-owned cemeteries could not cause a reasonable person to perceive a significant risk that he would resolve this litigation on anything other than the merits. Indeed, the Committee has given *no reasonable explanation* for how his relatives' resting place would affect his ability to resolve the litigation impartially. The Committee suggests that Judge Randa may have an "emotional stake" in the outcome of this litigation. Committee Br. in Support of Motion to Recuse, Dkt. No. 31, at 15. Yet, this alleged "emotional stake"—based on a premise so speculative and remote— is not cognizable under section 455(a). *See, e.g., Perry v. Schwarzenegger*, 790 F. Supp. 2d 1119, 1131-32 (N.D. Cal. 2011) (noting that mere speculation about a judge's motive and desire on the basis of an unsubstantiated suspicion that the judge is personally biased or prejudiced does

not trigger the recusal requirements of Section 455(a)); *see also Union Carbide Corp.*, 782 F.2d at 716 ("it is one thing to assume that judges are human beings with the usual human emotions and another to attribute to them a malevolent, a calculating, vindictiveness").

Two or three extremely remote intervening factors would have to occur for the gravesites to fall into disrepair: the removal of all or nearly all the funds from the Trust, the Archdiocese's failure to provide perpetual care, triggering the statutory duty of municipalities to step in and, continuing the speculation, those same municipalities failing to provide the care. The risk that the judge resolved (or would resolve in the future) any aspect of the cemetery litigation on anything but the merits based on his relatives' resting place is so trivial it does not even approach the standard set forth in section 455(a). It certainly does not meet it.

The choice, long ago exercised, to inter relatives at a particular place does not satisfy the "reasonable person" test under section 455(a). A reasonable person is aware of all publicly-available facts and legal standards bearing on a situation, which includes information available on the internet. It bears repeating: the Committee has provided no credible evidence that Judge Randa would be financially impacted if the cemetery plots were to fall into disrepair. At best, the Committee has made a case for a hypothetical "trivial" risk that Seventh Circuit precedent squarely rejects. *In re Mason*, 916 F.2d at 386.

## IV. THE MOTION TO VACATE SHOULD BE DENIED.

Rule 60 provides that a court may relieve a party from a final judgment, order, or proceedings for several enumerated reasons or for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). The rule "exists to allow courts to overturn decisions where 'special circumstances' justify an 'extraordinary remedy.'" *Cash v. Illinois Div. of Mental Health*, 209 F.3d 695, 698 (7th Cir. 2000). The Seventh Circuit has emphasized that Rule 60(b) imposes an

"exacting standard" under which the movant must demonstrate exceptional circumstances.  *See Romo v. Gulf Stream Coach, Inc.*, 250 F.3d 1119, 1121 n.3 (7th Cir. 2001).

In conjunction with 28 U.S.C. § 455, Rule 60 provides "a procedure whereby, in appropriate cases, a party may be relieved of a final judgment."  *Liljeberg*, 486 U.S. at 863.  A Rule 60 motion, however, is not a substitute for an appeal from the underlying judgment.  *See Travelers Ins. Co.*, 38 F.3d at 1408; *McKnight v. U.S. Steel Corp.*, 726 F.2d 333, 338 (7th Cir. 1984); *see also* Sec. I, *supra*.  Thus, even assuming a judge should have recused himself or herself under section 455, vacating a judgment under Rule 60(b) is not automatically justified.  *Williamson v. Indiana Univ.*, 345 F.3d 459, 464 (7th Cir. 2003); *Liljeberg*, 486 U.S. at 862 ("[a] conclusion that a statutory violation occurred does not, however, end our inquiry.  As in other areas of the law, there is surely room for harmless error committed by busy judges who inadvertently overlook a disqualifying circumstance.").  If a violation of section 455 is established, Rule 60(b) relief is appropriate only after considering three factors: (1) the risk of injustice to the parties in the particular case; (2) the risk that the denial of relief will produce injustice in other cases; and (3) the risk of undermining the public's confidence in the judicial process.  *Id*. at 863.

