In the

# United States Court of Appeals

## For the Seventh Circuit

CERTIFIED COPY

A True Copy
Teste:

*[signature]*

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

———————————

Nos. 13-2881, 13-3353, 13-3495

JEROME E. LISTECKI, as Trustee of the
Archdiocese of Milwaukee Catholic
Cemetery Perpetual Care Trust

*Plaintiff-Appellee,*

*v.*

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS,

*Defendant-Appellant.*

———————————

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 13-cv-00179 — **Rudolph T. Randa**, *Judge.*

———————————

ARGUED JUNE 2, 2014 — DECIDED MARCH 9, 2015

———————————

Before FLAUM and WILLIAMS, *Circuit Judges*, and DOW,
*District Judge.*[*]

———————

[*] Of the United States District Court for the Northern District of Illinois,
sitting by designation.

WILLIAMS, *Circuit Judge*. Facing financial problems and lawsuits from victims of sexual abuse, the Archdiocese of Milwaukee filed for Chapter 11 bankruptcy in 2011. A Creditors' Committee composed of abuse victims subsequently sought to void a one-time transfer of $55 million from the Archdiocese's general accounts to a trust earmarked for maintaining cemeteries as fraudulent or preferential under the Bankruptcy Code (the "Code"). The Committee wanted the $55 million included in the Archdiocese's bankruptcy estate (the "Estate"), making it available to creditors. However, the district court found that the application of the Code to that transfer would violate the Archbishop's free exercise rights under the Religious Freedom Restoration Act ("RFRA") and the First Amendment. We only affirm the district court's conclusion that RFRA is not applicable when the government is not a party to the suit based on the statute's plain language. However, we disagree with the district court's conclusion that RFRA is applicable in this action because the Committee does not act under "color of law" and is not the "government" for RFRA purposes. It is composed of non-governmental actors, owes a fiduciary duty to the creditors it represents and no one else, and has other non-governmental traits. Although the Free Exercise Clause is implicated here, we disagree with the district court's conclusion that it bars the application of the Code to the $55 million. The Code and its relevant provisions are generally and neutrally applicable and represent a compelling governmental interest in protecting creditors that is narrowly tailored to achieve that end.

The Committee sought the district court judge's recusal after the summary judgment order, but the court denied that

motion. Because of our holding in Parts A–C of this opinion, it is not necessary to definitively decide this issue.

## I. BACKGROUND

The Archdiocese has operated and maintained eight Catholic cemeteries and seven mausoleums in the Milwaukee area since 1857. It states in its complaint, which we accept as true, that it has set aside money for decades to provide perpetual care for those cemeteries in accordance with Canon Law. In April 2007, the Archdiocese created a trust fund (the "Trust") to maintain that money. Two months later, the Archbishop sent a letter seeking approval from the Vatican to transfer roughly $55 million (the "Funds") into the Trust, noting that "[b]y transferring these assets to the Trust, I foresee an improved protection of these funds from any legal claim and liability." The Vatican approved and the money was transferred in March 2008.

Before the creation of the Trust, the Archdiocese settled a case in which ten victims alleged they were abused by two priests in California. *See* Tom Heinen, *$17 Million Settles 10 Abuse Cases*, Milwaukee Journal Sentinel, Sept. 1, 2006, at A1. Ten months later, after the Trust was created, but before the Funds were transferred, the Wisconsin Supreme Court ruled certain statutes of limitations could be tolled, which allowed various sexual misconduct suits to go forward against the Archdiocese. *John Doe 1 v. Archdiocese of Milwaukee*, 734 N.W.2d 827, 842–47 (Wis. 2007). Some of the resulting cases have been stayed pending the outcome of the bankruptcy petition.

Due in part to those cases, the Archdiocese filed for Chapter 11 bankruptcy on January 4, 2011. The Archdiocese

has run the Estate as a debtor-in-possession since the filing. After the filing, the United States Trustee appointed a group of abuse victims to the Committee to represent the Archdiocese's unsecured creditors in the proceedings. The Archbishop then, in his role as trustee of the Trust, sought declaratory judgment from the bankruptcy court that the Funds would not "be used to satisfy any of the claims the Committee intends to pursue" against the Archdiocese because application of the Code to the Funds would violate the Archbishop's free exercise rights and RFRA. (We will call the plaintiff the "Archdiocese," even though it was technically the Trust and the Archbishop that brought the present action.) However, the complaint created a conflict because the plaintiff-Archbishop sought to limit the size of the Estate, and the Archdiocese as debtor-in-possession had little incentive to vigorously defend that complaint or assert affirmative defenses since it acts through its sole corporate member, the Archbishop. In other words, the declaratory complaint resulted in the Archbishop initiating an adversary action (as Trustee) against himself (as sole corporate member of the Archdiocese). Recognizing this problem, the parties entered into a stipulation, approved by the bankruptcy court, stating that the Committee was "granted derivative standing to assert and litigate the Avoidance and Turnover Claims against the Archbishop for the benefit of the Debtor's estate." The Committee asserted as a counterclaim that the transfer of money into the Trust was fraudulent and preferential and should be avoided pursuant to the Code.

The Committee moved for summary judgment on Count III, which sought a declaration that the First Amendment and/or RFRA bar the application of the avoidance and turn-over provisions of the Code to the Funds. The Archdiocese

responded and filed a cross-motion for summary judgment. The Archdiocese attached the Archbishop's affidavit, saying he had a Canonical duty to "properly maintain[] in perpetuity" the cemeteries and mausoleums, and "[i]f the Committee is successful in converting the [Funds] into property of the Debtor's estate, there will be no funds or, at best, insufficient funds, for the perpetual care of the Milwaukee Catholic Cemeteries." There was no discovery taken on whether this imposed a substantial burden on his religious beliefs, and attorneys for both sides later agreed to stay the cross-motion until the Committee's summary judgment motion was adjudicated.

The bankruptcy court granted the Committee's motion, but the district court reversed. It found the Committee was acting under color of law for RFRA purposes and that the Archbishop's exercise of religion would be substantially burdened if the Funds were required to become part of the Estate. It granted the Archdiocese's cross-motion for summary judgment on both RFRA and First Amendment grounds and dismissed the case. Two weeks later, the Committee filed motions to vacate and for recusal of the district court judge based on information it obtained after the ruling. The Committee argued that the judge was biased, or a reasonable person would question his impartiality, based on documents showing he has nine family members who were buried between 1972 and 2013 in cemeteries owned by the Archdiocese: his father and mother (who passed away in 1975 and 1976, respectively), two sisters (1985 and 2001), an uncle (1972), an aunt (1985), his brother in-law (2013), and his wife's parents (1984 and 2010). The Committee also produced an Agreement that the judge signed with the Archdiocese on August 1, 1975, the day after his father passed

away, for the purchase of his parents' burial plots. The judge denied the motion to recuse, stating he had no financial or other interest in the litigation and no reasonable person would perceive a substantial risk of bias in the case. The Committee filed a petition for a writ of mandamus with this court seeking the judge's recusal, and also appealed the summary judgment decision.

## II. ANALYSIS

We begin by noting that the issue of whether the Archdiocese actually made a fraudulent, preferential or avoidable transfer is not before us. The issues before us relate only to Count III, which sought a declaration that the First Amendment and/or RFRA bar the application of the avoidance and turnover provisions of the Code to the Funds. We review the district court's decision that such a bar existed de novo. *Kvapil v. Chippewa Cnty.*, 752 F.3d 708, 712 (7th Cir. 2014).