The Court need not reach the issue of whether to vacate the Decision because Judge Randa had no reason to recuse himself.  Regardless, any identified error was harmless, and the drastic remedy of vacating the Decision is inappropriate.

### A.    The Risk Of Injustice To The Trustee Outweighs The Risk Of Injustice To The Committee.

The Committee seeks to support its Motion to Vacate by attacking the reasoning of the underlying Decision.  *See, e.g.*, Committee Br. in Support of Motion to Vacate, Dkt. No. 28 at 4-5.  While long on vitriol, the Committee's attack fails to identify any cognizable harm that it

21

would suffer in allowing the Decision and Judgment to stand pending further appellate review. There is none.

A judge's failure to recuse himself is harmless under the "injustice to the parties" test when the judgment in question is reviewed *de novo* on appeal. *Williamson v. Indiana Univ.*, 345 F.3d at 464-65. When the judgment is appealed, it is subject to "full review by an impartial panel." *Id*. at 465. In this case, the Committee's counsel seeks to vacate the Decision because it disagrees with the outcome. The Committee filed its notice of appeal. The merits of this Court's decision will be reviewed *de novo*. *Id*. at 464; *see also* Sec. I, *supra*. Therefore, the Committee has suffered no injustice.

In an attempt to divert attention from its failure to challenge the Listecki Declaration, the Committee suggests that this Court improperly "reached issues that were not before him." The Committee has suffered an injustice, it argues, because it did not have the opportunity to refute the Trustee's assertions. Committee Br. in Support of Motion to Vacate, Dkt. No. 28 at 20. The Committee misstates the law and procedural history and pointedly ignores its own acts and omissions, including its repeated failure to file any factual material, save one solitary document.

Contrary to counsel's assertions, the Committee first raised the "substantial burden" issue in its partial motion for summary judgment and asked the Bankruptcy Court to decide it. Committee's Summ. J. Br., Adv. Dkt. No. 57-1 at 14, ¶ 26. And even after the October 18, 2012 status conference, the Committee relentlessly argued substantial burden. It is disingenuous for the Committee to continue to argue that the substantial burden question was excluded from consideration below, Committee Resp. Br., Dkt. No. 19 at 15, or that it was otherwise not properly before this Court. *See Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir.

22

2006) (finding court can grant summary judgment on any grounds that parties raised and had opportunity to brief).

Regardless of what occurred below, this Court withdrew the reference to the Bankruptcy Court on the RFRA and First Amendment claims to the extent that the District Court's own appellate jurisdiction was in question. Decision, Dkt. No. 24 at 10 (withdrawing the reference for the *Trustee*'s RFRA and First Amendment claims, which necessarily included assertions that the Trustee's religious exercise was substantially burdened). Therefore, even assuming the Bankruptcy Court concluded that the "substantial burden" question was a fact intensive question that could require discovery, this Court reviewed the record *de novo*.

The Committee's counsel made a series of strategic choices not to submit proposed facts to the Bankruptcy Court, despite repeated opportunities. The Committee did not move to strike the Listecki Declaration. It should not attack a federal judge to compensate for its own decisions. Regardless, "no amount of discovery can change canon law. In this context, any transfer of funds from the Trust to the estate would meet the substantial burden test." Decision at 26. No evidence could have cast doubt on the Listecki Declaration's statements of the Trustee's application of canon law.[12] The Committee's counsel has suffered no injustice, and it has no one but itself to blame for the fact that the Listecki Declaration is "uncontroverted" in the record.