### A. RFRA Does Not Apply in Suits in Which the "Government" Is Not Involved

The Committee contends it is not the "government" and therefore RFRA does not apply. We first determine whether RFRA applies when the "government" is not a party to action. We have previously said in dicta that "RFRA is applicable only to suits to which the government is a party." *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006), *abrogated on other grounds by Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694 (2012). Based on RFRA's plain language, its legislative history, and the compelling reasons offered by our sister circuits, we now hold RFRA is not applicable in cases where the government is not a party.

Nos. 13-2881 *et al.*                                    7

We begin by first examining RFRA's plain language. *See Barma v. Holder*, 640 F.3d 749, 751 (7th Cir. 2011) (noting statutory interpretation begins with the plain language of the statute). It states, "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability ...." 42 U.S.C. § 2000bb-1(a). Subsection (b) provides an exception, stating that "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). In other words, this is a burden shifting test in which the government must make a showing after the plaintiff demonstrates a substantial burden. *Rweyemamu v. Cote*, 520 F.3d 198, 203 n.2 (2d Cir. 2008) ("[W]e think the text of RFRA is plain … in that it requires *the government* to demonstrate that application of a burden to a person is justified by a compelling governmental interest" (emphasis in original) (internal citation omitted)). It is self-evident that the government cannot meet its burden if it is not party to the suit. *See Hankins v. Lyght*, 441 F.3d 96, 114–15 (2d Cir. 2006) (Sotomayor, J., dissenting) ("Where, as here, the government is not a party, it cannot 'go [] forward' with any evidence. In my view, this provision strongly suggests that Congress did not intend RFRA to apply in suits between private parties."). A private party cannot step into the shoes of the "government" and demonstrate a compelling governmental interest and that it is the least restrictive means of furthering that compelling governmental interest because the statute explicitly says that the "government" must make this showing.

If the intent were not yet clear, we find further support for this interpretation from the "[j]udicial relief" section of the statute. 42 U.S.C. § 2000bb-1(c). Congress stated that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain *appropriate relief against a government*." *Id.* (emphasis added). The relief is clearly and unequivocally limited to that from the "government." If the government is not a party, no one can provide the appropriate relief. *See Gen. Conf. Corp. v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010) ("The text of the statute makes quite clear that Congress intended RFRA to apply only to suits in which the government is a party."). The plain language is clear that RFRA only applies when the government is a party.

Our interpretation is also supported by RFRA's legislative history. The Report from the Committee on the Judiciary began by stating that the nation was founded by those with a conviction that they should be free to practice their religion "free from Government interference" and "Government actions singling out religious activities for special burdens." S. Rep. No. 103-111, at 4 (1993). In describing RFRA's purpose, the report refers to "government actions," "only governmental actions," and "every government action." *Id.* at 8–9. As then-Judge Sotomayor noted, "[a]ll of the examples cited in the Senate and House Reports on RFRA involve actual or hypothetical lawsuits in which the government is a party." *Hankins*, 441 F.3d at 115 n.9 (Sotomayor, J., dissenting); *see also Gen. Conf. Corp.*, 617 F.3d at 411. The legislative history shows Congress did not mean for RFRA to be applicable when the government is absent, and we will not read into

the statute what neither the plain language nor legislative history has included.

Finally, two of the three circuits to analyze this matter have found RFRA does not apply in suits where the government is not a party. *See Gen. Conf. Corp.*, 617 F.3d at 410–11; *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834, 837–43 (9th Cir. 1999). The only circuit to analyze the issue and hold to the contrary did so in the limited situation when the government *could* have been a party, over a strong dissent, and has retreated from its holding. *Compare Hankins*, 441 F.3d at 103 (finding RFRA applicable in private civil suit) *with id.* at 114–15 (Sotomayor, J., dissenting) *and Rweyemamu*, 520 F.3d at 203–04 & n.2 (noting its "doubts" about *Hankins* because of RFRA's plain language and policy reasons, but not deciding the issue because it was waived). Therefore, we hold RFRA does not apply when the "government," as defined in RFRA, is not a party to the action.

## B. The Committee Is Not the "Government"

The next question is whether the Committee is the "government" under RFRA, thereby triggering the statute. RFRA defines "government" to include "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States ...." 42 U.S.C. § 2000bb-2(1). The Archdiocese argues that generally a creditors committee, including this Committee, acts "under color of law" and therefore is "government" because: (1) it is an arm of the United States Trustee; (2) it owes its creation and existence to the combination of the Trustee, the court, and the Code; or (3) it is performing a traditional governmental

function.[1] The Committee counters that its specific makeup and ability to appear in this action, as well as a committee's general fiduciary duties and responsibilities, all show that this Committee is not the "government." We agree with the Committee.

The phrase "color of law" in RFRA mirrors that found in 42 U.S.C. § 1983, which applies to those acting "under color of" law. We do not think this word choice is coincidental and agree with the Ninth Circuit in presuming that Congress intended for RFRA "color of law" analysis to overlap with Section 1983 analysis. *Sutton*, 192 F.3d at 834–35 (interpreting RFRA "under color of law" in the same way as Section 1983 because "[w]hen a legislature borrows an already judicially interpreted phrase from an old statute to use it in a new statute, it is presumed that the legislature intends to adopt not merely the old phrase but the judicial construction of the phrase" (internal citation omitted)); *see also Brownson v. Bogenschultz*, 966 F. Supp. 795, 797 (E.D. Wis. 1997) (interpreting "color of law" under RFRA using Section 1983 analysis). So we turn to Section 1983 precedent to assist our analysis. We also note the overlap between a governmental actor and someone acting under the color of law and use these terms interchangeably. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 (1982).

The Supreme Court has set forth various tests to use when deciding whether someone is a governmental actor, including the "symbiotic relationship test, the state com-

---

[1] The Archdiocese argues that the Committee is the governmental actor. It does not argue that the Bankruptcy Code or the Bankruptcy Court, is the "government" under RFRA.

mand and encouragement test, the joint participation doc-
trine, and the public function test." *Rodriguez v. Plymouth
Ambulance Serv.*, 577 F.3d 816, 823–24 (7th Cir. 2009). But "[a]t
its most basic level, the state action doctrine requires that a
court find such a 'close nexus between the State and the chal-
lenged action' that the challenged action 'may be fairly treat-
ed as that of the State itself.'" *Id.* at 823 (quoting *Jackson v.
Metro Edison Co.*, 419 U.S. 345, 351 (1974)).

First, the Archdiocese argues that the court and the Trus-
tee collectively appoint and monitor a committee's makeup
which shows a close nexus to governmental action. Yet, none
of the individuals who make up the Committee are govern-
mental actors. Each is a private, individual creditor who was
sexually abused by the clergy. Neither is the process of ap-
pointing this Committee, nor committees in general, evi-
dence of a close nexus. A committee is usually made up of
the seven largest unsecured creditors. 11 U.S.C. § 1102(b)(1).
They became creditors through their own private transac-
tions with the debtor and choose to be appointed to the
committee, and that makes them eligible for appointment.
The U.S. Trustee, admittedly a governmental actor, appoints
the committee in the first instance, as it did here. *See* 11
U.S.C. § 1102(a)(1). Appointing a committee is one of the
ways that the Trustee is able to perform its duty and "super-
vise" the bankruptcy cases. *Id.*; 28 U.S.C. § 586(a)(3)(E). But
upon the "request of a party in interest and after notice and
a hearing, the court may order the United States trustee to
change the membership of a committee." 11 U.S.C.
§ 1102(a)(4). So, a committee is a combination of private de-
cisions, Trustee appointment, and court supervision, with
the private actions providing the qualifying criteria for ap-
pointment. This is not action that can be "fairly treated as

that of the State itself." *Rodriguez*, 577 F.3d at 823. Just because the court appoints an entity and supervises some of its actions does not make it a governmental actor. *See Loyd v. Loyd*, 731 F.2d 393, 398 (7th Cir. 1984) (finding court-appointed administer who sold a piece of property pursuant to the court's approval was not governmental actor).