The risk of injustice to the Trustee outweighs any imagined risk of injustice to the Committee. The District Court had both the authority and the jurisdiction to decide all of the

---

[12] The Committee improperly attempts to introduce "evidence" that it asserts would have contradicted the Listecki Declaration. Committee Br. in Support of Motion to Vacate, Dkt. No. 28 at 20-22. The Committee suggests that Cardinal Mahoney's alleged use of cemetery trust funds—in another proceeding, in another state, in another era—has some bearing on this Trustee's statement of his obligations under canon law. *Id*. at 5. These "facts" were not put before the Bankruptcy Court or this Court. They are irrelevant.

issues before it, and the Trustee is entitled to rely on the finality—subject to appeal—of that process. The Committee's counsel, unsurprisingly, does not agree with the Decision, but asking for a new judge and renewed litigation is the wrong remedy. Counsel can make their arguments on appeal. Subjecting the matter to review by another district court judge will only impose unnecessary delay and costs on the estate. Moreover, regardless of the decisions at the district court level—past, present or future—this matter already has reached the Seventh Circuit.

### B.   There Is No Risk That Failing To Grant Relief From The Judgment Will Produce Injustice In Other Cases.

There is no risk of injustice to other litigants. The Decision was based on the unique facts of this case. The Committee's disagreement with the outcome is insufficient grounds for seeking relief under Rule 60(b). *McKnight*, 726 F.2d at 338 ("[t]he appropriate way to seek review of alleged legal errors is by timely appeal; a 60(b) motion is not a substitute for an appeal"); *see also* Sec. I, n.7, *supra*. If the Committee believes the Decision was in error, it can argue just that—on appeal to the Seventh Circuit.

To the extent a discussion of the merits is even appropriate here, the Committee's grounds for disagreement with the Decision are baseless. The Committee argues, for instance, that the determination that it is "government" for the purposes of RFRA is "a radical change to federal bankruptcy law and practice," which will improperly expose creditors' committees to a risk of suit for alleged statutory or constitutional violations. Committee Br. in Support of Motion to Vacate, Dkt. No. 28 at 22-23. In so arguing, however, the Committee blithely ignores the various instances in which committees have already been sued—and found to have qualified immunity. *See In re L.F. Rothschild Holdings, Inc.*, 163 B.R. 45, 49 (S.D.N.Y. 1994); *see also Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 514 (S.D.N.Y. 1994); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 717, 722 (Bankr. S.D.N.Y.), *aff'd*, 140 B.R. 347

(S.D.N.Y. 1992); Adv. Dkt. No. 79 at 7 (the Bankruptcy Court here noting that a creditors' committee "has shades of judicial immunity").

Section 1103(c) of the Bankruptcy Code, which grants a creditors' committee broad authority to formulate a plan and perform "such other services as are in the interest of those represented," has been interpreted to imply a limited grant of immunity to creditors' committee members. This immunity extends to conduct within the scope of the committee's statutory or court-ordered authority. *Pan Am Corp.*, 175 B.R. at 514. "Because of its central statutory role in the Chapter 11 process, and to assure the effective representation of its constituency, an official committee such as the Creditors Committee enjoys a qualified immunity that corresponds to, and is intended to further, the Committee's statutory duties and powers." *Pan Am Corp.*, 175 B.R. at 514 (airline could not sustain counterclaims against the creditors committee in part because it had judicial immunity). When the Committee is acting within the scope of its duties—indeed, duties specifically authorized by the Bankruptcy Court—it enjoys the protection of immunity.[13] This Court's holding that the Committee falls within RFRA's definition of government when acting within the scope of its official duties, therefore, will not destabilize other bankruptcy cases.

Perhaps more troubling is the Committee's claim that Judge Randa somehow held that the Trust is not subject to the fraudulent conveyance laws simply because it is "religious." Committee Br. in Support of Motion to Vacate, Dkt. No. 28, at 2. Incorrect. This Court found the Trust is not subject to the fraudulent conveyance laws because their application would

---

[13] It necessarily follows that creditors committees, like bankruptcy trustees, are bound by the constitution. *See*, *e.g.*, *In re Barman*, 252 B.R. 403, 412-13 (Bankr. E.D. Mich. 2000) (finding that a bankruptcy trustee acted under color of law for purposes of the Fourth Amendment when it accompanied a U.S. Marshal to search for concealed assets in the debtor's residence).