Moreover, once a committee is created, it takes on a life of its own. The committee can, with the court's approval, employ one or more attorneys, accountants, or other agents to represent or perform services for the committee. 11 U.S.C. § 1103(a). Here, the Committee has retained counsel that represents them in this appeal. Those professionals report to the committee, not the Trustee or the court. The committee has an attorney-client relationship with the attorney. *In re Subpoenas Duces Tecum*, 978 F.2d 1159, 1162 (9th Cir. 1992) (per curiam). Neither the Trustee nor the court is involved. All of a committee's expenses, and the fees and expenses of the professionals that the committee hires, are paid for by the Estate and not the government. 7 Collier on Bankruptcy ¶ 1103.03 (16th ed. 2014). The Trustee can weigh in, and the court has input, but the money ultimately comes from the Estate, rather than the public coffers.

The Archdiocese next argues the Committee only gains standing to appear in the case from action taken by the bankruptcy court, rather than its own private actions, and so its presence in the suit is a result of governmental action. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex. rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir.), *cert. dismissed*, 124 S.Ct. 530 (2003). Here, however, because there was conflict with the Archbishop representing the Trust on one hand and the Estate on the other, the two sides

executed a "Stipulation Regarding the [Committee's] Standing" that allowed the Committee "derivative standing to assert and litigate the Avoidance and Turnover Claims against the Archbishop." True, the court had to approve it, but the Committee's standing came about from the Archbishop's conflict and the Archdiocese's concession that the Committee could pursue the claims. This is private ordering.

Perhaps most problematic for the Archdiocese's argument is that a committee represents the larger interests of the unsecured private creditors, and it is to them, and not the Trustee, court, or any governmental actor, that the committee owes a fiduciary duty. *Smart World Techs., LLC v. Juno Online Services*, 423 F.3d 166, 175 n.12 (2d Cir. 2005) ("[C]reditors' committee owes a fiduciary duty to the class it represents, but not to the debtor, other classes of creditors, or the estate."); *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1315–16 (1st Cir. 1993) (same). The committee does not have to act in accordance with the Trustee's or court's wishes. In fact, the committee can, and should, oppose the Trustee if it is acting against the best interests of the unsecured creditors. *See In re Bayou Group, LLC*, 564 F.3d 541, 547 (2d Cir. 2009) (noting both the creditors' committee and bankruptcy court disagreed with Trustee's motion to appoint trustee); *In re Columbia Gas Sys., Inc.*, 33 F.3d 294, 295 (3d Cir. 1994) (noting difference between the committee's and Trustee's position on interpretation of statute). It is beholden to no governmental actor.

But, the Archdiocese argues, the Committee gets a "limited grant of immunity" and only governmental actors get immunity. *See In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (noting immunity pursuant to Section 1103(c) of

Code for acts related to work for creditors). The problem with this argument is that immunity is routinely given to private individuals, for example, directors of corporations, *see Kamen v. Kemper Fin. Servs., Inc.*, 939 F.2d 458, 461 (7th Cir. 1991), good Samaritans, *see Rodas v. Seidlin*, 656 F.3d 610, 626 (7th Cir. 2011), and parents from tort suits for damages from their minor children, *see Barnes v. Barnes*, 603 N.E.2d 1337, 1339 (Ind. 1992). Here, the Committee's immunity only applies when it is acting on behalf of the creditors, showing us the independence the Committee has from the court and Trustee since it is not subject to their whims or obligated to represent them.

Finally, the Archdiocese argues—and the district court found—that the Committee performs a "public function" making it a governmental actor. Under this test, a private entity is a governmental actor when it is performing an action that is "traditionally the exclusive prerogative of the State." *Jackson*, 419 U.S. at 353. This test is rarely met. *Rodriguez*, 577 F.3d at 824 n.11. The Archdiocese argues that the Committee is basically stepping into the shoes of the Trustee. First, that theory is belied by the fact that the Committee can, and does, conflict with the Trustee. Were they performing the same function, they would presumably be on the same page. Second, the goal and purpose of the committee is to act on behalf of and for the creditors. Conversely, the goal of the Trustee is to "promote the integrity and efficiency of the bankruptcy system for the *benefit of all stakeholders – debtors, creditors, and the public*." 1 U.S. Department of Justice, United States Trustee Program Policy and Practices Manual § 1-4.2.1 (Feb. 2015) (emphasis added), *available at* http://www.justice. gov/ust/eo/ust_org/docs/Volume_1_Overview. pdf. There is some overlap between their functions—*e.g.,*

both engage in restructuring discussions and converse with the court regarding the status of the case and the debtor's estate—but the traditional function of the governmental entity is to act as an impartial supervisor of the bankruptcy process for the benefit of all. The Committee, however, is far from impartial.

The Archdiocese also argues, and the district court found, that a debtor-in-possession performs a public function, and when the Committee obtained derivative standing to pursue avoidance claims, it stepped into the shoes of the debtor-in-possession, thereby becoming a governmental actor. *See In re Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 524 (Bankr. E.D.N.Y. 1989) (noting debtor-in-possession "becomes an officer of the court subject to the supervision and control of the Bankruptcy Court and the provisions of the Bankruptcy Code"). The problem for the Archdiocese is that the debtor-in-possession does not perform an action that is "*traditionally the exclusive prerogative* of the State." *Jackson*, 419 U.S. at 353 (emphasis added). As the Code makes clear, the "trustee" avoids transfers—not the United States Trustee or any other governmental entity. *See, e.g.*, 11 U.S.C. §§ 544, 547, 548. It is not the government or even a governmental actor that traditionally avoids transfers, but rather individual trustees and debtor-in-possessions. This is not the exclusive prerogative of the government. *See State Bank of Toulon v. Covey* (*In re Duckworth*), 776 F.3d 453, 458 (7th Cir. 2014) (noting individual trustee attempted to avoid transfer).

Although each determination of an entity's governmental actor status is fact- and case-specific, our conclusion that the Committee is not a governmental actor is supported by the Supreme Court's precedent. In *Polk County v. Dodson*, 454

U.S. 312, 318–19 (1981), the Court considered whether a public defender, performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding, was a state actor. The public defender is created by the government, selected and employed by governmental officials, subject to governmental supervision, exists only because of the state-created adversary system, and is given its power to appear in court (a uniquely state setting) by the government. Yet, the Court held that a public defender performing those duties is not a state actor because its job is not to act "on behalf of the State or in concert with it, but rather by advancing 'the undivided interests of his client[;]'[t]his is essentially a private function." *Id.* Moreover, "a public defender is not amenable to administrative direction in the same sense as other employees of the State. … [A] defense lawyer is not, and by the nature of his function cannot be, the servant of an administrative superior." *Id.* at 321. The same can be said of the Committee. Although some of its activities are subject to governmental and court supervision, its core function is to act on behalf of, and advance the undivided interest of, its clients, namely the private creditors. *See also Filarsky v. Delia*, 132 S. Ct. 1657, 1667 (2012) (focusing on whether the relevant actors were working "to achieve their own ends, [or] individuals working for the government in pursuit of government objectives"); *cf. West v. Atkins*, 487 U.S. 42, 51 (1988) (noting jail doctor was a governmental actor, even though he had a duty to his patient first and foremost, because "his relationship with other prison authorities was cooperative"). There might be a "nexus," between the Committee and the government, but it is not a close one. *See Rodriguez*, 577 F.3d at 823.