substantially burden the Trustee's religious exercise in violation of RFRA and the First Amendment. This Court found that Archbishop Listecki stated an authoritative church position on an issue and, therefore, the Court was without jurisdiction to question it. The Listecki Declaration:

> unquestionably represents the authoritative church position regarding the central and sacred nature of cemeteries to the Catholic faith. A secular court 'may not take sides on issues of religious doctrine.' *McCarthy v. Fuller*, 714 F.3d 971, 975 (7th Cir. 2013). The Court's only province is to decide 'whether a party is correct in arguing that there is an authoritative church ruling on an issue, a ruling that removes the issue from the jurisdiction of that court. But once the court has satisfied itself that the authorized religious body has resolved the religious issue, the court may not question the resolution.' *Id*. at 976.

Decision at 24-25. The Decision does not stand for the notion that any "religious person" may ignore fraudulent transfer laws. Moreover, RFRA's and the First Amendment's "least restrictive means" and "compelling government interest" tests provide safeguards to ensure that a RFRA or First Amendment defense is appropriate.

The Committee's counsel mischaracterizes this Court's holdings in an attempt to create a slippery slope where none exists. There is no risk of injustice to other cases because this Court relied on existing case law to logically come to its conclusions. To the extent that the Committee disagrees with these conclusions, a timely appeal—now underway—mitigates any "risk" that it perceives, given that the issues will be reviewed *de novo*.

### C. Vacating Judge Randa's Decision Will Undermine The Public's Confidence In The Judicial System.

Make no mistake—the Committee's motions thinly veil its desire to shop for a new district court judge and, at that, on a religious basis. But the Constitution itself suggests an answer to this campaign. Article VI provides: "no religious test shall ever be required as a qualification to any office or public trust under the United States." That Judge Randa is Catholic

26

and may appreciate the need for the maintenance of cemeteries—public or private—is insufficient and, in fact, a prohibited consideration for purposes of section 455(b). *See*, *e.g.*, *Feminist Women's Health Ctr. v. Codispoti*, 69 F.3d 399 (9th Cir. 1995) (Catholic judge is not disqualified from presiding in abortion-related litigation based on anti-abortion views of his religion); *Singer v. Wadman*, 745 F.2d 606, 608 (10th Cir. 1984) (affirming denial of motion to recuse on grounds that the district court judge was Mormon and the case allegedly involved "a challenge to the theocratic power structure of Utah"); *Idaho v. Freeman*, 507 F. Supp. 706, 730-31 (D. Idaho 1981) (denying motion to recuse based on district court judge's former leadership position with The Church of Jesus Christ of Latter-Day Saints). The motions, taken to their logical conclusion, impermissibly impose a religious test on this judge—and the next and the next.

The direct application of Article VI is not at issue. Rather, "[t]he act of vacating the district court's judgment would be counterproductive, inefficient, and would serve only to weaken public confidence by undermining the finality of judgments." *Williamson v. Indiana Univ.*, 345 F.3d at 465. The Committee's appeal will permit error correction, assuming any correction is necessary.

## CONCLUSION

Judge Randa had no reason to recuse himself from these proceedings. He has no direct financial stake in this matter. The chances that he would be affected in even the smallest way by the outcome of this case is, as the Committee concedes, highly speculative. The Committee has stated no grounds for recusal and, certainly, no grounds to vacate the Decision. The Committee's untimely, improper motions should be denied.

27

Dated:  September 2, 2013.

GODFREY & KAHN, S.C.

By:     *s/ Jennifer L. Vandermeuse*
        Jennifer L. Vandermeuse, SBN 1070979
        Brady C. Williamson, SBN 1013896

        780 North Water Street
        Milwaukee, WI 53202-3590
        Phone: 414-273-3500
        Fax: 414-273-5198
        Email: jvandermeuse@gklaw.com

        *Attorneys for Archbishop Jerome E. Listecki, as*
        *Trustee of the Archdiocese of Milwaukee Catholic*
        *Cemetery Perpetual Care Trust*

9916767.5

28