For all these reasons, we find the Committee is not acting under the color of law and so RFRA does not apply. Therefore we need not address the Committee's argument that RFRA's application here would create federalism issues.

### C. Free Exercise Clause Does Not Prevent Application of the Code to the Funds

The Archdiocese contends that even if the Committee is not the government and so RFRA does not apply, the Free Exercise Clause is implicated. While we agree that the First Amendment is applicable here, it does not prevent the application of the turnover and avoidance provisions because there is a compelling governmental interest in the application of the relevant portions of the Code that is narrowly tailored to achieving that interest.

#### 1. Free Exercise Clause Is Applicable in Private Civil Suits

The Free Exercise Clause states that "Congress shall make no law … prohibiting the free exercise" of religion. U.S. Const. amend. 1, cl. 1. "[M]ost rights secured by the Constitution are protected only against infringement by governments," so that "the conduct allegedly causing the deprivation of a federal right [must] be fairly attributable to the State." *Lugar*, 457 U.S. at 936–37 (internal citation omitted). However, not all rights require the government be a party in the case. The Court's practice makes clear that free exercise is one of those rights. For example, in *McDaniel v. Paty*, Paty sought election to the state constitutional convention and filed a declaratory judgment action in state court that her opponent, McDaniel, was prohibited from running since he was an ordained minister and a Tennessee statute

barred "minister[s] of the Gospel, or priest[s] of any denomination whatever" from serving. 435 U.S. 618, 621 & n.1 (1978). McDaniel countered that the statute violated his right to free exercise. *See id.* at 620–21. Both parties were clearly private citizens, and yet the Court implicitly recognized that the Clause was applicable when it found a free exercise violation. *Id.* at 629. The Court has also been clear that other clauses of the First Amendment are applicable in entirely private civil suits, and we see no reasonable distinction between those and the Free Exercise Clause. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964) ("It matters not that that law has been applied in a civil action and that it is common law only, though supplemented by statute. The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised."); *see also Phila. Newspapers v. Hepps*, 475 U.S. 767, 777 (1986) (noting that the text of the First Amendment "by its terms applies only to governmental action" but is nonetheless applicable in civil suits between private parties). So, even though we find that the Committee is not a governmental actor, that does not end our First Amendment analysis.

We note that a certain line of Supreme Court cases, some of which the Archdiocese cites, have held that the Free Exercise Clause can be an affirmative defense that bars consideration of certain religious matters by secular courts. *See, e.g., Hosanna-Tabor*, 132 S. Ct. at 706 (holding that "ministerial exception," grounded in the Free Exercise Clause, bars courts from adjudicating employment discrimination case between religious institution and its ministers); *McCarthy v. Fuller*, 714 F.3d 971, 975 (7th Cir. 2013) (collecting cases and noting that a "secular court may not take sides on issues of religious doctrine"). We understand the Archdiocese to be arguing,

and it confirmed during oral argument, that it is citing these cases to show this court cannot "determine the centrality of the religious practice to an adherent's faith," meaning the sincerity of the Archbishop's religious beliefs, which we agree we cannot do. *See Korte v. Sebelius*, 735 F.3d 654, 683 (7th Cir. 2013).

We do not understand the Archdiocese to be arguing the transfer of the Funds is a religious matter that this court cannot adjudicate, nor could it make that argument because those cases relate only to intrachurch disputes. Here, we have what was alleged to be a fraudulent or otherwise avoidable transfer, and the court need not interpret any religious law or principles to make that determination, nor must it examine a decision of a religious organization or "tribunal" on whether or not the transfer was fraudulent. *Cf. Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 724–25 (1976). So, there is no intrachurch dispute at issue.

Moreover, it is unclear whether the intrachurch doctrine is even applicable where fraud is alleged:

> [T]his Court never has suggested that those ["intrachurch"] constraints similarly apply outside the context of such intraorganization disputes. … Such considerations are not applicable to purely secular disputes between third parties and a particular defendant, albeit a religious affiliated organization, in which fraud, breach of contract, and statutory violations are alleged.

*Gen. Council on Fin. & Admin. v. Cal. Superior Ct.*, 439 U.S. 1369, 1372–73 (1978) (Rehnquist, J., Circuit Justice, in cham-

bers); *see also Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 16 (1929) (examining the intrachurch doctrine and noting "the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights" might not be accepted in secular courts if "fraud" is found). The intrachurch doctrine is not applicable here.

## 2. Challenged Provisions Are of General and Neutral Applicability

Under the Free Exercise Clause, "neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2761 (2014) (quoting *City of Boerne v. Flores*, 521 U.S. 507, 514 (1997)); *see also Employment Div. v. Smith*, 494 U.S. 872, 879–80 (1990). A law is not neutral if it discriminates on its face by "refer[ring] to a religious practice without a secular meaning discernible from the language or context." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 533 (1993). Moreover, facial neutrality is not determinative since "[o]fficial action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." *Id.* at 534. We also look at whether the object of the law is a neutral one, examining both direct and circumstantial evidence. *Id.* at 540. In terms of general application, all laws are selective to some extent, but "categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice." *Id.* at 542. The Free Exercise Clause, at its heart, "protects religious observers against unequal treatment;" in other words, the government "cannot in a selective manner impose burdens only on conduct motivated by religious belief." *Id.* at 542–43

(alterations and quotations omitted). If a law is not of general and neutral applicability, we ask whether the law is justified by a compelling governmental interest that is narrowly tailored to advance that interest. *Id.* at 531–32.

There are four relevant sections of the Code at issue (the "Challenged Provisions"): (1) 11 U.S.C. § 541, which determines what the bankruptcy "estate is comprised of"; (2) 11 U.S.C. § 544, which sets forth voidable transfers, usually by looking at the state fraudulent transfer statutes, *In re Equip. Acquisition Res., Inc.,* 742 F.3d 743, 746 (7th Cir. 2014); (3) 11 U.S.C. § 547, which allows the trustee to avoid and set aside certain preferential transactions; and (4) 11 U.S.C. § 548, which relates to "fraudulent transfers and obligations." The provisions work together to establish the scope of the estate subject to the bankruptcy proceedings, *id.* § 541; by ensuring that no assets involved in transactions that are "voidable under" the state fraudulent transfer statute, *id.* § 544, "voidable" as preferential, *id.* § 547, or "fraudulent," *id.* § 548, escape inclusion in the estate. The purpose of the Bankruptcy Code's avoidance and turnover provisions "is to maximize the bankruptcy estate and thereby maximize the recovery for creditors." *Tort Claimants Comm. v. Roman Catholic Archbishop* (*In re Roman Catholic Archbishop*), 335 B.R. 842, 864 (Bankr. D. Or. 2005).

We find the Challenged Provisions are of general and neutral applicability. The Challenged Provisions and Code as a whole are generally applied to all entities with equal force—be it a church, synagogue, deli, bank, city or any other qualifying debtor. *See* 11 U.S.C. § 109 (defining "debtor" expansively). The Archdiocese does not challenge the general applicability, but instead contends the Challenged Pro-

visions are not neutral because three sections specifically carve out religious and charitable contributions from the reach of the estate. *See* 11 U.S.C. § 548(a)(2) ("A transfer of a charitable contribution to a qualified religious or charitable entity or organization" is subject to different avoidance considerations); 11 U.S.C. § 548(d)(4) (defining "qualified religious or charitable entity or organization" by cross-referencing the Internal Revenue Code); and 11 U.S.C. § 544(b)(2) (addressing same charitable contributions as § 548(a)(2)). The Archdiocese argues these provisions "refer[] to a religious practice without a secular meaning discernible from the language or context" and are therefore not neutral. *Lukumi*, 508 U.S. at 533–34.

The first problem with the Archdiocese's argument is that these provisions do not "prohibit[]" the practice of religion. *See* U.S. Const. amend. 1, cl. 1 ("Congress shall make no law … *prohibiting* the free exercise" of religion. (emphasis added)). Instead, they do the exact opposite and encourage religious practice by providing exceptions to avoidance for certain religious and charitable donations. A benefit to religion does not disfavor religion in violation of the Free Exercise Clause. *See Hernandez v. Comm'r*, 490 U.S. 680, 696 (1989) ("encouraging gifts to charitable entities, including but not limited to religious organizations—is neither to advance nor inhibit religion"); *see also Walz v. Tax Comm'n. of N.Y.*, 397 U.S. 664, 669 (1970) (finding exemptions like the Challenged Provisions are a type of "benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference").

The second problem with the Archdiocese's argument is that the Challenged Provisions do not single out only reli-

gious practice. Anyone, regardless of religion or beliefs, can donate money to a qualified religious or secular charitable organization under the Code and qualify for avoidance—no religion or religious practice required. *See Universal Church v. Geltzer*, 463 F.3d 218, 227–28 (2d Cir. 2006) (noting that "fraudulent conveyance provision applies equally to religious and non-religious entities, while allowing a limited safe harbor for any charitable contributions, so it neither advances nor inhibits religion"). That the Challenged Provisions have both secular and religious components make them consistent with the laws upheld in *Smith*: "every single case cited by the *Smith* Court [as a] 'valid and neutral law of general applicability' … involved laws encompassing *both* secular and religious conduct." *Cent. Rabbinical Cong. of the U.S. v. N.Y.C. Dep't. of Health*, 763 F.3d 183, 195 (2d Cir. 2014) (collecting cases). The Challenged Provisions are generally and neutrally applicable.

### 3. Compelling Governmental Interest in Challenged Provisions Is Narrowly Tailored To Achieve That Interest

Were we writing from a clean slate, that would be the end of our Free Exercise Clause analysis. We understand the Supreme Court to have stated that the *Smith* general and neutral applicability tests apply regardless of the strength of the burden imposed. In other words, a law of general and neutral applicability will be upheld whether it imposes a substantial or minimal burden. *Smith*, 494 U.S. at 878 ("It is a permissible reading of the [Free Exercise Clause] text … to say that if prohibiting the exercise of religion (or burdening the activity of printing) is not the object of the tax but merely the incidental effect of a generally applicable and otherwise

valid provision, the First Amendment has not been offended."). The very point of *Smith* is to avoid having courts "engage in a case-by-case assessment of the religious burdens imposed by facially constitutional laws." *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 424 (2006); *see also United States v. Ali*, 682 F.3d 705, 710 (8th Cir. 2012) ("[T]he district court evaluated [under RFRA] whether the order substantially burdened Ali's religious practices, although this would not be required in a standard First Amendment analysis."); *United States v. Hardman*, 297 F.3d 1116, 1126 (10th Cir. 2002) (en banc) (noting *Smith* held that a neutral and generally applicable law "need not be justified by a compelling interest even where religious practice is substantially burdened"). We read the Court's statement that a general and neutral law will be upheld even if it has the "incidental effect of burdening" religion to mean the law will be upheld as long as it only unintentionally burdens religion. *See, e.g., Lukumi*, 508 U.S. at 531. We do not take the Court's precedent to mean a law must be supported by a compelling interest that is narrowly tailored if it unintentionally imposes a substantial burden on religion. *See id.* at 562 (Souter, J., concurring) ("Distinguishing between laws whose 'object' is to prohibit religious exercise and those that prohibit religious exercise as an 'incidental effect,' *Smith* placed only the former within the reaches of the Free Exercise Clause; the latter, laws that satisfy formal neutrality, *Smith* would subject to no free-exercise scrutiny at all, even when they prohibit religious exercise in application.").

However, our circuit precedent includes a subsequent step after the *Smith* test, namely to consider whether a law "unduly burdens" the religious practice. If so, we revert back to the pre-*Smith* balancing test and ask whether the govern-

ment has a compelling interest that is narrowly tailored to advance that interest. *See Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 996 (7th Cir. 2006). The Committee has not asked us to overrule or reconsider *Vision Church*, so we proceed with the second step of its "two-fold" analysis.

Since no discovery was taken on the substantial burden issue, we accept as true that the Code's application to the Funds would substantially burden the Archbishop's religious beliefs without deciding the issue. So, we ask whether there is a compelling governmental interest in the Challenged Provisions that is narrowly tailored to advance that interest. Though there is no exact definition of a compelling interest, it is one "of the highest order" and is only found in "rare cases." *Lukumi*, 508 U.S. at 546 (internal quotation omitted). For example, the Court has found compelling interests in the tax system, *Hernandez*, 490 U.S. at 699, social security system, *United States v. Lee*, 455 U.S. 252, 258–59 (1982), and national security and public safety. *Gillette v. United States*, 401 U.S. 437, 462 (1971). But not all proffered justifications have met this high standard. *See, e.g., Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2825 (2011) (holding no compelling interest in "leveling the playing field" via election funding statute for Free Speech Clause purposes); *Sherbert v. Verner*, 374 U.S. 398, 407–09 (1963) (determining no compelling interest in dilution of employment compensation fund or employers' scheduling and finding eligibility provisions in unemployment statute unconstitutional as applied); *Koger v. Bryan*, 523 F.3d 789, 800 (7th Cir. 2008) (finding no compelling governmental interest in management of prison dietary department). Whether there is a compelling governmental interest depends on "a case-by-case determination of the question, sensitive to the

facts of each particular claim." *Gonzales*, 546 U.S. at 431 (quoting *Smith*, 494 U.S. at 899 (O'Connor, J., concurring in judgment)).

The Committee's asserted compelling governmental interest is the protection of creditors. We agree that this is a compelling governmental interest that can overcome a burden on the free exercise of religion.

We start with the history of the Code since the "long history of the very provision under discussion" contributes to our understanding of its importance. *Gillette*, 401 U.S. at 460. The Court has extensively analyzed the history of the Bankruptcy Clause in the Constitution, U.S. Const. art. 1, § 8, cl. 4, and its place in our nation. In *Central Virginia Community College v. Katz*, for example, the Court chronicled the history of the Bankruptcy Clause to 1649, noting that there was near unanimity to include the Bankruptcy Clause in the Constitution so that the federal government could address insolvency and discharging of debts with a uniform body of laws. 546 U.S. 356, 365–69 (2006). Further, the protection of creditors has always been important. *See, e.g.*, *In re River West Plaza-Chicago, LLC*, 664 F.3d 668, 671 (7th Cir. 2011) ("A central purpose of bankruptcy is to maximize creditor recovery.") The Court has noted that avoidance of preferential transfers has been "a core aspect of the administration of bankrupt estates since at least the 18th century." *Katz*, 546 U.S. at 372; *see also Cohen v. De La Cruz*, 523 U.S. 213, 221 (1998) ("The Bankruptcy Act of 1898 prohibited discharge of 'judgments in actions for frauds, or obtaining property by false pretenses or false representations'"); *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 540–41 (1994) (tracing history of fraudulent transfer laws to 1570); *Begier v. IRS*, 496 U.S. 53, 58 (1990)

(noting avoidance sections of the Code "further[]" the "central policy of the Bankruptcy Code" of "[e]quality of distribution among creditors"). The Code's importance in our nation's history is well-established.

The broad scope and remedial nature of the Code are akin to some of those interests the Court has held are compelling under this test, *e.g.*, the social security system. The social security system "serves the public interest by providing a comprehensive … system with a variety of benefits available to all participants" nationwide. *Lee*, 455 U.S. at 258. As with the social security system, the purpose of the Code is to provide a support system for those who need it. While the social security system aids those who have reached a certain age or are disabled, the Code aids those who have reached a certain financial condition and who need assistance repaying or recovering a debt. Both the Code and the social security system ensure the financial stability of the citizenry. *See also United States v. Whiting Pools*, 462 U.S. 198, 203 (1983) ("By permitting reorganization [through bankruptcy], Congress anticipated that the business would continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owners.").

These purposes, the history and the Court's words, convince us that there is a compelling interest in the Code, including the Challenged Provisions. *Cf. United States v. Crystal Evangelical Free Church (In re Young)*, 82 F.3d 1407, 1422–23 (8th Cir. 1996) (Bogue, J., dissenting) ("I agree with the district court's view that the bankruptcy code and § 548(a)(2)(A) furthers the compelling governmental interest in … protecting the interests of creditors by maximizing the debtor's estate."), *overruled on other grounds by Christians v. Crystal Evan-*

*gelical Free Church*, 521 U.S. 1114 (1997); *Morris v. Midway S. Baptist Church* (*In re Newman*), 183 B.R. 239, 251 (Bankr. D. Kan. 1995) (finding compelling interest in the Code); *In re Navarro*, 83 B.R. 348, 353 (Bankr. E.D. Pa. 1988) (same).

Indeed, there is also no doubting the significance of the Bankruptcy Code to the individuals who invoke it. One need not look any further than the Archdiocese's own purposeful availment of the Code. If the Code's functioning were not a significant interest, it is questionable that the Archdiocese would have subjected itself to this bankruptcy proceeding and the adversary action since there is a very serious danger, from the Archdiocese's perspective, that it could be compelled to make the Funds part of the Estate. But it has taken that risk because of the benefits the Code provides: "A Chapter 11 reorganization … enables the archdiocese to use available funds to compensate all victims/survivors with unresolved claims in a single process overseen by a court, ensuring that all are treated equitably. In addition, by serving as a final call for legal claims against the archdiocese, the proceeding will allow the Church to move forward on stable financial ground, focused on its Gospel mission." Archdiocese of Milwaukee, *Chapter 11 Reorganization: Original Statement* (Jan. 4, 2011), http://www.archmil.org/reorg.htm. The Archdiocese is not alone. In 2013, there were 1,071,932 bankruptcy filings in the United States, including nearly 9,000 Chapter 11 filings. *See United States Bankruptcy Courts–Business & Nonbusiness Cases Commenced*, http://www.uscourts.gov/uscourts/Statistics/BankruptcyStatistics/BankruptcyFilings/2013/1213_f2.pdf (last visited Mar. 5, 2015). The very scope and number of entities that avail themselves of the Code is a telling indicator of its importance. *See Lee*, 455 U.S. at 258

(noting that "[b]ecause the social security system is nation-wide, the governmental interest is apparent").

In this case, the importance of protecting the interests of the creditors is readily apparent. There were fifteen pages and hundreds of entries of accounts payables attached to the answer, each representing a vendor that requires the Code's functioning, as well as five additional pages of creditors holding unsecured nonpriority claims. *Cf. Andrews v. Riggs Nat'l Bank*, 80 F.3d 906, 909 (4th Cir. 1996) ("Section 541, like the Bankruptcy Code generally, has two overarching purposes: (1) providing protection for the creditors of the insolvent debtor and (2) permitting the debtor to carry on and rebuild ….").

In finding a compelling interest, we disagree with the Eighth Circuit's finding that the Code in general, and specifically 11 U.S.C. § 548(a)(2)(A)—which is not at issue in this litigation—do not present a compelling governmental interest. *See In re Young*, 82 F.3d at 1419–20. In *Young*, the Eighth Circuit held that the Code could not be applied to avoid certain tithes and make them part of the bankruptcy estate. *Id.* at 1420. It found, without explanation, that "bankruptcy is not comparable to national security or public safety," meaning the social security system in *Lee* and the Selective Service Act in *Gillette*, and that "protecting the interests of creditors is not comparable to the collection of revenue through the tax system or the fiscal integrity of the social security system." *Id.* at 1419. As discussed above, we see parallels between *Lee* and the Code that the Eighth Circuit did not discuss. Additionally, we find the Eighth Circuit's cursory analysis did not take into account the importance of the Code in Supreme Court precedent, our nation's history, or the effect

it has on debtors and creditors.[2] *See id.* at 1422–23 (Bogue, J., dissenting) ("It can be fairly said that our nation's economy depends extensively on the availability of credit to individuals and businesses. Bankruptcy is an extraordinary remedy for insolvent debtors and oftentimes harsh on creditors. One of the creditor's few protections are recovery statutes like section 548, which as of today includes a free exercise exception for religious giving in the year preceding filing for bankruptcy.").

We also find that the Challenged Provisions are narrowly tailored to achieve the interests of expanding the estate to pay creditors, thereby protecting their interests. We must look "beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Gonzales*, 546 U.S. at 431. The Committee argues the Challenged Provisions are narrowly tailored because their existence and application to all creditors is the only means possible to serve the ends of federal bankruptcy law. The Archdiocese argues that there are various exceptions that already limit the definition of estate, and so there could be another exception to adequately address the Archbishop's substantial burden. Under the Archdiocese's proffered exception, it would comply with the other provisions of the Code but not those that affect its religious practices. The Archdiocese's proposed course of action

---

[2] Because our decision creates a circuit split, this opinion has been circulated among all judges of this court in regular active service. No judge favored a rehearing *en banc* on the question of the government's compelling interest in the Bankruptcy Code. Circuit Judge Sykes took no part in the consideration of this case.

would allow it to avoid including what were allegedly preferential, avoidable and fraudulent amounts in the Estate.

This proffered exception would undermine the narrowly tailored purpose of the Code. First, as the Committee notes, such an exception would not serve the purpose of aiding creditors. In this case, for example, the creditors would have $55 million less available in the Estate. Moreover, if the allegations are true, the rule would favor a dishonest debtor at the creditors' expense. This would undermine the compelling interest of the Code by allowing a debtor who has made preferential, fraudulent and avoidable transfers to intentionally harm its creditors. *See also Grogan v. Garner*, 498 U.S. 279, 287 (1991) ("[W]e think it unlikely that Congress … would have favored the interest in giving perpetrators of fraud a fresh start over the interest in protecting victims of fraud, [*e.g.* the creditors].") (Again, we make no determination on the nature of the transfer here.)

Such an exception would also pose a logistical nightmare for the court, which would have to consider every provision in the Code, determine whether it affects the Archbishop's beliefs, and then act accordingly. Such an exception would also open up a religious affirmative defense beyond this case to all provisions of the Code, so long as that belief is sincerely held. The once-unified Code would become piecemeal in its application. But as with the tax code, the bankruptcy system "'could not function if denominations were allowed to challenge the [] system' on the ground that it operated 'in a manner that violates their religious belief.'" *Hernandez*, 490 U.S. at 699–700 (quoting *Lee*, 455 U.S. at 260); *see also Comm. of Tort Litigants v. Catholic Diocese of Spokane*, 329 B.R. 304, 324 n.5 (Bankr. E.D. Wash. 2005) ("Bankruptcy debtors who vol-

untarily choose to participate in that statutory scheme, even those of a religious nature, should not be able to 'pick and choose' among Code sections."); *Tort Claimants Comm.*, 335 B.R. at 853 n.9 (same). The mandatory and unified nature of the Code is just as important as the tax and social security systems once it has been initiated. Indeed, as Justice Stevens noted in his concurrence to *Lee*, "if tax exemptions were dispensed on religious grounds, every citizen would have an economic motivation to join the favored sects." 455 U.S. at 263 n.3 (Stevens, J., concurring). If an exemption to the Code was created in the name of religious beliefs, we can envision scenarios in which individuals would join religious sects to circumvent the Code, all in the name of religion, and gain an "economic advantage over" their secular competitors. *See Braunfeld v. Brown*, 366 U.S. 599, 608–09 (1961) (plurality opinion) (noting competitive advantage over competitors was reason not to carve out exception to law at issue).

The Archdiocese counters that Congress has already created exceptions to increasing the size of the Estate elsewhere in the Code, and so the court could do the same here to respect the Archbishop's beliefs. However, "[t]he fact that Congress has already crafted some deductions and exemptions in the Code also is of no consequence" to the possibility of crafting a further exception. *Hernandez*, 490 U.S. at 700 (quoting *Lee*, 455 U.S. at 261). Congress has intended the estate to be expansive so that the creditors can obtain maximum relief. *See* 5 Collier on Bankruptcy ¶ 541.01 (16th ed. 2014) (discussing "Congress's intent to define property of the estate in the broadest possible sense" since "[i]t would be hard to imagine language that would be more encompassing"). The Archdiocese's proposed narrowing would defeat

Congress's very purpose in defining "estate" broadly by shrinking its size with an unwritten exception.

The case for a religious exception is even weaker here than in *Lee* and *Hernandez*, since what the Archdiocese asks us to do is write in an exception for purported fraud. The Court has rejected the idea that fraudulent or improper actions can be excused in the name of religion: "Nothing we have said is intended even remotely to imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public. … Even the exercise of religion may be at some slight inconvenience in order that the State may protect its citizens from injury." *Cantwell v. Conn*, 310 U.S. 296, 306 (1940); *see also McDaniel*, 435 U.S. at 643 n.* (Stewart, J., concurring) ("[A]cts harmful to society should not be immune from proscription simply because the actor claims to be religiously inspired."); *Gonzalez*, 280 U.S. at 16 (noting fraud exception to intrachurch doctrine). We do not believe that there is, nor can there be, a religious exception that would allow a fraudulent conveyance in the name of free exercise. For these reasons, we find that the Challenged Provisions are of general and neutral applicability. Assuming the Archbishop's religious practice is substantially burdened, we find that there is a compelling interest in the application of the Challenged Provisions here that is narrowly tailored to achieve that interest.

Therefore, we reverse the grant of summary judgment in favor of the Archdiocese and the dismissal of the case, and grant the Committee's motion for summary judgment on Count III of the Archdiocese's complaint. Our decision does not resolve all the issues in the Archdiocese's complaint, nor do we make any finding as to whether the transfer of the

Funds to the Trust was fraudulent, avoidable, or preferential. Our holding today is limited to a determination that RFRA and the First Amendment do not prevent the application of the Challenged Provisions to the Funds. In other words, if the case reaches that stage, the adjudicator can consider the issue of whether the transfer of the Funds ran afoul of any of the Challenged Provisions without violating the Free Exercise Clause or RFRA.

### D. Recusal

Finally, the Committee appeals the denial of its motion for recusal, which it filed after the district court entered its summary judgment order. Because we have vacated the summary judgment order and the case shall be assigned to a new judge on remand, we need not reach the merits of the Committee's motion. However, because the case will be remanded, we briefly note recusal considerations. The Committee alleges that the judge had financial and other interests in the case and so recusal was required under 28 U.S.C. § 455(b). The Committee also argues that a reasonable person would "be deeply concerned about the state of his parents' and other close relatives' bodies and gravesites" and would believe these facts create an appearance of impropriety requiring recusal under 28 U.S.C. § 455(a).

The Archdiocese argues "if the basis for recusal is a matter of public record, as in this case, then the failure to seek recusal in a timely manner is inexcusable." But there is no such requirement—a party does not have an obligation to discover any potentially disqualifying information that is in the public record. The onus is on the judge to ensure any potentially disqualifying information is brought to the attention of the litigants. 28 U.S.C. § 455(c) ("A judge should in-

form himself about his personal and fiduciary financial interests."); *see also Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 873 n.9 (1988) ("[N]otwithstanding the size and complexity of the litigation, judges remain under a duty to stay informed of any personal or fiduciary financial interest they may have in cases over which they preside."). It would be unreasonable, unrealistic and detrimental to our judicial system to expect litigants to investigate every potentially disqualifying piece of information about every judge before whom they appear. "[L]itigants (and, of course, their attorneys) should assume the impartiality of the presiding judge, rather than pore through the judge's private affairs and financial matters. … 'Both litigants and counsel should be able to rely upon judges to comply with their own Canons of Ethics.'" *Am. Textile Mfrs. Inst., Inc. v. Limited, Inc.*, 190 F.3d 729, 742 (6th Cir. 1999) (quoting *Porter v. Singletary*, 49 F.3d 1483, 1489 (11th Cir. 1995)).

A judge should stay up to date on her financial and other interests so she can make informed decisions and avoid either the appearance of impropriety (28 U.S.C. § 455(a)) or actual bias (28 U.S.C. § 455(b)). The informed judge may then recuse herself on her own motion, if necessary. *See Hampton v. Chicago*, 643 F.2d 478, 480 n.7 (7th Cir. 1981) (per curiam) (noting district court "may disqualify himself on his own motion since, for example, he is probably best informed about his minor children's financial interests"). The informed judge can also disclose any concerns he might have so that the parties can proceed with full knowledge. 28 U.S.C. § 455(e) (noting "waiver may be accepted [under § 455(a)] provided it is preceded by a full disclosure on the record of the basis for disqualification"). Had that been done here, any purported timing issues or concerns that the Committee had

questionable motives in filing the motion would have re-
solved themselves earlier in the proceedings.

Under 28 U.S.C. § 455(a), a judge "shall disqualify him-
self in any proceeding in which his impartiality might rea-
sonably be questioned." Whether a judge's impartiality
might be reasonably questioned is an objective determina-
tion. *In re Hatcher*, 150 F.3d 631, 637 (7th Cir. 1998). The ques-
tion is whether a reasonable person could perceive "a signif-
icant risk that the judge will resolve the case on a basis other
than the merits." *Id.* (quoting *Hook v. McDade*, 89 F.3d 350,
354 (7th Cir. 1996)).

The Committee argues that a reasonable person would
question the judge's impartiality because he would be emo-
tionally attached to the well-being of his family members'
resting places. The Archdiocese argues that no reasonable
person would "make [that] leap in logic." We think it sur-
prising, given this litigation involves cemetery care and
strongly held beliefs about the same, that the Archdiocese
would give so little weight to the importance of where the
deceased are buried.

Many people strongly ritualize the way they honor the
departed, regardless of their faith, religion, or lack thereof.
As the Archbishop points out, "the care and maintenance of
Catholic cemeteries, cemetery property, and the remains of
those interred therein is a fundamental exercise of the Catho-
lic faith." No doubt we could go through and chronicle the
importance that graves and cemeteries have on many of the
world's major religions, or the importance they have on
secular practices, as well.

That importance is compounded by who was buried in the cemeteries here. The Judicial Code of Conduct specifically notes the problems that arise when the "judge or the judge's spouse, or a person related to either within the third degree of relationship" is "known by the judge to have an interest that could be substantially affected by the outcome of the proceeding." *Code of Conduct for United States Judges* Canon 3(C)(1)(d)(iii) (Mar. 20, 2014), *available at* http://www.uscourts.gov/uscourts/RulesAndPolicies/conduct/vol02a-ch02.pdf. Persons within the third degree are a "parent, child, grandparent, grandchild, great grandparent, great grandchild, sister, brother, aunt, uncle, niece, and nephew." *Id.* Canon 3(C)(3)(a). When one of the family members within the third degree is involved in the litigation, that should heighten the judge's awareness, raising the question of whether there is actual bias and, if not, whether the judge should disclose any information so that the parties can decide whether to proceed with full knowledge. *See* 28 U.S.C. § 455(e). Here, these were not distant relatives of the judge's—they were his parents (whose plots he personally bought), two sisters, an uncle, an aunt, his mother- and father-in-law, and his brother in-law, so nine relatives within the third degree. This was problematic.

Though the municipality can come in after one year and take control of the cemeteries if the owner is unable to, Wis. Stat. § 157.115(1)(b)(1), there is no assurance that will happen. Also, the municipality does not have an obligation to take control until five years have passed. *Id.* at (b)(2). A reasonable person might wonder whether the impartiality of a judge, secular or religious, could be affected by the possibility of the graves of nine close relatives falling into a state of disrepair. A lot can happen in one year, let alone five. The

image of the graves containing someone's father and mother crumbling is a powerful one indeed, regardless of one's beliefs, and could reasonably call into question a judge's impartiality. These are graves of close relatives and loved ones, and the judge was clearly concerned enough about their care that, at least in his parent's case, he bought their graves. People have been known to act differently when the care of their loved ones is, or might be, affected. This is why the Canons draw the third degree distinction. *Cf. Nichols v. Alley*, 71 F.3d 347, 352 (10th Cir. 1995) (finding reasonable person could question impartiality of judge whose chambers was affected by, and staff member and court personnel were injured by, bomb allegedly set off by defendant).

### III. CONCLUSION

For the foregoing reasons, we AFFIRM IN PART and REVERSE IN PART the judgment of the district court and REMAND for proceedings consistent with this opinion. Circuit Rule 36 shall apply on remand.

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

**CERTIFIED COPY**

A True Copy

Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

## FINAL JUDGMENT

March 9, 2015

Before:    JOEL M. FLAUM, Circuit Judge

ANN CLAIRE WILLIAMS, Circuit Judge

ROBERT M. DOW, District Court Judge*

| | |
|---|---|
| Nos. 13-2881. 13-3353 & 13-3495 | JEROME E. LISTECKI, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Truste, Plaintiff - Appellee v. OFFICAL COMMITTEE OF UNSECURED CREDITORS, Defendant - Appellant |
| **Originating Case Information:** | |
| District Court No: 2:13-cv-00179-RTR Eastern District of Wisconsin District Judge Rudolph T. Randa | |

The judgment of the District Court is AFFIRMED IN PART and REVERSED IN PART, and the appeal is REMANDED for further proceedings consistent with the opinion. Circuit Rule 36 shall apply on remand.

The above is in accordance with the decision of this court entered on this date. Costs are to be assessed against the appellee.

*Of the United States District Court for the Northern District of Illinois, sitting by designation.

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## BILL OF COSTS

March 31, 2015

Taxed in Favor of: **Appellant Official Committee of Unsecured Creditors ; Petitioner Official Committee of Unsecured Creditors ; Appellant Official Committee of Unsecured Creditors**

| No. 13-2881 | IN RE: ARCHDIOCESE OF MILWAUKEE, <br> Debtor <br><br> APPEAL OF: OFFICAL COMMITTEE OF UNSECURED CREDITORS |
|---|---|
| No. 13-3353 | IN RE: <br> OFFICIAL COMMITTEE OF UNSECURED CREDITORS, <br> Petitioner |
| No. 13-3495 | IN RE: <br> ARCHDIOCESE OF MILWAUKEE, <br> Debtor <br><br> APPEAL OF: OFFICIAL COMMITTEE OF UNSECURED CREDITORS |
| **Originating Case Information:** | |
| District Court No: 2:13-cv-00179-RTR <br> Eastern District of Wisconsin <br> District Judge Rudolph T. Randa | |
| **Originating Case Information:** | |
| District Court No: 2:13-cv-00179-RTR <br> Eastern District of Wisconsin <br> District Judge Rudolph T. Randa <br> Clerk/Agency Rep Jon W. Sanfilippo | |

The mandate or agency closing letter issued in this cause on March 31, 2015.

BILL OF COSTS issued in the amount of: $981.50.

|  |  | Cost of Each Item | Total Cost Each Item |
|---|---|---|---|
| 1. | For docketing a case on appeal or review or docketing any other proceeding: _____ | _____ | _____ |
| 2. | For reproduction of any record or paper, per page: _____ | _____ | _____ |
| 3. | For reproduction of briefs: _____ | _____ | $981.50 |
|  |  | TOTAL: | $981.50 |

form name: **c7_BillOfCosts**(form ID: **140**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

March 31, 2015

To:     Jon W. Sanfilippo
        UNITED STATES DISTRICT COURT
        Eastern District of Wisconsin
        Milwaukee , WI 53202-0000

| No. 13-2881 | IN RE: ARCHDIOCESE OF MILWAUKEE,<br>Debtor<br><br>APPEAL OF: OFFICAL COMMITTEE OF UNSECURED CREDITORS |
|---|---|
| No. 13-3353 | IN RE:<br>OFFICIAL COMMITTEE OF UNSECURED CREDITORS,<br>Petitioner |
| No. 13-3495 | IN RE:<br>ARCHDIOCESE OF MILWAUKEE,<br>Debtor<br><br>APPEAL OF: OFFICIAL COMMITTEE OF UNSECURED CREDITORS |
| **Originating Case Information:** | |
| District Court No: 2:13-cv-00179-RTR<br>Eastern District of Wisconsin<br>District Judge Rudolph T. Randa | |
| **Originating Case Information:** | |
| District Court No: 2:13-cv-00179-RTR<br>Eastern District of Wisconsin<br>District Judge Rudolph T. Randa<br>Clerk/Agency Rep Jon W. Sanfilippo | |

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

AMOUNT OF BILL OF COSTS (do not include the $):    981.50

DATE OF MANDATE OR AGENCY CLOSING LETTER ISSUANCE:    03/31/2015

RECORD ON APPEAL STATUS:    No record to be returned

**NOTE TO COUNSEL:**

If any physical and large documentary exhibits have been filed in the above-entitled cause, they are to be withdrawn ten (10) days from the date of this notice. Exhibits not withdrawn during this period will be disposed of.

Please acknowledge receipt of these documents on the enclosed copy of this notice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Received above mandate and record, if any, from the Clerk, U.S. Court of Appeals for the Seventh Circuit.

**Date:**                                        **Received by:**

_____03/31/15_____          _____s/Jelena Vekic_____

form name: **c7_Mandate**(form ID: **135**)